EXHIBIT 1

| | |
|---|---|
| **WALTERS RENWICK RICHARDS SKEENS & VAUGHAN, P.C.** | **PERKINS COIE, LLP** |

**WALTERS RENWICK RICHARDS
SKEENS & VAUGHAN, P.C.**
R. Frederick Walters, Esq.
Karen W. Renwick, Esq.
David M. Skeens, Esq.
Michael B. Sichter, Esq.
1100 Main, Suite 2500
Kansas City, Missouri 64105
(816) 421-6620 (Telephone)
(816) 421-4747 (Facsimile)
*Co-Lead Counsel for the Kessler Class*
*Counsel for the Mitchell Class*

**CARLSON LYNCH SWEET &
KILPELA, LLP**
R. Bruce Carlson, Esq.
Gary F. Lynch, Esq.
1133 Penn Avenue, 5th Floor
Pittsburgh, Pennsylvania 15222
(412) 322-9243 (Telephone)
(412) 231-0246 (Facsimile)
*Co-Lead Counsel for the Kessler Class*

**PERKINS COIE, LLP**
Selena J. Linde, Esq.
Vivek Chopra, Esq.
Alexis Danneman, Esq.
700 13th St. NW, Suite 600
Washington, DC 20005
Telephone (202) 654-6200
Facsimile (202) 654-9952
*Counsel for ResCap Liquidating Trust*

**POLSINELLI**
Daniel J. Flanigan, Esq.
Jason A. Nagi, Esq.
900 Third Avenue, 21st Floor
New York, New York 10022
(212) 684-0199 (Telephone)
(212) 759-8290 (Facsimile)
*Counsel for Kessler and Mitchell Classes*

**EXHIBIT
19
TO YALOWITZ
DECL.**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>RESIDENTIAL CAPITAL, LLC, *et al.*,<br><br>Debtors. | Case No. 12-12020<br><br>Chapter 11<br><br>Jointly Administered |
| ROWENA DRENNEN, FLORA GASKIN, ROGER TURNER, CHRISTIE TURNER, JOHN PICARD AND REBECCA PICARD, individually and as the representatives of the *KESSLER* SETTLEMENT CLASS,<br><br>STEVEN AND RUTH MITCHELL, individually and as the representatives of the *MITCHELL* SETTLEMENT CLASS,<br><br>and | Adv. Case No. 15-01025<br><br>**THIRD AMENDED ADVERSARY COMPLAINT** |

RESCAP LIQUIDATING TRUST,

                     Plaintiffs,

vs.

CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON,

and

TWIN CITY FIRE INSURANCE COMPANY,

and

CONTINENTAL CASUALTY COMPANY,

and

CLARENDON NATIONAL INSURANCE COMPANY,

and

SWISS RE INTERNATIONAL SE (F/K/A SR INTERNATIONAL BUSINESS INSURANCE COMPANY LTD.),

and

ACE BERMUDA INSURANCE LTD.,

and

XL INSURANCE (BERMUDA) LTD,

and

AMERICAN INTERNATIONAL REINSURANCE COMPANY (F/K/A STARR EXCESS LIABILITY INSURANCE INTERNATIONAL LIMITED),

and

CHUBB ATLANTIC INDEMNITY LTD.,

and

STEADFAST INSURANCE COMPANY,

and

ST. PAUL MERCURY INSURANCE COMPANY,

and

NORTH AMERICAN SPECIALTY INSURANCE COMPANY,

Defendants.

## <u>TABLE OF CONTENTS</u>

THIRD AMENDED ADVERSARY COMPLAINT ................................................. i

I.      NATURE OF ACTION AND RELIEF SOUGHT ........................................ 1

     A.    THE KESSLER ALLOWED CLAIM ............................................. 3

     B.    THE MITCHELL ALLOWED CLAIM ........................................... 3

     C.    THE RELATED MISSOURI ACTIONS ......................................... 4

     D.    REQUESTED RELIEF ............................................................. 5

II.      THE PARTIES AND POLICIES ........................................................... 7

     A.    THE PLAINTIFFS .................................................................. 7

     B.    THE DEFENDANTS ............................................................... 9

III.      PERSONAL JURISDICTION ............................................................. 13

     A.    DEFENDANTS LLOYD'S, TWIN CITY, CONTINENTAL, CLARENDON, ST. PAUL AND NORTH AMERICAN ........................................... 13

     B.    DEFENDANT SRI ................................................................ 14

     C.    DEFENDANT STEADFAST .................................................... 15

     D.    DEFENDANT THIRD EXCESS INSURERS ................................. 15

         1. Allegations Specific to Defendant ACE .................................. 19

         2. Allegations Specific to Defendant XL .................................... 21

         3. Allegations Specific to Defendant Starr ................................. 24

         4. Allegations Specific to Defendant Chubb ............................... 25

IV.      SUBJECT MATTER JURISDICTION AND VENUE .............................. 26

V.      BACKGROUND AND PROCEDURAL HISTORY ................................ 33

     A.    THE *KESSLER* CLAIM ......................................................... 33

     B.    THE *MITCHELL* CLAIM ....................................................... 41

     C.    THE RELATED MISSOURI ACTIONS ....................................... 44

     D.    THE CONFIRMED PLAN ...................................................... 46

VI.     RELEVANT PROVISIONS AND DEFINED TERMS IN THE PRIMARY
INSURANCE POLICY ................................................................................................ 48

VII.    THE CLAIMS OF THE *KESSLER* CLASS AND THE RESCAP LIQUIDATING
TRUST RELATED TO THE *KESSLER* CLAIM AND SETTLEMENT .................................... 49

  A.    COVERAGE UNDER THE TERMS OF THE PRIMARY INSURANCE
  POLICY ........................................................................................................ 49

  B.    THE DEFENDANT INSURERS' BREACH OF THE GM POLICIES ...................... 53

  C.    THE DEFENDANT INSURERS' BAD FAITH REFUSAL TO CONSENT TO
  A REASONABLE SETTLEMENT OF THE KESSLER CLAIM ........................................ 54

  D.    DEFENDANT INSURERS' BAD FAITH CONDUCT AND ADJUSTMENT OF
  RFC'S CLAIMS ............................................................................................ 56

  E.    CLAIMS .................................................................................................... 67

    1.  COUNT I:  Declaratory Relief For The *Kessler* Class – Payment for the *Kessler*
    Settlement ................................................................................................... 67

    2.  COUNT II:  Breach of Contract – The Kessler Class ................................................ 69

    3.  COUNT III:   Declaratory Relief For The Liquidating Trust – Payment for
    Defense Costs Relating To The Pennsylvania Actions, *Community Bank* MDL, and
    the *Kessler* Claim .......................................................................................... 69

    4.  COUNT IV: Breach of Contract – The Liquidating Trust - Failure to Pay Defense
    Costs Relating To The Pennsylvania Actions, *Community Bank* MDL, and the
    *Kessler* Claim ............................................................................................. 71

VIII.   THE *MITCHELL* CLASS AND RESCAP LIQUIDATING TRUST'S CLAIMS
RELATED TO THE *MITCHELL* ACTION AND SETTLEMENT ............................................ 72

  A.    COVERAGE UNDER THE TERMS OF THE PRIMARY INSURANCE
  POLICY ........................................................................................................ 72

  B.    CLAIMS .................................................................................................... 74

    1.  COUNT VI:   Declaratory Relief For The *Mitchell* Class – Payment for the
    *Mitchell* Settlement ........................................................................................ 74

    2.  COUNT VII: Breach of Contract – The *Mitchell* Class ........................................... 75

    3.  COUNT VIII:   Declaratory Relief For The Liquidating Trust – Payment for
    *Mitchell* Judgment and Defense Costs Relating To The *Mitchell* Action ....................... 76

4. COUNT IX: Breach of Contract – The Liquidating Trust - Failure to Pay the *Mitchell* Judgment and Defense Costs Relating To The *Mitchell* Action ....................... 78

IX.   THE RESCAP LIQUIDATING TRUST'S CLAIMS ARISING FROM DEFENSE AND SETTLEMENT OF THE RELATED MISSOURI ACTIONS .................................................... 79

A.   COVERAGE UNDER THE TERMS OF THE PRIMARY INSURANCE POLICY ......................................................................................................................... 79

B.   CLAIMS ....................................................................................................................... 81

1. COUNT X: Declaratory Relief For The Liquidating Trust – Payment for the Settlements in the Related Missouri Actions and Defense Costs Relating To The Related Missouri Actions .......................................................................................... 81

2. COUNT XI: Breach of Contract – The Liquidating Trust - Failure to Pay for the Settlements in the Related Missouri Actions and Defense Costs Relating To The Related Missouri Actions .......................................................................................... 82

X.   THE *PLAINTIFFS'* CLAIMS AGAINST LLOYD'S FOR BREACHING THE COVENANT OF GOOD FAITH AND FAIR DEALING ............................................................ 84

A.   COUNT XII: Lloyd's Breach of the Covenant of Good Faith and Fair Dealing for the Kessler Claim. ..................................................................................................... 84

B.   COUNT XIII: Lloyd's Breach of the Covenant of Good Faith and Fair Dealing for the Mitchell Claim and the Related Missouri Actions. ..................................... 90

## THIRD AMENDED ADVERSARY COMPLAINT

Plaintiffs Rowena Drennen, Flora Gaskin, Roger Turner, Christie Turner, John Picard and Rebecca Picard, individually, and as the representatives of the *Kessler* Settlement Class (the "*Kessler* Class"), along with Plaintiffs Steven and Ruth Mitchell, individually, and as the representatives of the *Mitchell* Settlement Class (the "*Mitchell* Class"), and the ResCap Liquidating Trust ("Liquidating Trust"), as successor to Residential Funding Company, LLC ("RFC") (collectively "Plaintiffs"), by and through their undersigned attorneys, bring this action for declaratory relief, breach of contract, and tortious and bad faith insurance claims handling against Defendants Certain Underwriting Members at Lloyd's of London ("Lloyd's"), Twin City Fire Insurance Company ("Twin City"), Continental Casualty Company ("Continental"), Clarendon National Insurance Company ("Clarendon"), Swiss Re International SE (f/k/a SR International Business Insurance Company Ltd.) ("SR"), ACE Bermuda Insurance Ltd ("ACE"), XL Insurance Bermuda ("XL"), American International Reinsurance Company (f/k/a Starr Excess Liability Insurance International Limited) ("Starr"), Chubb Atlantic Indemnity Ltd. ("Chubb"), Steadfast Insurance Company ("Steadfast"), St. Paul Mercury Insurance Company ("St. Paul") and North American Specialty Insurance Company ("North American"), (collectively the "Defendant Insurers").

In support of their Third Amended Adversary Complaint, Plaintiffs allege as follows:

## I.   NATURE OF ACTION AND RELIEF SOUGHT

1.      On May 14, 2012, due in part to pending litigation and claims by individual borrowers like the *Kessler* and *Mitchell* Classes, and the incurred liability in other actions, such as the Related Missouri Actions, RFC, together with two of its parent companies, Residential Capital, LLC ("ResCap") and GMAC Residential Holding Company, LLC ("GMAC Holding"), along with

numerous other affiliated entities, (collectively the "Debtors"), filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.

2.      This adversary action arises from the insurance policies issued by the Defendant Insurers and over a billion dollars in potential liabilities and losses incurred by RFC that were addressed and resolved by the Chapter 11 Plan approved by this Court to secure, at least in part, some relief for Plaintiffs and other creditors of RFC in the above-captioned bankruptcy case.  By the time the bankruptcy petition was filed in this case in May 2012, RFC had spent millions of dollars to defend and settle its liability, and still faced the possibility of over a billion dollars in additional liability, all from claims asserted by tens of thousands of second mortgage holders who were harmed by RFC's business practices.

3.      Starting in 2001, the first of several putative class actions against RFC and other defendants were filed on behalf of borrowers who had obtained second mortgage loans that were originated by entities other than RFC but later purchased and acquired by RFC on the secondary market.  At this time, and at all times prior to its bankruptcy, RFC was in the business of acquiring mortgage loans in the secondary market and securitizing those loans in its capacity as a financial services company.

4.      Prior to the petition date of this bankruptcy, the Defendant Insurers sold General Motors Corporation ("General Motors"), RFC's parent company, comprehensive insurance policies for millions of dollars in premiums (collectively, the "GM Policies") that covered the very type of liability that RFC faced in the class action lawsuits stemming from its business practices as a financial services company.  Despite adequate notice of these suits, and repeated efforts at cooperation by RFC, the Defendant Insurers failed to pay the majority of defense costs incurred by RFC and have never paid for RFC's liabilities stemming from these suits.

2

A.   **THE KESSLER ALLOWED CLAIM**

5.     On the petition date of this bankruptcy RFC was defending the claims of what would become the *Kessler* Class in a multidistrict proceeding styled as *In re Community Bank of Northern Virginia Second Mortgage Lending Practices Litigation*, MDL No. 1674, in the United States District Court for the Western District of Pennsylvania (the "*Community Bank* MDL").

6.     After the petition date of this bankruptcy, the class members in the *Community Bank* MDL became borrower-creditors in this case when they filed class proofs of claim in excess of $1.87 billion against RFC (the "*Kessler* Claim").

7.     As part of mediation ordered by this Court, and with the full awareness of Defendant Insurers, RFC and counsel for the *Kessler* Class ultimately negotiated a settlement of the *Kessler* Claim asserted in this bankruptcy proceeding for an unsecured allowed claim of $300 million (hereinafter referred to as the "*Kessler* Settlement" and/or the "*Kessler* Allowed Claim").

8.     Pursuant to the *Kessler* Settlement and the Chapter 11 Plan approved by this Court on December 11, 2013 (the "Plan"), RFC assigned to the *Kessler* Class certain rights under the GM Policies (the "GM Insurance Rights"), including the right to recover from the Defendant Insurers the $300 million *Kessler* Allowed Claim adjudicated by the Court.

9.     Also pursuant to the *Kessler* Settlement and Plan, the Liquidating Trust was assigned the right under the GM Policies to recover RFC's costs, charges and expenses in the amount of approximately $7.0 million incurred in the defense of the *Community Bank* MDL.

B.   **THE MITCHELL ALLOWED CLAIM**

10.     In January 2008, after a four-week trial, a jury returned a verdict against RFC and awarded damages in the amount of $99,651,115.00 in a case entitled *Mitchell v. Residential Funding Company, et al.*, Case No. 03-CV-220489-01, in the Circuit Court of Jackson County, Missouri (the "*Mitchell* Action"). The plaintiffs were Missouri borrowers who had secured second

mortgage loans that were later purchased and securitized by RFC. The award was affirmed in part on appeal, and the remaining claims of the *Mitchell* Class were remanded for a retrial. Prior to the petition date of this bankruptcy, RFC paid a total of $15,648,868.12 to satisfy the portion of the judgment and award of attorneys' fees in the *Mitchell* Action that was affirmed on appeal and related attorneys' fees incurred by plaintiffs on appeal, and entered into an agreement with the *Mitchell* Class to settle the remaining claims for $14.5 million (hereinafter referred to as the "*Mitchell* Settlement" and/or the "*Mitchell* Allowed Claim").

11.     Although the *Mitchell* Settlement was preliminarily approved by the trial court, the proceedings in the *Mitchell* Action were automatically stayed upon the petition date in this case and before final approval could be entered. After the petition date, the members of the *Mitchell* Class also became borrower-creditors in this action and pursuant to the Plan were given an unsecured allowed claim of $14.5 million and assigned RFC's right to recover the allowed claim from the Defendant Insurers. Also pursuant to the Plan, the Liquidating Trust was assigned RFC's right to recover from the Defendant Insurers the unpaid costs, charges and expenses incurred by RFC in the defense of the *Mitchell* Action, approximately $6.1 million, as well as RFC's rights to payment for the $15.6 million it had already paid to the *Mitchell* Class pursuant to the judgment referenced above.

### C.     THE RELATED MISSOURI ACTIONS

12.     In 2010, subsequent to the trial of the *Mitchell* Action, RFC settled other claims asserted by Missouri borrowers who had obtained second mortgage loans and subsequently asserted claims against RFC in six class action lawsuits that were then proceeding in both Missouri state court and the United States District Court for the Western District of Missouri (the "Related Missouri Actions"). RFC ultimately paid $8.5 million to settle the Related Missouri Actions and incurred approximately $4.7 million in costs, charges and expenses in defending against the

4

Related Missouri Actions.  Pursuant to the Plan, the Liquidating Trust was assigned all of RFC's rights to recover those settlement amounts and costs, charges and expenses from the Defendant Insurers.

D.    **REQUESTED RELIEF**

13.    Since 2001 and at all times thereafter, the Defendant Insurers were apprised and kept fully informed of the underlying second mortgage loan actions, the proceedings in this case, the court ordered mediation, the negotiations that led to the *Kessler* Settlement and a Plan Support Agreement, the proposed Chapter 11 Plan, and the later confirmed Plan.

14.    Despite numerous invitations through correspondence, conference calls and an in-person meeting to participate and review proposed settlement terms, the Defendant Insurers refused, further breaching their polices.

15.    This adversary action is for the benefit of creditors of RFC and seeks relief for the Defendant Insurers' repeated breaches of the GM Policies with respect to the second mortgage claims asserted against RFC as follows:

16.    With respect to the *Kessler* Claim, Plaintiffs seek the following relief:

a)    Pursuant to 28 U.S.C. § 2201, a declaration that the Defendant Insurers are obligated under the GM Policies (more fully described herein) to (1) provide coverage for RFC's legal liability in connection with the *Kessler* Claim, including sums owed to the *Kessler* Class pursuant to the Court-approved *Kessler* Settlement; and (2) pay timely the Liquidating Trust for costs incurred in defense of the *Kessler* Claim; and

b)    Damages resulting from the Defendant Insurers' breaches of the contractual obligations set forth in the GM Policies, including the Defendant Insurers' refusal to: (1) provide coverage for RFC's legal liability in connection with

5

the sums owed to the *Kessler* Class pursuant to the *Kessler* Settlement; and (2) pay timely the reasonable defense costs incurred by RFC in defense of the *Kessler* Claim.

17.    With respect to the *Mitchell* Action, Plaintiffs seek the following relief:

a)    Pursuant to 28 U.S.C. § 2201, a declaration that the Defendant Insurers are obligated under the GM Policies to: (1) provide coverage for RFC's legal liability in connection with the *Mitchell* Action, including amounts already paid to satisfy a partial judgment in the *Mitchell* Action and sums owed the *Mitchell* Class pursuant to the court-approved *Mitchell* Settlement resolving the matter; and (2) to pay timely the Liquidating Trust for all costs incurred in defense of the *Mitchell* Action; and

b)    Damages resulting from the Defendant Insurers' breaches of the contractual obligations set forth in the GM Policies, including the Defendant Insurers' refusal to: (1) pay RFC for the amounts paid in connection with the *Mitchell* judgment; (2) provide coverage for RFC's legal liability in connection with the sums owed to the *Mitchell* Class pursuant to the *Mitchell* Settlement; and (3) pay timely all of the reasonable costs incurred by RFC in defense of the *Mitchell* Action.

18.    With respect to the Related Missouri Actions, Plaintiffs seek the following relief:

a)    Pursuant to 28 U.S.C. § 2201, a declaration that the Defendant Insurers are obligated under the GM Policies to (1) provide coverage for RFC's legal liability in connection with the Related Missouri Actions, including amounts paid in the settlements of the Related Missouri Actions; and (2) to

6

pay timely the Liquidating Trust for costs incurred in defense of the Related Missouri Actions; and

b)      Damages resulting from the Defendant Insurers' breaches of the contractual obligations set forth in the GM Policies, including the Defendant Insurers' refusal to: (1) provide coverage for RFC's legal liability in connection with the amounts RFC paid in the settlements of the Related Missouri Actions and (2) pay timely the reasonable costs incurred by RFC in defense of the Related Missouri Actions.

## II.      THE PARTIES AND POLICIES

### A.      THE PLAINTIFFS

19.     The Plaintiff *Kessler* Class is a certified settlement class defined as:

All persons who obtained a second or subordinate, residential, federally related, non-purchase money, HOEPA qualifying mortgage loan from Community Bank of Northern Virginia ("CBNV") or Guaranty National Bank of Tallahassee ("GNBT"), that was secured by residential real property used as their principal dwelling and that was assigned to GMAC-Residential Funding Corporation n/k/a Residential Funding Company, LLC who was not a member of the class certified in the action captioned *Baxter v. Guaranty National Bank, et al.,* Case No. 01-CVS-009168 in the General Court of Justice, Superior Court Division of Wake County, North Carolina.

20.     The *Kessler* Class was certified on November 27, 2013 by this Court as a part of this case.  The *Kessler* Class was certified by this Court in New York and one or more members of the *Kessler* Class are residents of New York.  One or more of the *Kessler* Class representatives are citizens of Missouri, Pennsylvania, and Alabama.

21.     The Plaintiff *Mitchell* Class is a certified settlement class defined as:

All persons who, on or after July 29, 1997, obtained a "Second Mortgage Loan" as defined by § 408.231.1 RSMo, from Mortgage Capital Resource Corporation ("MCR"), on real property located in Missouri that was purchased by, assigned to and/or serviced and/or master serviced by Residential Funding Company, LLC (f/k/a Residential Funding Corporation), and who did not timely exclude

7

themselves from the litigation class that the Court certified in the Litigation on December 8, 2006.

22.     The *Mitchell* Class was preliminarily approved and certified on April 16, 2012 by the Circuit Court of Jackson County, Missouri in *Mitchell v. Residential Funding Corp.*, Case No. 03-CV-220489-01.  By Order dated December 17, 2013 this Court granted approval of the *Mitchell* Settlement and, as a condition for final confirmation of the Plan, permitted the Circuit Court of Jackson County, Missouri to proceed with Final Approval.  The Circuit Court of Jackson County, Missouri then granted final approval of the *Mitchell* Settlement and final certification of the *Mitchell* Class was made by court order on January 14, 2014.  The representatives of the *Mitchell* Class are residents of Missouri.

23.     Plaintiff Liquidating Trust is a Delaware statutory trust created pursuant to the ResCap Chapter 11 Plan, established for the purpose of liquidating and distributing assets to creditors in this bankruptcy case.  Plaintiff Liquidating Trust has one or more trustees that is a citizen of New York.

24.     Upon information and belief, on or before the inception of the GM Policies and/or before the end of the Policy Period, RFC (formerly known as Residential Funding Corporation, a Delaware corporation) was a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota and was authorized to do business in New York.  At that time, RFC was a wholly owned subsidiary of GMAC-RFC Holding Company, LLC (successor by merger to GMAC-RFC Holding Corp., a Michigan corporation), a Delaware limited liability company.  GMAC-RFC Holding Company, LLC was a wholly owned subsidiary of Residential Capital, LLC (formerly known as Residential Capital Corporation, a Delaware corporation), a Delaware limited liability company. Residential Capital, LLC was a wholly owned subsidiary of GMAC Mortgage Group LLC, a Delaware limited liability company, which in turn was a wholly

owned subsidiary of Ally Financial Inc. (formerly known as GMAC, Inc.), a Delaware corporation with its principal place of business in Michigan. Pursuant to the Plan, on December 17, 2013, GMAC-RFC Holding Company, LLC's interest in RFC was cancelled and the Liquidating Trust succeeded to all of RFC's rights and interest, including the insurance rights under the GM Policies described herein.

### B. **THE DEFENDANTS**

25. Defendant Lloyd's are the Lloyd's Syndicates that issued policy numbers FD0001142 ("Primary Policy") and FD0001144 (excess follow form policy) to General Motors.

26. Upon information and belief, Defendant Lloyd's is domiciled in England and is authorized to do business in the State of New York. Upon information and belief, a non-exclusive list of some, but perhaps not all, of the Lloyd's Syndicates that participated in policy numbers FD0001142 and/or FD0001144 include Syndicate Numbers 01212, 02488, 00205, 1007, 00079, 00250, 02020, 01047, and 00456 (collectively "Lloyds").

27. Defendant Twin City issued policy number NDA 0200454-00 to General Motors. Upon information and belief, Defendant Twin City is an Indiana corporation with its principal place of business in Hartford, Connecticut. Defendant Twin City is authorized to do business in the State of New York.

28. Defendant Continental issued policy number DOX 169737324 to General Motors. Upon information and belief, Defendant Continental is an Illinois corporation with its principal place of business in Chicago, Illinois. Defendant Continental is authorized to do business in the State of New York.

29. Defendant Clarendon issued policy number MAG 14 400436 50000 to General Motors. Upon information and belief, Defendant Clarendon is a New Jersey corporation with its principal place of business in New Jersey. Defendant Clarendon is authorized to do business in

9

the State of New York.

30.     Defendant SR issued policy number MP 27049.1 to General Motors.  Upon information and belief, Defendant SR is a Swiss corporation with its principal place of business in Zurich, Switzerland and an unauthorized, foreign or alien insurer under New York Insurance Law § 1213.

31.     Defendant ACE issued policy number GM-9384D to General Motors.  Upon information and belief, Defendant ACE is a Bermuda corporation with its principal place of business in Hamilton, Bermuda and an unauthorized, foreign or alien insurer under New York Insurance Law § 1213.

32.     Defendant XL issued policy number XLE+O-039290 to General Motors.  Upon information and belief, Defendant XL is a Bermuda corporation with its principal place of business in Hamilton, Bermuda and an unauthorized, foreign or alien insurer under New York Insurance Law § 1213.

33.     Defendant Starr issued policy number 6457606 to General Motors.  Upon information and belief, Defendant Starr is a Bermuda corporation with its principal place of business in Hamilton, Bermuda and an unauthorized, foreign or alien insurer under New York Insurance Law § 1213.

34.     Defendant Chubb issued policy number (03)3310-10-90 to General Motors.  Upon information and belief, Defendant Chubb is a Bermuda corporation with its principal place of business in Pembroke, Bermuda and an unauthorized, foreign or alien insurer under New York Insurance Law § 1213.

35.     Defendant Steadfast issued policy number IPR 2185703-00 to General Motors.  Upon information and belief, Defendant Steadfast is a Delaware corporation with its principal

place of business in Illinois and an unauthorized foreign or alien insurer under New York Insurance Law § 1213.

36.      Defendant St. Paul issued policy number 0512CM0406 to General Motors.  Upon information and belief, Defendant St. Paul is a Connecticut corporation with its principal place of business in Hartford, Connecticut.  Defendant St. Paul is authorized to do business in the State of New York.

37.      Defendant North American issued policy number BNX 0000337-0 to General Motors. Upon information and belief, Defendant North American is a New Hampshire corporation with its principal place of business in Manchester, New Hampshire.  Defendant North American is authorized to do business in the State of New York.

### C.      THE INSURANCE POLICIES THAT DEFENDANTS SOLD TO GENERAL MOTORS

38.      Defendant Lloyd's sold General Motors a Combined Directors and Officers Liability and Company Liability, Errors and Omissions Liability, Pension Trust Liability, and Mortgagees Errors and Omissions Insurance Policy, Certificate No. 823/FD0001142, issued on a claims-made basis for the period December 15, 2000 to December 15, 2003, with $50 million per claim and in the aggregate limits and a $5 million per claim retention (the "Primary Policy").

39.       At the time the policies were issued and/or delivered to General Motors and at all material times, General Motors was authorized to do business in the State of New York.  At the time the policies were issued and/or delivered to General Motors and at all material times, its subsidiary and the debtor, RFC, also was authorized to do business in the State of New York.

40.      The other Defendant Insurers (collectively the "Excess Insurers") sold General Motors excess "follow form" insurance policies that incorporate the terms and conditions of the Primary Policy, and in some instances add additional terms and conditions to the coverage they

provide (the "Excess Policies"). These Excess Policies provide an additional $350 million of coverage in excess of the $50 million in coverage provided by the Primary Policy.

41.     The Defendant Excess Insurers participating in the first $50 million of excess coverage (the "First Excess"), in excess of the $50 million Primary Policy, provide coverage as follows:

    a)     Twin City - $20 million part of $50 million;

    b)     Lloyd's - $10 million part of $50 million;

    c)     Continental - $10 million part of $50 million; and

    d)     Clarendon - $10 million part of $50 million.

42.     The Defendant Excess Insurer SR provides coverage for the entire $100 million of excess coverage (the "Second Excess") in excess of the $50 million Primary Policy and the $50 million First Excess.

43.     The Defendant Excess Insurers participating in the third $100 million of excess coverage (the "Third Excess") provide coverage, in excess of the $50 million Primary Policy, the $50 million First Excess and $100 million Second Excess, as follows:

    a)     ACE - $25 million part of $100 million;

    b)     XL - $25 million part of $100 million;

    c)     Starr - $25 million part of $100 million; and

    d)     Chubb - $25 million part of $100 million.

44.     The Defendant Excess Insurers participating in the fourth $100 million of excess coverage (the "Fourth Excess") provide coverage, in excess of the $50 million Primary Policy, the $50 million First Excess, the $100 million Second Excess, and the $100 million Third Excess, as follows:

a)      Steadfast - $50 million part of $100 million;

b)      St. Paul - $25 million part of $100 million; and

c)      North American - $25 million part of $100 million.

## III.   PERSONAL JURISDICTION

45.     The Court has jurisdiction over the Defendant Insurers pursuant to Federal Rules of Bankruptcy Procedure, Rule 7004, New York Insurance Law §§ 1101, 1212 and 1213, CPLR §§ 301 and 302, and/or pursuant to the provisions of the GM Policies.

46.     In addition, each of the Defendant Insurers has purposefully availed itself of the privilege of conducting business in New York and the United States and could reasonably anticipate and/or foresee being haled into this Court.

### A.   DEFENDANTS LLOYD'S, TWIN CITY, CONTINENTAL, CLARENDON, ST. PAUL AND NORTH AMERICAN.

47.     Pursuant to General Endorsement Number 3 in the Primary Policy, Lloyd's submits to the jurisdiction of this Court and has designated the Superintendent of the New York State Department of Financial Services as its lawful attorney upon which it may be served with process in this action.  Twin City, Continental, Clarendon, St. Paul and North American, pursuant to their respective follow form policies, have adopted General Endorsement Number 3 in the Primary Policy and thereby submit to the jurisdiction of this Court and have designated the Superintendent of the New York State Department of Financial Services as their lawful attorney upon which they may be served with process in this action.

48.     In addition Defendants Lloyd's, Twin City, Continental, Clarendon, St. Paul and North American are all authorized to do business in the State of New York and at all material times herein were conducting an insurance business in the State of New York, delivering and/or issuing insurance policies to residents of New York or to businesses authorized to do business in New

York, and transacting business and/or contracting to supply services in New York, all within the meaning of New York Insurance Law §§ 1101 and  1212 and CPLR §§ 301 and 302 including, without limitation, in the following respects:

      a)    the delivery and/or issuance of their respective GM Policies to General Motors, a corporation authorized to do business in the State of New York;

      b)    their respective GM Policies insured certain subsidiaries of General Motors, such as RFC, that were also authorized to do business in the State of New York; and

      c)    their respective GM Policies insured one or more subsidiaries of General Motors that were incorporated and/or based in the State of New York, including but not limited to GMAC Commercial Credit, LLC.

## B.    **DEFENDANT SRI**

49.    Pursuant to Endorsement No. 2 of policy number MP 27049.1, SR submits to the jurisdiction of this Court and has designated the Superintendent of the New York State Department of Financial Services as its lawful attorney upon which it may be served with process in this action.

50.    In addition, and at all times material herein, Defendant SR was conducting an insurance business in the State of New York, delivering and/or issuing insurance policies to residents of New York or to businesses authorized to do business in New York, and transacting business and/or contracting to supply services in New York, all within the meaning of New York Insurance Law § 1101 and § 1213 and CPLR §§ 301 and 302, including, without limitation, in the following respects:

      a)    Defendant SR delivered and/or issued its contract of insurance to General Motors, a corporation authorized to do business in the State of New York;

      b)    The SR Policy insured certain subsidiaries of General Motors, such as RFC,

that were also authorized to do business in the State of New York; and

    c)    The SR Policy insured one or more subsidiaries of General Motors that were incorporated and/or based in the State of New York, including but not limited to GMAC Commercial Credit, LLC.

## C.    DEFENDANT STEADFAST

51.    Pursuant to Section N of policy number IPR 2185703-00 Steadfast submits to the jurisdiction of this Court and has designated the Superintendent of the New York State Department of Financial Services as its lawful attorney upon which it may be served with process in this action.

52.    In addition, and at all times material herein, Defendant Steadfast was conducting an insurance business in the State of New York, delivering and/or issuing insurance policies to residents of New York or to businesses authorized to do business in New York, and transacting business and/or contracting to supply services in New York, all within the meaning of New York Insurance Law § 1101 and § 1213 and CPLR §§ 301 and 302, including, without limitation, in the following respects:

    a)    Defendant Steadfast delivered and/or issued its contract of insurance to General Motors, a corporation authorized to do business in the State of New York;

    b)    The Steadfast Policy insured certain subsidiaries of General Motors, such as RFC, that were also authorized to do business in the State of New York; and

    c)    The Steadfast Policy insured one or more subsidiaries of General Motors that were incorporated and/or based in the State of New York, including but not limited to GMAC Commercial Credit, LLC.

## D.    DEFENDANT THIRD EXCESS INSURERS

53. At all times material herein, the four Defendant Insurers that issued the Third Excess policies, specifically Defendants ACE, XL, Starr and Chubb (collectively, the "Third Excess Insurers") were conducting an insurance business in the State of New York, delivering and/or issuing insurance policies to residents of New York or to businesses authorized to do business in New York, and transacting business and/or contracting to supply services in New York, all within the meaning of New York Insurance Law § 1101 and § 1213 and CPLR §§ 301 and 302, including, without limitation, in the following respects:

a) The Third Excess Insurers delivered and/or issued its contract of insurance to General Motors, a corporation authorized to do business in the State of New York;

b) The Third Excess Policies insured certain subsidiaries of General Motors, such as RFC, that were also authorized to do business in the State of New York; and

c) The Third Excess Policies insured one or more subsidiaries of General Motors that were incorporated and/or based in the State of New York, including but not limited to GMAC Commercial Credit, LLC.

54. Moreover, the Third Excess Insurers have sufficient contacts with the State of New York and the United States as a whole such that it would be reasonable for the Court to exercise jurisdiction over the Third Excess Insurers in that:

a) The Third Excess Policies insured risks throughout the United States including New York. Therefore, the Third Excess Insurers had knowledge and an expectation that claims would be asserted against their Assureds in the State of New York, including the *Kessler* and *Mitchell* Claims.

16

b)    The Third Excess Policies created a substantial and long term relationship between the Third Excess Insurers and General Motors and its subsidiaries, including RFC, that has lasted for over 15 years.

c)    The Third Excess Insurers received premiums paid by General Motors from the U.S. in the amount of $1.125 million to each Third Excess Insurer in exchange for excess coverage under the Third Excess Policies in the amount of $25 million each.

d)    The Third Excess Insurers' breach of its respective Policies, as described herein, occurred in New York where, among other things, 1) the Plan was confirmed triggering the Third Excess Insurers' obligation to pay; 2) the Third Excess Insurers unreasonably withheld their consent to the *Kessler* Settlement that was also negotiated, resolved and ultimately approved in New York; and 3) the Third Excess Insurers refused to honor their obligations to pay the *Kessler* Settlement under their respective Policies.

e)    The Third Excess Insurers' breach with respect to the *Mitchell* Settlement, as described herein, also occurred in New York where the *Mitchell* Allowed Claim was negotiated, resolved and ultimately approved.

f)    The Third Excess Insurers, over a period of years leading up to the filing of this action, directly or through agents or other representatives, performed numerous acts in New York and the United States necessary for the investigation, evaluation, adjustment, settlement, assessment of coverage, and other claims handling activities for such underlying claims.  These acts included but are not limited to repeated and numerous communications,

written and oral, in person and by telephone and/or conference call, to and from representatives of the Debtors as well as representatives of the other Defendant Insurers, almost all of whom were located in New York and/or the United States as a whole. The Third Excess Insurers also directed that communications with Bermuda based brokers be forwarded to its Assured in the United States with the purpose and intent that such communications be given to its Assured in the United States. The content of the communications and the corresponding responses to those communications include, without limitation, claim notifications, coverage positions, case evaluations, case status, case settlement discussions, mediations, requests for information and responses to those requests for information.

g) The Third Excess Insurers retained U.S. counsel and other agents to communicate on its behalf with RFC and the others Debtors and to assist with and perform numerous acts in New York and the United States necessary for the investigation, evaluation, adjustment, settlement, assessment of coverage, and other claims handling activities and otherwise fulfill the Third Excess Insurers' obligations to RFC under their respective Policies.

h) As part of their claims handing activities, the Third Excess Insurers solicited and received information in New York and/or the United States with respect to the Debtors, and the claims asserted against the Debtors, for the purpose of investigating, evaluating, adjusting, settling, and assessing coverage for the claims asserted against the Debtors.

     i)     The Third Excess Insurers (along with the other Defendant Insurers) attended, through their respective agents, an all-day meeting in Washington D.C. on or about June 14, 2013 with representatives of the Debtors to discuss case evaluation, risks, case history, and ultimate resolution of the *Kessler* Claim.

     j)     The Third Excess Insurers used law firms, affiliated entities and/or other agents to carry out their obligations under their respective Third Excess Policies with respect to their claims handling activities, including but not limited to, investigating, evaluating, adjusting, settling, assessing coverage for the claim, and performing other obligations arising from the underlying claims described herein.  Such activities were done on behalf of the Third Excess Insurers with their knowledge, consent and authorization, and consisted of activities that the Third Excess Insurers would have performed had they themselves been present in New York and/or the United States.

**1. Allegations Specific to Defendant ACE**

55.    Pursuant to its follow form policy Defendant ACE has adopted General Endorsement Number 3 in the primary policy and Endorsement No. 2 of the SR excess policy, and therefore submits to the jurisdiction of this Court and designates the Superintendent of the New York State Department of Financial Services as its lawful attorney upon which it may be served with process in this action.

56.    The ACE Policy contains a provision that it shall be governed by and construed and enforced in accordance with the internal laws of the State of New York.

57.    Upon information and belief, and based upon Defendant ACE's own participation

in the GM Policies and upon financial statements filed by Defendant ACE and its affiliated entities, as well as based upon Defendant ACE's involvement in various lawsuits throughout the United States, Defendant ACE has issued many other similar excess policies to U.S. policyholders, earned millions of dollars from premiums paid by its U.S. policyholders, has continuing relationships with U.S. policyholders, and/or may be soliciting additional business in the U.S.

58. Defendant ACE is a subsidiary of ACE Ltd., which is a Swiss Corporation listed on the New York stock exchange and is a component of the S&P 500 stock index. Ace, Ltd. maintains offices in the United States, including New York, and employs over 20,000 in the United States and worldwide. According to its website, Ace, Ltd. wrote nearly $23 billion of gross written premiums in 2013, and its core operating insurance companies, including Defendant ACE, maintained financial strength ratings of AA- (Very Strong) from Standard & Poor's and A+ (Superior) from A.M. Best.

59. Also according to its website, Defendant ACE's business model specifically focuses on Fortune 1000 companies in the United States and targets risks that are generally low in frequency and high in severity, and that includes the type of class action litigation that is involved in this proceeding.

60. Upon information and belief, Defendant ACE's underwriters transact underwriting business in the United States, including but not limited to working directly with U.S. based brokers, visiting insured facilities in the United States, and attendance at industry meetings and conferences. Upon information and belief, Defendant ACE's claims handling representatives and their agents transact claims handling activities in the United States, including visits to insured facilities and negotiations with United States based insureds and their representatives.

61. Further, in order to comply with the recently enacted Foreign Account Tax

Compliance Act and its compliance deadlines of January 2014, Defendant ACE has provided an IRS Form W-8BEN-E form on its website for use by United States taxpayers to complete to evidence their business with foreign entities and financial institutions, such as Defendant ACE. Under FATCA, any U.S. taxpayer that has non product related transactions with a foreign entity ("FE") must receive a completed Form W-8BEN-E from that FE to determine if the FE is subject to the default 30 percent withholding on payments to FEs or if is the FE is eligible for any reduced withholdings related to an applicable treaty. According to its Form W-8BEN-E Defendant ACE has a United States Federal Tax Identification Number 98-0090151.

62.     Defendant ACE has a number of Executives who are attorneys and who maintain current active licensure with the New York and New Jersey State Bar, including its corporate counsel.

63.     Defendant ACE retained the United States law firm, Bailey Cavalieri, LLC, of Columbus, Ohio, to carry out their obligations under the ACE Policy with respect to the adjustment, evaluation, investigation of possible coverage and all other obligations arising from the underlying claims described herein. Such activities were done on behalf of ACE with its knowledge, consent and authorization, and consisted of activities that ACE would have performed had it been present in New York and/or the United States.

**2.  Allegations Specific to Defendant XL**

64.     The XL Policy contains a provision that it shall be governed by and construed and enforced in accordance with the internal laws of the State of New York.

65.     Upon information and belief, Defendant XL has issued many other similar excess policies to U.S. policyholders, earned millions of dollars from premiums paid by its U.S. policyholders, has continuing relationships with U.S. policyholders, and/or may be soliciting

additional business in the U.S.  Specifically, upon information and belief, and Defendant XL has well in excess of 600 insureds in the United States under similar excess insurance policies of between $25 million and $100 million, collects millions of dollars in premiums on an annual basis, and that those United States based insureds represent 90 percent of Defendant XL's total insureds worldwide.

66.    According to Defendant XL's Consolidated Financial Statements for the Years Ended December 31, 2013 and 2012, filed with the Bermuda Monetary Authority, Defendant XL had over $15 billion in invested assets held in trust and pledged in support of insurance and reinsurance liabilities for the purposes of satisfying U.S. state insurance regulations.

67.    Defendant XL's 2012 and 2013 financial statements stated that Defendant XL maintains a defined benefit plan that covers "a number of U.S. employees" and that the fair value of the U.S. Plan on December 31, 2013 was $36.4 million.

68.    Defendant XL's 2012 and 2013 financial statements stated that in 2010 Defendant XL "revised its capital strategy" such that its earnings arising in the U.S. will no longer be permanently reinvested in the U.S. and therefore "a provision for withholding taxes arising in respect of U.S. earnings has been made."

69.    Defendant XL is a subsidiary of XL Group plc, which is headquartered in Dublin, Ireland, which is listed on the New York stock exchange and that maintains offices in the United States, including New York.  According to its website, XL Group has over 4,000 employees in 60 offices located in 24 countries, including the United States.

70.    Defendant XL is a parent to numerous subsidiaries that are headquartered in the United States including, among others, X.L. America, Inc. (Delaware) and XL Reinsurance America, Inc. (New York), XL Insurance Company of New York, Inc. (New York) and numerous

others within the United States that are headquartered or incorporated in various states such as Delaware, New York, Texas, Oklahoma, North Dakota. These subsidiaries of Defendant XL, and the subsidiaries of those subsidiaries, transact business on Defendant XL's behalf and in furtherance of its business in the United States such that they may be considered agents of XL.

71. Upon information and belief, Defendant XL, through its parent and/or subsidiaries, operates and transacts substantial business in the United States and had substantial contacts with New York and the United States. These subsidiaries are financially and operationally dependent on Defendant XL for all aspects of their business and provide services for and on behalf of Defendant XL such that they are merely conduits for Defendant XL to maintain a substantial United States presence yet maintain its foreign residence in its attempts to avoid being subject to United States laws and taxation. Specifically, upon information and belief, Defendant XL uses these affiliated companies to perform functions it would otherwise have to do itself in order to satisfy its obligations under the insurance policies it issues to U.S. policyholders, and these affiliated companies otherwise perform functions that are compatible with and further assist Defendant XL to pursue business in New York and the United States as a whole. Further, upon information and belief, the parent, Defendant XL, and its subsidiaries share officers, employees, computer systems and Internet portals and websites, corporate intranet and email, insurance underwriting and adjusting services, corporate policies and procedures, legal departments and attorneys, claims adjusters, employee retirement plans, office spaces and supplies, and worldwide advertising and marketing.

72. Further, in order to comply with the recently enacted Foreign Account Tax Compliance Act and its compliance deadlines of January 2014, Defendant XL has provided an IRS Form W-8BEN-E form on its website for use by United States taxpayers to complete to evidence

their business with foreign entities and financial institutions, such as Defendant XL. Under FATCA, any U.S. taxpayer that has non product related transactions with a foreign entity ("FE") must receive a completed Form W-8BEN-E from that FE to determine if the FE is subject to the default 30 percent withholding on payments to FEs or if is the FE is eligible for any reduced withholdings related to an applicable treaty. According to its Form W-8BEN-E Defendant XL has a United States Federal Tax Identification Number 98-0354869.

73.     XL retained the United States law firm, Kissel Hirsch & Wilmer, LLP of Tarrytown, New York to carry out its obligations under the XL Policy with respect to the adjustment, evaluation, investigation of possible coverage and all other obligations arising from the underlying claims described herein. Such activities were done on behalf of XL with its knowledge, consent and authorization, and consisted of activities that XL would have performed had it been present in New York and/or the United States.

**3.  Allegations Specific to Defendant Starr**

74.     The Starr Policy contains a provision that it shall be governed by and construed and enforced in accordance with the internal laws of the State of New York.

75.     According to Defendant Starr's Consolidated Financial Statements for the Twelve Months Ended December 31, 2013, filed with the Bermuda Monetary Authority, Defendant Starr "in 2010 elected to be treated as a United States corporation for purposes of imposing United States tax under section 953(d) of the Internal Revenue Code" and that "[a] $10 million letter of credit was secured for the benefit of the IRS that may be drawn upon in the event that the Company does not pay tax to the IRS . . ." By making the election under 953(d) to be treated as a domestic corporation for tax purposes, Defendant Starr "waives all benefits . . . granted by the United States under any treaty," including the Convention on Recognition and Enforcement of Foreign Arbitral

Awards, and is "treated as transferring . . . all of its assets to a domestic corporation" for purposes of certain U.S. taxes.

76.     Defendant Starr's 2013 financial statement also stated that "as of December 31, 2013, the Company had federal net operating loss carry forwards of $922 million, which were generated by the Company, a foreign operation, prior to making the election to be taxed as a U.S. domestic corporation" and that "[t]he losses were generated through operations effectively connected to U.S. related business."

77.     Upon information and belief, and based upon Defendant Starr's own participation in the GM Policies and upon financial statements filed by Defendant Starr and its affiliated entities, as well as based upon Defendant Starr's involvement in various lawsuits throughout the United States, Defendant Starr has issued many other similar excess policies to U.S. policyholders, earned millions of dollars from premiums paid by its U.S. policyholders, has continuing relationships with U.S. policyholders, and/or may be soliciting additional business in the U.S..

78.     Defendant Starr is a subsidiary of American International Group, Inc. ("AIG") and the AIG Property Casualty Group, which are Delaware corporations.  AIG is listed on the New York stock exchange and maintains offices in the United States, including New York.

79.     Defendant Starr retained the United States law firm, D'Amato & Lynch, LLP, of New York City, New York, to carry out their obligations under the Starr Policy with respect to the adjustment, evaluation, investigation of possible coverage and all other obligations arising from the underlying claims described herein.  Such activities were done on behalf of Starr with its knowledge, consent and authorization, and consisted of activities that Starr would have performed had it been present in New York and/or the United States.

   **4.  Allegations Specific to Defendant Chubb**

80. Defendant Chubb is a wholly owned subsidiary of the Chubb Corporation, which is a New Jersey Corporation that transacts business in New York and the United States.

81. Defendant Chubb has elected to be treated as a United States domestic corporation for tax purposes pursuant to 26 U.S.C. § 953(d), which allows a controlled foreign corporation engaged in the insurance business to elect to be treated as a U.S. corporation for U.S. tax purposes. By making the election under 953(d) to be treated as a domestic corporation for tax purposes, Defendant Chubb "waives all benefits . . . granted by the United States under any treaty," including the Convention on Recognition and Enforcement of Foreign Arbitral Awards, and is "treated as transferring . . . all of its assets to a domestic corporation" for purposes of certain U.S. taxes.

82. Upon information and belief, and based upon Defendant Chubb's own participation in the GM Policies and upon financial statements filed by entities affiliated with Defendant Chubb, as well as based upon Defendant Chubb's involvement in various lawsuits throughout the United States, Defendant Chubb has issued many other similar excess policies to U.S. policyholders, earned millions of dollars from premiums paid by its U.S. policyholders, has continuing relationships with U.S. policyholders, and/or may be soliciting additional business in the U.S..

83. Defendant Chubb retained the United States law firm, Bailey Cavalieri, LLC, of Columbus, Ohio, to carry out their obligations under the Chubb Policy with respect to the adjustment, evaluation, investigation of possible coverage and all other obligations arising from the underlying claims described herein. Such activities were done on behalf of Defendant Chubb with its knowledge, consent and authorization, and consisted of activities that Defendant Chubb would have performed had it been present in New York and/or the United States.

IV. **SUBJECT MATTER JURISDICTION AND VENUE**

84. This Court has jurisdiction over this adversary action pursuant to 28 U.S.C. §§

157(a) and 1334, in that the matter arises under Title 11 or arises in or is related to this Bankruptcy, and requires interpretation and enforcement of the Plan approved by this Court on December 11, 2013 with respect to the *Kessler* Claim, the *Mitchell* Action and Related Missouri Actions all as set forth below.

85.     Plaintiffs' claims against Defendants arise by virtue of the application of federal bankruptcy law and certification of the *Kessler* and *Mitchell* Classes by this Court, and are inseparable from the bankruptcy context.  Pursuant to the rights created under federal bankruptcy law at 28 U.S.C. § 1123(a)(5), along with Bankruptcy Rules 7023 and 9019, the ordered assignment of the GM Insurance Rights to members of Plaintiff Classes pursuant to the *Kessler* and *Mitchell* Settlements bars Defendants from asserting the anti-assignment provisions in the GM Policies as a defense to coverage.  This Court's order and the federal Bankruptcy Code preempt the GM Insurance anti-assignment provisions.

86.     Further, pursuant to Federal Bankruptcy Rules 7023, 7052, 9014 and 9019, this Court adjudicated the proofs of claims of the *Kessler* and *Mitchell* Classes and determined that the proofs of claims should be allowed in the amount of $300 million and $14.5 million respectively because those amounts were fair, reasonable and adequate and in the best interests of the bankruptcy estate, the creditors of the estate, and "all other parties in interest," (which would include the Defendants).  *See* Docket No. 5968, at ¶6; Docket No. 6066, at ¶169.  This Court also concluded that the *Kessler* and *Mitchell* settlements, which were part of a Global Settlement with the Debtor, were in the "best interests of the Debtors, their Estates, Creditors, the RMBS Trusts, Investors, and other parties in-interest . . ."  *See* Docket No. 6065, at ¶¶ 7, 64.

87.     This adversary action is a core proceeding under 28 U.S.C. §§ 157(b)(1) and 157(b)(2)(A), (L), and (O) and is related to the bankruptcy and Plan for the reasons set forth in this

Third Amended Adversary Complaint, including, but not limited to:

     a)    It affects the administration of the Debtors' bankruptcy cases and implicates specific rights created under bankruptcy law, including those at 26 U.S.C. § 1123(a)(5) which allow for the assignment of the GM Insurance Rights to the Plaintiffs and precludes the Defendant Insurers from asserting the anti-assignment provisions in the GM Policies as a defense to coverage, and which rights were specifically incorporated into the Plan. *See* Docket No. 6065, at Art. I.G.6. ("In accordance with Bankruptcy Code section 1123(a)(5), the Plan, including the Plan Supplement, details adequate and proper means for its implementation, including, pursuant to section 1123(a)(5)(B), transfer and assignment of certain GM Insurance Rights to the *Kessler* Settlement Class, the Liquidating Trust, and others.");

     b)    Further, it affects the administration of the Debtors' bankruptcy cases and the estate because the Court, as part of its core function, determined that the claims in the amount of $300 million and $14.5 million were reasonable and should be allowed in resolution of the Class Proofs of Claims. The Defendant Insurers attack and contest the Court's core determination as to the reasonableness of the $300 million *Kessler* Allowed Claim and $14.5 million *Mitchell* Allowed Claim by their refusal to consent to the Allowed Claims;

     c)    It requires the ongoing implementation and enforcement of the Plan, including, specifically, the provisions that (a) approve of the Allowed Claims by the *Kessler* and *Mitchell* classes; (b) confirm the fairness of the

settlements under Bankruptcy Rules 7023 and 9019; (c) preclude the Defendant Insurers from asserting the anti-assignment provisions in the GM Policies as a defense to coverage. In its Findings of Fact entered in connection with its Order Confirming Second Amended Joint Chapter 11 Plan this Court found that that the *Kessler* Settlement was reached following "intensive good faith and hard fought negotiation" and that the Allowed Claim is "fair and reasonable, and in the interests of the Debtors' Estates and their creditors." *See* Docket No. 6066, at ¶¶ 168-169;

d) It requires enforcement and/or interpretation of the Plan in order to determine the rights and responsibilities between the parties, which includes enforcing the bar against the Defendant Insurers from asserting the anti-assignment provisions in the GM Policies as a defense to coverage and enforcing the reasonableness of the Allowed Claims and the propriety of class certification under Bankruptcy Rules 7023 and 9019;

e) It impacts the liquidation of the assets of the estate and distribution of those assets to unsecured creditors in that the proceeds of any recovery on the GM Policies by the *Kessler* or *Mitchell* Class do not inure solely to the benefit of the *Kessler* or *Mitchell* Class. Pursuant to the Return Amount provisions of the Plan, ResCap Borrowers Claims Trust and *Kessler* Settlement Agreement, a portion of any recovery obtained in this case will result in additional distributions to Trust Beneficiaries other than members of the *Kessler* and *Mitchell* Class. *See* Docket No. 6065-1, at Art. IV.F.6. Docket No. 6136, at Exhibit 4.

f)     It requires resolution of issues concerning bankruptcy law, including the binding effect of allowed claim adjudications, and determinations and conclusions in class actions made pursuant to Bankruptcy Rules 7023 and 9019 on third parties;

g)     Resolution of this dispute in any other forum will seriously jeopardize the Court's power, authority and control over the debtor's property and the absent Class members, undermine the orderly and expeditious liquidation of the assets of the estate and otherwise seriously jeopardize the objectives of the Bankruptcy Code; and

h)     Several of Defendants' breaches of the GM Policies, including their bad faith misconduct, occurred post-petition.

88.     Pursuant to Article XII of the Plan, this Court retained exclusive jurisdiction over, but not limited to, the following matters:

a)     to hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan including, without limitation, the allocation of RMBS Trust Claims, the RMBS Trust Allocation Protocol, the Monoline Reservation, and the *Kessler* Settlement Agreement;

b)     to hear and determine any Causes of Action preserved under the Plan;

c)     to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court; and

    d)    to enforce all orders previously entered by the Bankruptcy Court.

*See* Docket No. 6065-1, at Art. XII (emphasis added).

89.    Pursuant to Article XII of the Plan, this Court retained non-exclusive jurisdiction to the extent permissible under applicable law to hear and determine matters relating to the GM Policies and the Defendant Insurers, including the Plaintiffs' rights under the GM Policies. *See* Docket No. 6065, at Art. XII.  The Plan states:

> Bankruptcy Court shall retain non-exclusive jurisdiction to the extent permissible under applicable law to hear and determine matters relating to the GM Policies and the GM Insurers, including rights under the GM Policies.

*Id*.

90.    The Final Order approving the *Kessler* Settlement pursuant to Federal Rule 23 and Federal Bankruptcy Rule 9019 provides that the Court:

> [E]xpressly retains jurisdiction as to all matters relating to the administration and enforcement of the Agreement and Settlement and of this Order, and for any other necessary purpose as permitted by law, including, without limitation:
>
>     a)    enforcing the terms and conditions of the Agreement and Settlement and resolving any disputes, claims or causes of action that, in whole or in part, are related to the administration and/or enforcement of the Agreement, Settlement, this Order (including, without limitation, whether a person is or is not a member of the Kessler Settlement Class or a Kessler Settlement Class Member; and whether any claim or cause of action is or is not barred by this Order);
>
>     b)    entering such additional Orders as may be necessary or appropriate to protect or effectuate the Court's Order and/or to ensure the fair and orderly administration of the Settlement and distribution of the Kessler Gross Recoveries; and
>
>     c)    entering any other necessary or appropriate Orders to protect and effectuate this Court's retention of continuing jurisdiction.

Docket No. 5968, at ¶13.

91.    It is necessary for this Court to retain jurisdiction over this adversary proceeding because the maintenance of separate actions or arbitration proceedings will interfere and conflict

with the Court's Orders described herein, including those approving the *Kessler* and *Mitchell* Settlements pursuant to Federal Bankruptcy Rules 7023 and 9019, and the Plan, and thereby undermine the objectives of the Bankruptcy Code.

92.　　In addition, this Court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and this is a class action in which the number of members of all plaintiff classes in the aggregate is greater than 100 and the Class members and Defendants are citizens of different states and/or are foreign insurers.

93.　　This Court is the best forum for adjudication of this action given its knowledge of bankruptcy law and procedure in this and similar complex bankruptcies matters, involvement in the mediation, its facilitation of the Global Settlements embodied in the Plan, understanding of RFC's operations, approval and understanding of the *Kessler* and *Mitchell* Settlements, the Allowed Claims of the *Kessler* and *Mitchell* Classes, and the Plan, as well as the opportunity for this Court to swiftly and efficiently adjudicate Plaintiffs' claims in a single forum—some of which are more than a decade old.

94.　　Plaintiffs hereby consent to the entry of final orders or judgment by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

95.　　Venue is proper in this Court because the claims asserted in this action relate to the bankruptcy cases of the Debtors, the payment of these claims will impact the assets available to distribute to RFC's creditors under the Plan approved by this Court, and, further, litigating the action in this Court is necessary to ensure the prompt administration of justice for all parties, including RFC's creditors. In addition, the consolidation and adjudication of these claims in this

Court will be the most efficient and economical use of judicial resources as compared to any other jurisdiction, given this Court's intimate knowledge of the bankruptcy and these claims.

## V. BACKGROUND AND PROCEDURAL HISTORY

### A. THE *KESSLER* CLAIM

96. Starting in 2001, members of what would become the *Kessler* Class filed the first of several putative class actions against RFC and other defendants on behalf of borrowers who had taken out predatory mortgage loans with Community Bank of Northern Virginia ("CBNV") and Guaranty National Bank of Tallahassee ("GNBT"). At this time, and at all times prior to its bankruptcy, RFC was a financial services company engaged in the business of acquiring residential mortgage loans on the secondary market from its correspondent lender customers and clients, and securitizing residential mortgage loans for its downstream customers and clients. The loans made to the members of the *Kessler* Class and acquired by RFC were originated by CBNV and GNBT.

97. On May 1, 2001, a class action lawsuit was commenced against RFC in the Court of Common Pleas of Allegheny County, Pennsylvania, captioned *Davis v. Community Bank of Northern Virginia, et al.*, and later was removed to the United States District Court for the Western District of Pennsylvania and assigned Case No. 01-1201. The *Davis* action was commenced as a putative class action on behalf of borrowers who had taken out predatory and illegal second mortgage loans with CBNV.

98. On September 18, 2002, a related class action was commenced against RFC in the United States District Court for the Western District of Pennsylvania, captioned *Ulrich v. Guaranty National Bank of Tallahassee, et al.*, and assigned Case No. 02-1616. The *Ulrich* action was commenced as a putative class action on behalf of borrowers who had taken out predatory and illegal second mortgage loans with GNBT.

99. As of February 2003, RFC had been named as a defendant in four other related

33

Pennsylvania class action lawsuits in addition to *Davis* and *Ulrich* (collectively the "Pennsylvania Actions")[1]  Altogether, the Pennsylvania Actions alleged on behalf of a nationwide class of borrowers that RFC was liable for violations of the Real Estate Settlement Practices Act ("RESPA"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and various state laws, all in connection with RFC's acquisition of second mortgage loans from its correspondent lenders CBNV and GNBT.

100.    In June 2003, RFC and the representatives of the putative class members in the Pennsylvania Actions reached an agreement to consolidate and settle the Pennsylvania Actions. On July 17, 2003 the United States District Court for the Western District of Pennsylvania preliminarily approved a proposed settlement of the Pennsylvania Actions.

101.    On October 1, 2003, a number of members of the proposed settlement class (the "Objectors") filed objections to the proposed settlement of the Pennsylvania Actions and sought to intervene as additional plaintiffs.  The primary contention of the Objectors was that none of the named plaintiffs in the Pennsylvania Actions had alleged claims for relief for violations of the Truth in Lending Act ("TILA") and the Home Ownership and Equity Protection Act ("HOEPA"). As part of their objections, on October 1, 2003, the Objectors filed a Motion to Intervene and related Complaint in Intervention, demanding relief for the TILA and HOEPA violations which were not provided for in the settlement and which the Objectors contended could be worth almost $3 billion in damages.

---

[1] The Pennsylvania Actions consolidated in the *In re Community Bank of Northern Virginia and Guaranty National Bank of Tallahassee Second Mortgage Loan Litigation* consolidated action and their respective filing dates are as follows: (1) *Davis v. CBNV*, filed May 1, 2001; (2) *Sabo v. CBNV*, filed Sept. 11, 2002; (3) *Mathis v. GNBT*, filed Nov. 16, 2002; (4) *Ulrich v. GNBT*, filed Sept. 19, 2002; (5) *Picard v. CBNV*, filed Nov. 19, 2002; and (6) *Kessler v. GMAC-RFC*, filed Feb. 26, 2003.

102.    On December 4, 2003, and over the Objectors' objections, the District Court denied the Objectors' Motion to Intervene and gave final approval to the settlement.

103.    The decision approving the settlement was appealed by the Objectors to the United States Court of Appeals for the Third Circuit, which subsequently vacated the settlement and remanded the Pennsylvania Actions for further proceedings. *In re Community Bank of Northern Virginia and Guaranty National Bank of Tallahassee Second Mortgage Loan Litigation*, 418 F.3d 277 (3rd Cir. 2005).  In its opinion, the Third Circuit held that the numerosity, typicality, commonality, predominance and superiority requirements of Rule 23 were met, but that the District Court had failed to rigorously examine whether the Class was adequately represented in light of the failure to assert the TILA/HOEPA claims.

104.    During the pendency of the *Pennsylvania* Actions, several plaintiffs in other states also filed lawsuits against RFC based upon its purchase and acquisition of second mortgage loans originated by CBNV and GNBT.  One of these actions, *Hobson v. Irwin Union Bank & Trust Co., et al*., alleged claims for relief against RFC and others for violations of TILA and HOEPA as had been demanded by the Objectors in their October 1, 2003 Complaint in Intervention.

105.    On April 28, 2005, during the pendency of the appeal of the Pennsylvania Actions settlement, the Judicial Panel on Multidistrict Litigation consolidated these additional lawsuits against RFC, including *Hobson*, into a multidistrict proceeding captioned as *In re Community Bank of Northern Virginia Mortgage Lending Practices Litigation*, MDL No. 1674, United States District Court for the Western District of Pennsylvania (the "*Community Bank* MDL").

106.    On or about September 30, 2005, after the Third Circuit issued its mandate vacating the first settlement of the Pennsylvania Actions, the Pennsylvania Actions also were transferred to the *Community Bank* MDL.

107.    In 2008, a second settlement of the Pennsylvania Actions was negotiated, which provided for additional monetary relief for the Class in exchange for a release of any TILA/HOEPA claims against Defendants.  The District Court again approved the settlement over the Objectors' objections, and the Objectors once again appealed to the Third Circuit.

108.    On September 22, 2010 the Third Circuit again vacated the settlement and remanded the matter for further proceedings.  *In re Community Bank of Northern Virginia and Guaranty National Bank of Tallahassee Second Mortgage Loan Litigation*, 622 F.3d 275 (3rd Cir. 2010).  In its opinion, the Third Circuit held that the District Court applied the wrong standard in determining whether the settlement was adequate in light of the release of the potential claims under TILA/HOEPA.

109.    In 2011, the Objectors joined forces with the other plaintiffs in the *Community Bank* MDL and on October 4, 2011 filed *Plaintiffs' Joint Consolidated Amended Class Action Complaint* (the "JCAC") against RFC, CBNV, GNBT, and other defendants.  The JCAC is the currently operative complaint filed in the *Community Bank* MDL.

110.    The JCAC is filed on behalf of a nationwide class of residential second mortgage borrowers that had obtained loans originated by RFC's correspondent lender customers and clients, CBNV and GNBT, which were later purchased by RFC.  The JCAC consolidates the original claims made in the Pennsylvania Actions with the Objectors' Complaint in Intervention and seeks damages for violations of RESPA, RICO, and TILA/HOEPA.

111.    After the filing of the JCAC, the *Community Bank* MDL moved forward on a litigation track and in November of 2011, RFC and its co-defendants moved to dismiss every claim alleged in the JCAC.

112.    On May 14, 2012, RFC and the other Debtors filed the bankruptcy petition in this

case.

113.    As of the petition date of this bankruptcy, the parties in the *Community Bank* MDL were engaging in discovery in anticipation of trial.  After the petition date, the litigation against RFC in the *Community Bank* MDL was automatically stayed under section 362(a) of the Bankruptcy Code, however, litigation against RFC's co-defendants continued.

114.    In November of 2012, certain named plaintiffs in the *Community Bank* MDL (the "*Kessler* Named Plaintiffs") became borrower-creditors in this bankruptcy case when, pursuant to Federal Rules of Bankruptcy Procedure 7023 and 9014, they filed class proofs of claim in excess of $1.87 billion against the Debtors in this case (referred to herein as the "*Kessler* Claim").  The *Kessler* Claim as asserted in the proofs of claim essentially mirrored the claims asserted in the JCAC filed in the *Community Bank* MDL, with the exception that a claim for rescission of the loans was not asserted in this case.  The *Community Bank* MDL was one of the largest class actions pending against the Debtors at the time it petitioned for bankruptcy.  *See* Claim Nos. 2110, 2117, 2254 in the Debtor's Official Claims Register; Motion to Apply Bankruptcy Rule 7023 And To Certify Class Claims (Docket No. 2044).

115.    The *Kessler* Claim sought to recover damages on behalf of the putative *Kessler* Class in excess of $1.87 billion for violations of RESPA, TILA/HOEPA, and RICO, all as alleged in the JCAC.  The *Kessler* Named Plaintiffs also moved this Court pursuant to Bankruptcy Rule 7023 to certify a class for the *Kessler* Claim.

116.    Beginning in April 2013, with the full awareness of Defendant Insurers, the Debtors, counsel for the *Kessler* Named Plaintiffs and representatives of the majority of the Debtors' significant creditors participated in mandatory mediation sessions ordered by this Court.

117.    The mediation sessions ultimately resulted in a roadmap for global resolution of the

creditors' claims in the form of a Plan Support Agreement ("PSA"), to which the *Kessler* Named Plaintiffs consented and which was submitted by Debtors to this Court for approval on May 23, 2013. *See* Docket No. 3814.

118.    On June 19, 2013, Defendants Lloyd's, Twin City, Continental, Clarendon, SR, St. Paul, and North American (the "Certain Defendant Insurers") filed a response to the Debtors' motion for approval of the PSA because the PSA contemplated a Plan of Reorganization they alleged was "unconfirmable" as a matter of law. These Defendant Insurers sought specific changes to the PSA that would require the inclusion of "insurance neutrality" language in the Plan. *See* Docket No. 4015.

119.    On June 26, 2013 this Court approved the PSA and overruled the objections of the Certain Defendant Insurers subject to their right to fully prosecute an objection to any proposed Chapter 11 Plan. *See* Docket No. 4102.

120.    Although the *Kessler* Named Plaintiffs had the right to withdraw from the PSA at any time, the PSA contemplated continuing settlement negotiations between the Debtors and the *Kessler* Named Plaintiffs.

121.    After extensive negotiations and an all-day session held on June 18, 2013, the Debtors, the *Kessler* Named Plaintiffs, and the other parties to the PSA agreed in principle to settle the *Kessler* Claim. The settlement was in RFC's best interest given the significant liability it faced due to the *Kessler* Claim.

122.    Over the next few weeks, counsel for the *Kessler* Named Plaintiffs and counsel for the Debtors continued to negotiate and draft the *Kessler* Settlement that would resolve the *Kessler* Claim.

123.    Meanwhile, on June 27, 2013 the district court in the *Community Bank* MDL denied

the majority of the motions to dismiss the plaintiffs' claims and left the majority of the plaintiffs'

claims for violations of RESPA, TILA/HOEPA and RICO against PNC intact.[2]

124.    Also, on or about June 27, 2013, the Debtors and the *Kessler* Named Plaintiffs

executed the *Kessler* Settlement Agreement memorializing the terms of the *Kessler* Settlement.

*See* Docket No. 4451.

125.    Under the finalized *Kessler* Settlement, a settlement class (referred to herein as the

*Kessler* Class) would be certified by this Court and the *Kessler* Claim would be reduced and

allowed as an unsecured borrower claim in the amount of $300 million against RFC.  The *Kessler*

Settlement was contingent upon this Court's approval of the settlement and the final Chapter 11

Plan.  *See* Docket No. 4451.

126.    In addition, under the terms of the *Kessler* Settlement and the Plan, the Debtors

assigned certain rights under the GM Policies to the *Kessler* Class, including the right to recover

any insurance proceeds to pay the $300 million allowed claim as well as the right to recover

damages from the Defendant Insurers for breach of contract or breach of any other duty or

obligation under the GM Policies.  Also, under the terms of the Plan, the Debtors assigned to the

Liquidating Trust certain rights, including but not limited to the rights to recover costs, charges

and expenses incurred by RFC in defense of the Pennsylvania Actions, the *Community Bank* MDL

and the *Kessler* Claim. *See* Docket No. 4451.

127.    If the *Kessler* Class receives any insurance proceeds under the GM Policies, then

under the terms of the *Kessler* Settlement, the *Kessler* Class is obligated to reimburse the ResCap

---

[2] On July 31, 2013, the district court in the *Community Bank* MDL certified a litigation class.  An interlocutory appeal of that class certification decision pursuant to the provisions of Federal Rule of Civil Procedure 23(f) is currently pending before the Third Circuit, Case No. 13-4273.  Oral argument was held on January 20, 2015.

Borrowers Claims Trust a portion of any distribution it previously received from the ResCap Borrowers Claims Trust.

128.    On November 27, 2013, this Court approved the *Kessler* Settlement finding the allowed claim amount to be reasonable and the negotiations that resulted in the allowed claim to be arm's length, non-collusive and conducted in good faith. *See* Docket No. 5968.  Further, the Court overruled all objections to the *Kessler* Settlement. *See id.*, at ¶9.  In its Findings of Fact Confirming the Plan, the Court concluded that the *Kessler* Settlement was "fair and reasonable, and in the best interests of the Debtors' Estates and their creditors."  *See* Docket No, 6066, at ¶¶167-69.  The *Kessler* Settlement was part of a Global Settlement with the Debtors and is essential to the continued implementation of the Plan approved by the Court.  *See* Docket No. 5720 (Memorandum of Law in Support of Confirmation of the Joint Chapter 11 Plan).

129.    Specifically in its Order approving the *Kessler* Settlement,  The Court expressly concluded that:

> the terms of the Agreement and the Settlement as provided therein are fully and finally approved, subject to satisfaction of the conditions precedent set forth in Section 14 of the Agreement, pursuant to Bankruptcy Rule 7023 and Rule 23, as fair, reasonable and adequate as to, and in the best interests of, the Parties and the Kessler Settlement Class Members, and in full compliance with all applicable requirements of the United States Constitution (including the Due Process Clause), and any other applicable law. Likewise, the terms of the Agreement and the Settlement as provided therein, are fully and finally approved, subject to satisfaction of the conditions precedent set forth in Section 14 of the Agreement, under Fed. R. Bankr. P. 9019 as fair and equitable to the Debtors' Bankruptcy estates and their creditors. The Agreement and the transactions contemplated thereby, including the releases given herein, are in the best interest of the Debtors, their estates, their creditors and all other parties in interest. The Agreement and the transactions contemplated thereby, including the releases given therein, meet the standards established by the Second Circuit for the compromise and settlement in bankruptcy, and are reasonable, fair and equitable and supported by adequate consideration. The Parties are hereby directed to implement and consummate the Agreement according to its terms and provisions and subject to satisfaction of the conditions precedent set forth in Section 14 of the Agreement.

Docket No. 5968, at ¶6.

130.    In connection with the *Kessler* Settlement approved as part of the Plan, this Court

certified the claims of the *Kessler* Class pursuant to Bankruptcy Rule 7023 and Federal Rule 23,

ordered that the *Kessler* Class should receive the *Kessler* Allowed Claim in the amount of $300

million, ordered the assignment of the GM Insurance Rights to the *Kessler* Class, and determined

that the *Kessler* Allowed Claim should be satisfied solely from the GM Insurance Rights and from

distributions from the Borrowers' Claims Trust. *See* Docket No. 4793, Ex. A ("Amended *Kessler*

Settlement Agreement"); Docket No. 5968 (Final Order Approving *Kessler* Settlement). The GM

Insurance Rights included the right to recover damages from the Defendant Insurers for breach of

contract or breach of any other duty or obligation under the GM Policies.

131.    Pursuant to the *Kessler* Settlement and the Plan, the Liquidating Trust was assigned

the right to recover the costs incurred by RFC in defense of the actions consolidated into the

*Community Bank* MDL and the *Kessler* Claim under the GM Policies, approximately $7.0 million.

132.    The Defendant Insurers were provided notice of the final approval hearing for the

*Kessler* Settlement and were given the opportunity to object, but no Defendant Insurer objected to

the *Kessler* Settlement. *See* Docket No. 5360.

B.    **THE *MITCHELL* CLAIM**

133.    On July 29, 2003 the *Mitchell* Class filed a class action lawsuit against RFC and

others in the Circuit Court of Jackson County, Missouri, in a case captioned *Mitchell, et al. v.*

*Residential Funding Corporation, et al.*, Case No. 03-CV0220489, (the "*Mitchell* Action"), on

behalf of Missouri borrowers whose second mortgage loans were originated by Mortgage Capital

Resource Corporation ("MCR"), a correspondent lender customer and client of RFC.

134.    The *Mitchell* Action alleged that MCR violated the Missouri Second Mortgage

Loan Act ("MSMLA") for each second mortgage loan that MCR originated to a member of the

*Mitchell* Class.  RFC, as a purchaser of the loans from its correspondent lender customer and client,

MCR, was alleged to be liable under state law and the assignee liability provision of HOEPA, at

15 U.S.C. § 1641(d).

135.    A litigation class was certified in the *Mitchell* Action in December 2006.  Trial was

commenced in December 2007 and on January 4, 2008, the jury returned a verdict in favor of the

plaintiffs and against RFC and its co-defendants for violations of the MSMLA.  The court later

entered final judgment against RFC in the amount of $99,651,115.00.

136.    RFC's request for reimbursement of defense costs, charges and expenses incurred

by RFC in defense of the *Mitchell* Action under the terms of the GM Policies was first approved

by Lloyd's on or about May 1, 2009.  Subsequently, in 2010, the parties entered into an Interim

Funding Agreement pursuant to which Lloyd's paid some of RFC's defense costs.

137.    The Defendants, including RFC, appealed the entry of judgment to the Missouri

Court of Appeals, Western District.  On November 23, 2010, the appellate court upheld in part the

jury's verdict and award and remanded the matter and ordered a new trial on the remaining claims.

138.    On September 7, 2011 and October 5, 2011, RFC paid the *Mitchell* Class a total of

$12,868,502.74 in partial satisfaction of the portion of the judgment affirmed by the Missouri

Court of Appeals.

139.    On February 22, 2012, Ally Financial (f/k/a GMAC) on behalf of its Subsidiary

RFC received consent from Defendant Lloyd's to enter into settlement discussions to resolve the

remaining *Mitchell* claims.

140.    Thereafter, on February 27, 2012, RFC and the *Mitchell* Class reached an

agreement to settle the remaining claims against RFC for a payment of $14.5 million (referred to

herein as the "*Mitchell* Settlement").

141.    On March 2, 2012 RFC paid an additional $2,780,365.38 to satisfy the remaining portion of the award to the *Mitchell* Class that had been affirmed by the Missouri Court of Appeals (*i.e.*, attorneys' fees).  Altogether, RFC paid $15,648,868.12 to satisfy the partial judgment and award of attorneys' fees in the *Mitchell* Action that had been affirmed by the Missouri Court of Appeals.

142.    On April 16, 2012 the Circuit Court of Jackson County, Missouri, preliminarily approved the *Mitchell* Settlement and notice of the proposed settlement was mailed to the members of the *Mitchell* Class.  The final approval hearing for the *Mitchell* Settlement was scheduled for May 18, 2012.

143.    Also on April 16, 2012, through its broker AON, Ally Financial (f/k/a GMAC) on behalf of its Subsidiary RFC made a written demand upon Lloyd's for payment of $30,148,868.12 plus outstanding defense costs for the following Loss suffered by RFC: (a) the *Mitchell* Settlement, as it was agreed to before the petition date of this case; (b) payments already made by RFC in satisfaction of the judgment entered against it in the *Mitchell* Action that were upheld on appeal; and (c) the costs of defending RFC in the *Mitchell* Action.

144.    Defendant Lloyd's never responded to Ally Financial's April 16, 2012 written demand nor paid any more of RFC's defense costs.

145.    As previously noted, RFC filed for bankruptcy in this case on May 14, 2012, before the final approval hearing in *Mitchell* was scheduled to be held.  After the petition date of this bankruptcy, members of the *Mitchell* Class sought and obtained an order from this Court pursuant to 11 U.S.C. § 362 and Bankruptcy Rule 9019 to:  (a) modify the automatic stay to allow the Debtors to proceed with the settlement of the Class Action; and (b) approve the Debtors' entry into the *Mitchell* Settlement and resulting *Mitchell* Allowed Claim and rule that the amount of $14.5

million *Mitchell* Allowed Claim was fair and reasonable. *See* Docket No. 5700, 6133. On December 17, 2013, this Court approved the *Mitchell* Allowed Claim as part of the Plan and ordered that "Allowed Claim shall be reflected on the Claims Register for the estate of Residential Funding Company, LLC." *See* Docket No. 6133.

146. On January 14, 2014, the Circuit Court of Jackson County, Missouri entered an order finally approving the *Mitchell* Settlement and certifying the *Mitchell* Class after careful review and consideration of the proposed settlement and after hearing the evidence and arguments of counsel.

147. In the Plan, the *Mitchell* Class was assigned certain rights under the GM Policies, including the right to recover any insurance proceeds to satisfy the *Mitchell* Allowed Claim. Apart from a distribution from a related trust for a small portion of the allowed claim (which distribution must be repaid in part or in whole depending upon the recovery here), the only source of recovery for the borrowers in the *Mitchell* Class is the insurance rights assigned to it.

148. Pursuant to the settlement agreement and Plan, the Liquidating Trust was assigned the right to recover under the GM Policies the $15,648,868.12 that RFC paid to satisfy a portion of the judgment in the *Mitchell* Action, and the additional amounts that RFC incurred in defense of the *Mitchell* Action, approximately $6.1 million.

C.    **THE RELATED MISSOURI ACTIONS**

149. On January 22, 2002, RFC was joined as a defendant in the putative class action lawsuit styled *Adkison v. FirstPlus Bank, et al.*, Case No. CV100-3174CC, in the Circuit Court of Clay County, Missouri ("*Adkison*") alleging liability arising out of RFC's acquisition of mortgage loans on the secondary market that allegedly violated the MSMLA. Prior to class certification, the claims of individual plaintiffs in *Adkison* were dismissed by the trial court and that dismissal was affirmed on appeal. Subsequently, on June 2, 2004, several members of the putative *Adkison* class

filed an action asserting the same claims on behalf of the same defined class now styled as *Thomas, et al., v. US. Bank National Association, ND*, Case No. 04-CV83549, in the Circuit Court of Platte County, Missouri. The *Thomas* action was removed to the U.S. District Court for the Western District of Missouri in 2004 and assigned Case No. 5:04-cv-06098 ("*Thomas*").

150. RFC subsequently was named as a defendant in the following five other Related Missouri Actions after July 12, 2001, also alleging liability arising out of RFC's acquisition of mortgage loans on the secondary market that allegedly violated the MSMLA: (1) *Baker, et al. v. Century Financial Group, Inc., et al.*, Circuit Court of Clay County, Missouri Case No. CV100-4294CC; (2) *Couch, et al. v. SMC Lending, Inc., et al.*, Circuit Court of Clay County, Missouri Case No. CV100-4332CC; (3) *Gilmor, et al. v. Preferred Credit Corporation, et al.*, U.S. District Court for the Western District of Missouri Case No. 4:10-CV-00189-ODS; (4) *Beaver, et al. v. Residential Funding Company, LLC, et al.*, Circuit Court of Jackson County, Missouri Case No. 00CV215097-01; (5) *Thomas, et al. v. US. Bank National Association, N.D.*, Case No. 5:04-cv-06098; and (6) *Mayo v. GMAC Mortgage, LLC, et al.*, Case No. 4:08-CV-00568-W-DGK (collectively, and including *Shokere* and *Schwartz*, the "Related Missouri Actions").[3]

151. Prior to the petition date in this case, RFC settled its liability in connection with the claims raised in the Related Missouri Actions and paid a total sum of $8.5 million. In order to effectuate the settlements, RFC agreed to the terms of separate class action settlements in the *Baker* and *Couch* matters and to individual settlement agreements in the *Beaver* and *Gilmor* matters.

152. RFC also incurred costs, charges and expenses in defense of the Related Missouri

[3] The settlement of the *Mayo* and *Thomas* actions was effectuated through the filing and immediate settlement of an action in the Circuit Court of Jackson County, Missouri, *Shokere v. Residential Funding Company, LLC*, Case No. 1116-CV30478 ("*Shokere*"). In addition, RFC was named as a defendant and later dismissed with prejudice from an action filed in the Circuit Court of Jackson County, Missouri, *Schwartz et al. v. Bann-Corr, et al.* ("*Schwartz*").

Actions.  Pursuant to the Plan, the Liquidating Trust was assigned the right to recover under the GM Policies the $8.5 million that RFC paid in settlements of the Related Missouri Actions and the approximately $4.7 million that RFC incurred in defense of the Related Missouri Actions.

D.    **THE CONFIRMED PLAN**

153.    On December 6, 2013, the Debtors sought confirmation of a comprehensive Revised Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, *et al*., and the Official Committee of Unsecured Creditors.  *See* Docket No. 6030.  The Revised Second Amended Plan ultimately became the "Plan" at issue in this case when it was approved by the Court on December 11, 2013.

154.    Prior to the submission of the Revised Second Amended Plan, Defendants Lloyd's, Twin City, Continental, Clarendon, SR, St. Paul, and North American ("Certain Defendant Insurers") appeared before this Court and filed objections to an earlier version of the proposed Plan.  *See* Docket No. 5413.  The Certain Defendant Insurers objected to the earlier proposed Plan in part because the GM Policies contained anti-assignment provisions which would purportedly prevent the assignment of the GM Insurance Rights under the GM Policies to Plaintiffs.  *See Id*.

155.    The Certain Defendant Insurers subsequently negotiated with counsel for the Debtors over those objections.  Following these negotiations, the Certain Defendant Insurers withdrew certain objections.  *See* Docket No. 5786.

156.    The Plan was approved by the Bankruptcy Court on December 11, 2013, with an effective date of December 17, 2013.  *See* Docket No. 6065.

157.    Under the Plan, the "GM Insurance Rights" were transferred and assigned to the Liquidating Trust and the certified *Kessler* and *Mitchell* Classes.  *See* Docket No. 6065-1 at Art. G.  The Plan defines the "GM Insurance Rights" to include the Debtors' rights and claims under "the General Motors Combined Specialty Insurance Program 12/15/00 – 12/15/03 [referred to

herein as the GM Policies].” Docket No. 6065-1 at Art. I.A (125), (126).

158.    As a critical part of the Plan and in order to effectuate its terms, the Court ordered

that:

> The GM Insurers shall be deemed to have waived any defense to coverage that is
> based on the assertion that the transfer of the insurance rights in the Plan are invalid,
> unenforceable or otherwise breach the terms of the GM Policies.

Docket No. 6065-1 at Art. VII, K, 2(e), p.94; *see also* Docket No. 5413 (Objection and

Memorandum of Law in Opposition to Confirmation of Chapter 11 Plan, filed by the Certain

Defendant Insurers).  Under the terms of the Plan, the term “GM Insurers” includes every one of

the Defendant Insurers.

159.    Under the Plan this Court also established a ResCap Borrowers Claims Trust for

the purpose of directing the reconciliation, processing, liquidation and payment of “Allowed

Borrower Claims” against the Debtors.  *See* Docket No. 6136, at Exhibit 4.

160.    Pursuant to the “Return Amount” provisions of the Plan, the governing ResCap

Borrowers Claims Trust documents and the *Kessler* Settlement Agreement, a portion of any

recovery from the GM Policies obtained in this case will result in additional distributions to Trust

Beneficiaries other than members of the *Kessler* and *Mitchell* Class.  *See* Docket No. 6065-1, at

Art. IV.F.6; Docket No. 6136 at Exhibit 4.

161.    Pursuant to the Plan, any recovery by the Liquidating Trust of pre-bankruptcy

judgments and settlements paid by RFC, and the costs, charges and expenses incurred by RFC in

defense of the cases consolidated into the *Community Bank* MDL, the *Mitchell* Action and the

Related Missouri Actions, will also inure to the benefit of creditors of RFC.

162.    This action was filed against the Defendant Insurers to effectuate the orders in the

Plan.

## VI.  RELEVANT PROVISIONS AND DEFINED TERMS IN THE PRIMARY INSURANCE POLICY

163.    As previously alleged, per the terms of the Plan approved by this Court, Plaintiffs were assigned the rights under the GM Policies to recover the amounts requested in this action from the Defendant Insurers.

164.    Insuring Clause I.D. of the Primary Policy provides Errors and Omissions Liability coverage to RFC, as a Professional Liability Assured and subsidiary of General Motors.  It obligates the Defendant Insurers to:

> "pay on behalf of the **Assureds**:  **Loss** which the **Assureds** shall become legally obligated to pay by reason of any **Claim** first made against such **Assured** during the **Policy Period** resulting directly from a **Wrongful Act** committed by a **Professional Liability Assured** or by any person or entity for whose conduct a **Professional Liability Assured** is legally responsible in rendering or failing to render **Professional Services** . . ."

165.    Under the Primary Policy, "**Loss**" is defined in part:

> "as used in Insuring Clause . . . I.D., damages, judgments, settlements, and **Costs, Charges and Expenses** incurred by any of the **Assureds** ..." and "**Costs, Charges and Expenses**" are defined as "reasonable and necessary legal fees and expenses incurred by the **Assured** in the investigation, adjustment, arbitration, mediation, defense or appeal of any **Claim** . . ."

166.    Under the Primary Policy, "**Assured**" is defined in part as:

> "1. The **Company** . . . 3. any **Professional Liability Assured**."

167.    Under the Primary Policy "**Company**" is defined as:

> "1. the **Parent Company** [*i.e.*, General Motors Corporation]; and 2. any **Subsidiary**."

168.    Under the Primary Policy, "**Professional Liability Assured**" is defined, in part, as:

> "1. General Motors Acceptance Corporation ("GMAC"); 2. Any Subsidiary of GMAC . . ."

48

169.    Under the Primary Policy, "**Subsidiary**" is defined in part as:

"a corporate entity or limited liability company of which the Parent Company owns directly or indirectly through one or more of its Subsidiaries on or before the inception of this Policy, either a) more than 50% of the issued and outstanding voting stock or equivalent, or b) exactly 50% of such voting stock or equivalent and also possesses Management Control over such corporate entity or limited liability company . . ."

170.    Under the Primary Policy, "**Claim**" is defined in part as:

"any written or oral demand for damages or other relief against any of the Assureds; or any civil . . . proceeding initiated against any of the Assureds . . ."

171.    The **Policy Period** of the Primary Policy and each of the Excess Policies extended from the 15th of December, 2000 to the 15th of December, 2003.

172.    Under the Primary Policy, "**Wrongful Act**" is defined in part as:

"breach of duty, neglect, error, misstatement, misleading statement, omission . . ."

173.    Under the Primary Policy "**Interrelated Wrongful Acts**" are defined as:

**Wrongful Acts** "which have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions."

174.    Under the Primary Policy, "**Professional Services**" is defined in part as:

"only those services to customers or clients which are rendered, or which ought to have been rendered, by or on behalf of a **Professional Liability Assured**, in the ordinary course of the **Professional Liability Assured's** activities as a financial services company . . ."

## VII.    THE CLAIMS OF THE *KESSLER* CLASS AND THE RESCAP LIQUIDATING TRUST RELATED TO THE *KESSLER* CLAIM AND SETTLEMENT

### A.    COVERAGE UNDER THE TERMS OF THE PRIMARY INSURANCE POLICY

175.    RFC is an Assured under the Primary Policy because it is both the Company and a

Professional Liability Assured.

176.     RFC is the Company because General Motors, the Parent Company, indirectly owned more than 50% of RFC's issued and outstanding voting stock or equivalent through certain Subsidiaries of General Motors including Residential Capital, LLC and GMAC.

177.     RFC is also a Professional Liability Assured because it was a Subsidiary of GMAC.

178.     The allowed claim owed to the *Kessler* Class in the *Kessler* Settlement entered into by RFC, along with the legal fees and expenses incurred by RFC in defending the *Kessler* Claim, constitute covered Loss that RFC was and is legally obligated to pay.

179.     The allegations made against RFC in the Pennsylvania Actions, the Objectors' Complaint in Intervention and the subsequent actions asserted against RFC, all of which were consolidated into the *Community Bank* MDL, asserted in the *Kessler* Claim, and ultimately resolved by the *Kessler* Settlement, all arise out of the same facts and circumstances.  As a result they are Interrelated Wrongful Acts and the *Kessler* Claim is considered a single Claim under the terms of the Primary Policy.  Therefore, the *Kessler* Settlement entered into by RFC to resolve the *Kessler* Claim, along with the legal fees and expenses incurred by RFC in defending all of these actions and the *Kessler* Claim, constitute covered Loss by reason of a single Claim and only one $5 million retention applies to this Claim.

180.     The *Kessler* Claim resulted directly from one or more Wrongful Acts committed by RFC.  RFC committed an actual or alleged breach of duty, neglect, error, misstatement, misleading statement, or omission, in one or more of, but not limited to, the following respects, by allegedly:

> a)     failing to adequately scrutinize for violations of law the loans it purchased
>
>         from its correspondent lender customers and clients, CBNV and GNBT, and

that it subsequently securitized;

b)      accepting assignments of loans from its correspondent lender customers and clients, CBNV and GNBT, without performing adequate due diligence;

c)      providing a flow of capital to its correspondent lender customers and clients, CBNV and GNBT, that were violating the law;

d)      participating in a racketeering enterprise with CBNV and GNBT;

e)      failing to scrutinize whether its correspondent lender customers and clients, CBNV and GNBT, made disclosures required by federal law when acquiring the loans; and

f)      failing to monitor and uncover the illegal settlement practices that pervaded the loans it purchased from its correspondent lender customers and clients, CBNV and GNBT.

181.    The Wrongful Acts committed by RFC were in the ordinary course of its activities as a financial services company (as disclosed to the Defendant Insurers) in rendering or failing to render Professional Services which included, without limitation, the acquisition of residential mortgage loans on the secondary market from its correspondent lender customers and clients, and securitizing residential mortgage loans for its downstream customers and clients.

182.    As set forth above, the Pennsylvania Actions, *Community Bank* MDL, and the *Kessler Claim* are a single "Claim" first made against RFC during the Policy Period.

183.    General Motors and its Subsidiaries, including RFC, have complied with any and all applicable conditions under the GM Policies for coverage of any Loss incurred as a result of Claims made against RFC in the *Kessler* Claim including but not limited to:

a)      payment of all premiums due;

b)      providing sufficient and timely notice to the Defendant Insurers of the Pennsylvania Actions, the actions that were consolidated into the *Community Bank* MDL, and the *Kessler* Claim;

c)      providing the Defendant Insurers with any information, assistance and co-operation as the Defendant Insurers reasonably requested with regard to the Pennsylvania Actions, the actions that were consolidated into the *Community Bank* MDL, and the *Kessler* Claim; and

d)      advising the Defendant Insurers of any efforts by it to resolve the *Kessler* Claim in advance of settlement.

184.    All conditions precedent under the GM Policies have been met, are subject to waiver or estoppel, or are otherwise excused.

185.    The *Kessler* Settlement entered into by RFC and the legal fees and expenses incurred by RFC in defending the Pennsylvania Actions, *Community Bank* MDL, and the *Kessler* Claim are covered Loss under the GM Policies. None of this Loss is excepted or excluded from the GM Policies' definition of a covered Loss. None of the GM Policies' exclusions or conditions operate to exclude from coverage any element of this Loss or any of the Claims.

186.    The Loss, represented by the $300 million allowed claim in the *Kessler* Settlement and the legal fees and expenses incurred by RFC in defending the Pennsylvania Actions, *Community Bank* MDL, and the *Kessler* Claim, when combined with the Loss incurred by RFC in *Mitchell* and the Related Missouri Actions are, in total, well in excess of $300 million. The total Loss reaches the attachment points of all GM Policies and falls within the coverage provided by all of the GM Policies. This Loss creates immediate coverage obligations under every one of the GM Policies.

### B.    THE DEFENDANT INSURERS' BREACH OF THE GM POLICIES

187.    At the time of the GM Policies' inception, Lloyd's and the Defendant Insurers knew that GM was purchasing significant insurance coverage to protect itself and its subsidiaries from the financial damage defense costs and legal liability could cause, and that a breach of the Defendant Insurers' coverage obligations under the GM Policies would cause their Assureds significant financial damage, including unnecessary attorney's fees and costs, lost income, and diminished financial results.

188.    Starting with the *Davis* action first filed in 2001, RFC provided notice to the Defendant Insurers of the individual Pennsylvania Actions and the actions that were ultimately consolidated into the *Community Bank* MDL.

189.    RFC kept the Defendant Insurers apprised of the progress of the actions from their inception through all proceedings in this case.

190.    Throughout the negotiations that ultimately led to the *Kessler* Settlement, RFC repeatedly sought consent from the Defendant Insurers to settle the *Kessler* Claim and invited the Defendant Insurers to participate in those negotiations.

191.    Under Section V.C.1 of the Primary Policy, the Defendant Insurers were obligated to not unreasonably withhold consent to any settlement entered into by RFC.

192.    On June 28, 2013, counsel for RFC requested that the Defendant Insurers give their consent for RFC to enter into the *Kessler* Settlement.

193.    In letters dated July 1, 2013, July 2, 2013 and July 3, 2013, each of the Defendant Insurers rejected RFC's request and in breach of the GM Policies unreasonably withheld consent to any form of settlement with the *Kessler* Class.

194.    Each of the Defendant Insurers has refused and continues to refuse to pay the sums that they are legally obligated to pay under the GM Policies.

195.    None of the Defendant Insurers has ever paid RFC for the covered Costs, Charges and Expenses incurred in the defense of the Pennsylvania Actions, *Community Bank* MDL, and the *Kessler* Claim.

### C.    THE DEFENDANT INSURERS' BAD FAITH REFUSAL TO CONSENT TO A REASONABLE SETTLEMENT OF THE KESSLER CLAIM

196.    The Defendant Insurers were informed of and aware, no later than the time the United States District Court for the Western District of Pennsylvania approved the first settlement agreement in the Pennsylvania Actions in 2003 (which was later reversed and remanded by the Third Circuit), that RFC faced potential liability for claims under RESPA, TILA/HOEPA and RICO and that the potential damages for all of those claims could exceed $1 billion if RFC were to lose at trial.

197.    The Defendant Insurers were further aware of all subsequent developments regarding the Pennsylvania Actions and the actions that were consolidated into the *Community Bank* MDL, including the filing of the JCAC alleging that RFC was liable for violations of RESPA, TILA/HOEPA and RICO related to its acquisition of over 44,535 second mortgage loans from its correspondent lender customers and clients, CBNV and GNBT.

198.    The Defendant Insurers were given notice of this case, the stay of proceedings against RFC in the *Community Bank* MDL, and the filing of the class-wide proofs of claim on behalf of the *Kessler* Class in this case.

199.    Counsel for the Debtors informed the Defendant Insurers of the court-ordered mediation in this case, the subsequent settlement negotiations, the demands and offers exchanged between the parties, and provided the Defendant Insurers with multiple opportunities to participate in some of the settlement meetings with counsel for the *Kessler* Named Plaintiffs.  The Defendant Insurers declined to participate.

200.    During the time that RFC was negotiating the *Kessler* Settlement with counsel for the *Kessler* Class, RFC provided the Defendant Insurers with updated damage calculations performed by experts for the *Kessler* Class.  The calculated damages were in excess of $1.6 billion.

201.    During the time that RFC was requesting consent for the *Kessler* Settlement, RFC informed the Defendant Insurers that the various motions to dismiss the claims asserted in the JCAC against PNC in the *Community Bank* MDL were mostly denied thereby leaving intact the majority of claims against PNC.

202.    Despite urgent and repeated requests on behalf of RFC, the Defendant Insurers refused to consent to a settlement between RFC and the *Kessler* Class in this case within the limits of the GM Policies and reserved their rights to grant or deny coverage for any Loss by reason of such a settlement.

203.    RFC was advised and believed that, given the risk of substantial liability and the enormous scope of damages that RFC faced because of the *Kessler* Claim, the $300 million allowed claim was reasonable.

204.    The Defendant Insurers were advised by defense counsel for RFC that this allowed claim amount was reasonable given the risk of substantial liability and the enormous scope of damages that RFC faced because of the *Kessler* Claim.

205.    At all times, the Defendant Insurers were apprised and kept fully informed of: the bankruptcy proceeding, the court ordered mediation, the negotiations that led to the *Kessler* Settlement and a Plan Support Agreement, the proposed Plan, and the later confirmed Plan. Despite numerous invitations through correspondence, conference calls and an in-person meeting to participate and review proposed settlement terms, Defendant Insurers refused, further breaching their polices.

206.     Despite having had adequate notice of these suits, and the repeated efforts at cooperation by RFC, Defendant Insurers failed to pay, and have never paid the *Kessler* Settlement or for RFC's defense of the *Kessler* Claim and the related, underlying actions.

207.     The Defendant Insurers' refusal to consent to a reasonable settlement was deliberate, reckless, in gross disregard of RFC's interests and in bad faith in light of the fact that the Defendant Insurers knew that RFC faced damages far in excess of the GM Policies' limits and despite the fact that RFC's liability for the claims had become increasingly probable throughout the course of the Pennsylvania Actions, the *Community Bank* MDL and the related appeals to the Third Circuit.

208.     The Defendant Insurers' refusal to consent to a reasonable settlement and assertion that the GM Policies may not cover any settlement of the claims alleged in the *Kessler* Claim was also deliberate, reckless, in gross disregard of RFC's interests and in bad faith in light of the clear coverage obligations under the facts of the *Kessler* Claim and the failure of the Defendant Insurers to provide any reasonable grounds for refusing coverage for the claims asserted in the *Kessler* Claim.

D.     **DEFENDANT INSURERS' BAD FAITH CONDUCT AND ADJUSTMENT OF RFC'S CLAIMS**

**Defendant Insurers' Bad Faith Delay and Knowingly False Assertion of the "Defense" that RFC was Paid Fees in Connection with the Kessler Claim**

209.     RFC first provided notice of the Kessler Claim to Lloyd's on or about September 5, 2001 and requested a coverage opinion from Lloyd's "as quickly as possible."

210.     In subsequent communications dated December 16, 2001 and thereafter RFC repeatedly renewed its request to Lloyd's for a coverage opinion on the Kessler Claim.

211.     Internal documents produced by Lloyd's reveal that as early as March of 2002, Lloyd's had investigated and arrived at a coverage position, but failed and refused to disclose its

coverage opinion to RFC despite RFC's previous requests. Further, these internal documents show that Lloyd's had the necessary information to make a coverage determination.

212.     As of March of 2003, 1 ½ years after RFC first requested a coverage opinion, Lloyd's had still not provided a coverage opinion to RFC on the Kessler Claim even though it knew that RFC was trying to negotiate a possible settlement with the underlying plaintiffs, even though RFC was incurring significant defense costs, and even though Lloyd's had conducted its own internal investigation into the facts and coverage for well over a year.

213.     It was not until May 2, 2003 that Lloyd's issued its first reservation of rights letter to RFC, and only then to refuse RFC's request for coverage for the proposed settlement of the Kessler Claim in early 2003.

214.     In the May 2, 2003 letter, Lloyd's refused to acknowledge coverage for the Kessler Claim because Lloyd's asserted that the Kessler Claim constituted a Mortgage Fee Claim and was therefore purportedly excluded under the III.C.10. Mortgage Fee Claim Exclusion.

215.     In the May 2, 2003 letter, Lloyd's asserted the Kessler Claim was a Mortgage Fee Claim based on Lloyd's position that the fees were "paid to" RFC.

216.     However, Lloyd's assertion that fees were "paid to" RFC was contrary to the facts known to Lloyd's that the fees were paid to the originating lenders and contrary to the facts known to Lloyd's that RFC purchased the loans after the fees at issue were paid and the loans were closed. Thus Lloyd's contention that fees were paid to RFC was knowingly false, not a position that would have been taken by a reasonable insurer under these facts, and not a good faith basis for reserving or denying coverage. Further, even under Lloyd's knowingly false coverage position, RFC was owed reimbursement of its defense costs, which Lloyd's did not provide.

217.     Each of the Excess Insurers subsequently adopted Lloyd's May 2, 2003 reservation

of rights letter as its own, despite also knowing the fact that the fees at issue were paid to the originating lenders and not to RFC. Thus the Excess Insurers' contention that fees were paid to RFC was knowingly false, not a position that would have been taken by a reasonable insurer under these facts, and not a good faith basis for reserving or denying coverage.

218.    For over 15 years since first receiving notice of the Kessler Claims, the Defendant Insurers ignored documentation and evidence provided to them that established that the improper fees were paid to the originating lenders and not to RFC. The Defendant Insurers' repeated refusal to acknowledge the documentation and evidence that no fees were ever paid to RFC was not a position that would have been taken by a reasonable insurer under these facts and not a good faith basis for reserving or denying coverage.

219.    Despite clear Policy language to the contrary, Lloyd's also took the knowingly false position that each of the actions consolidated in the Community Bank MDL were a separate "Claim" subject to a separate retention. Based on this knowingly false position, Lloyd's refused to reimburse RFC for the significant defense costs it incurred in defending against these actions. Despite multiple requests from RFC for reconsideration of this knowingly false position, Lloyd's refused to reconsider and refused to reimburse RFC for its mounting and significant defense costs.

**Defendant Insurers' Bad Faith Delay and Knowingly False "Defense" that RFC was Paid Fees in Connection with the Mitchell Claim and Related Missouri Actions**

220.    RFC first provided notice of the Mitchell Claim to Lloyd's on or about September 22, 2003. The Mitchell Claim was one of several lawsuits filed against RFC based on alleged violations of the MMSLA. Lloyd's acknowledged notice of all these claims.

221.    Eight days after RFC reported the Mitchell Claim, Twin City issued a letter acknowledging RFC should receive a prompt coverage analysis by the Defendant Insurers and noting Twin City's future coverage position, as yet to be determined, would depend upon and be

influenced by Lloyd's own coverage determination.

222.    The Defendant Insurers were informed no later than February 2004 that the Mitchell Claim involved problematic loans and that RFC faced potential liability in excess of the $5 million SIR, and the Defendant Insurers were thereafter regularly kept apprised of activity on the Mitchell Claim docket.

223.    As of August 2004, the Defendant Insurers had developed over 14 pages of coverage analysis for the Mitchell Claim, but chose not to share that analysis with RFC or otherwise issue any sort of coverage opinion to RFC.

224.    From the beginning of the Mitchell Claim RFC went to the effort of submitting regular updates on the Mitchell Claim to the Defendant Insurers as if it were a covered claim and regularly sought Lloyd's coverage position even though Lloyd's continued to refuse to provide a coverage position.

225.    The regular updates RFC submitted to the Defendant Insurers on the status of the Mitchell Claim repeatedly emphasized the problematic loans and exposure above the $5 million SIR.  Despite these regular updates, the Defendant Insurers continually failed and refused to issue a coverage position on the Mitchell Claim.

226.    In the several years the Mitchell Claim was pending, the Defendant Insurers knew that the Mitchell Claim was one of a handful of very significant Claims against RFC, and also knew that RFC's exposure could exceed the $5 million self-insured retention in the Policy, and that a negative outcome of the Mitchell Claim would cause significant financial damage to RFC.

227.    Even after being notified of the Mitchell Claim on September 22, 2003, and being kept apprised of the proceedings in the trial court up to the date the trial began on December 3, 2007, the Defendant Insurers still did not issue a coverage opinion on the Mitchell Claim or pay

any of RFC's mounting defense costs.

228.    Even more, after being informed of the jury verdict of over $99 million against RFC in the Mitchell Claim in January 2008, the Defendant Insurers still did not issue a coverage opinion. Nor did they provide a coverage opinion in the ensuing months of post-trial motion practice that ended on October 6, 2008 when the trial court entered final judgment against RFC.

229.    Despite being regularly updated on the status of the Mitchell Claim and the significant exposure Mitchell and the Related Missouri Actions posed to RFC, knowing that a trial was impending, and having access to the docket, the Defendant Insurers did not conduct any investigation of these claims by requesting the production of any pleadings, documents, or other information regarding the Mitchell claim over that already provided by RFC until February 2008, over a month after the jury entered its verdict.

230.    In response to the Defendant Insurers' February 2008 untimely request, RFC produced approximately 16,000 pages of material related to the Mitchell Claim.

231.    Although RFC provided timely notice of the Mitchell Claim and the Related Missouri Actions, the Defendant Insurers, contrary to what a reasonable insurer would do in that same position, never provided a coverage opinion for the Mitchell Claim for over 5 years during which time discovery, pre-trial motion practice, mediations, class certification, trial, verdict, post-trial motion practice, and final judgment all occurred.

232.    The Defendant Insurers knew, or should have known, that they had not issued a coverage opinion throughout the entire time the Mitchell Claim was litigated up until the time final judgment was entered.

233.    Internal communications reveal that as of June 2008 and again in October 2008 when final judgment was entered in the Mitchell Claim, the Defendant Insurers acknowledged that

a coverage letter should have been issued several years earlier.

234.    At that same time, an attorney for SRI expressed concern that the Defendant Insurers had not yet taken a coverage position on the Mitchell Claim, and noted they "were in a most difficult spot," if Lloyd's intended to disclaim coverage "six years after being told of the loss and nine months after the verdict."

235.    Indeed, the Defendant Insurers did not issue a "reservation of rights" letter for the Mitchell Claim until October 17, 2008, mere days before RFC was required to post a $127 million appeal bond, despite knowing that RFC was in a precarious financial position and that the Mitchell Class would immediately execute on the judgment if the bond was not posted.

236.    In the October 17, 2008 letter, Lloyd's refused to acknowledge coverage for the Mitchell Claim because it constituted a Mortgage Fee Claim and was therefore purportedly excluded under the III.C.10. Mortgage Fee Claim Exclusion.

237.    In the October 17, 2008 letter, Lloyd's asserted that the Mitchell Claim was a Mortgage Fee Claim because the plaintiffs "alleged and proved" that the improper fees were "'paid to' the Assured [RFC] 'in connection with' the origination, processing, closing, marketing, or servicing of the loans."

238.    Each of the Defendant Insurers subsequently adopted Lloyd's October 17, 2008 reservation of rights letter as its own.

239.    In response to Lloyd's refusal to acknowledge coverage for the Mitchell Claim based upon Lloyd's assertion that fees were "paid to" RFC, RFC pointed to evidence, already provided to Lloyd's, that there were no allegations or findings of fact that RFC was ever directly paid any fees in connection with the Mitchell Claim.  Under significant financial strain and facing significant liability, RFC requested Lloyd's to reconsider its knowingly false coverage position

that fees were "paid to" RFC. Lloyd's refused to change its knowingly false coverage position.

240.    Despite possessing all of the available information necessary to make a coverage determination on the Mitchell Claim, including the 16,000 pages of material RFC produced to the Defendant Insurers and having access to the entire record of those proceedings, contrary to what a reasonable insurer would do in the same position, the Defendant Insurers refused to change their knowingly false coverage position, refused to reimburse RFC for its payment of the Mitchell judgment, refused to reimburse RFC for approved settlements of the Related Missouri Actions, refused to fully pay RFC's defense costs, and continued to make additional, unnecessary, requests to RFC for information.

### Defendant Insurers' Acknowledgment of Their Bad Faith Assertion that Fees were Paid to RFC

241.    From the time of their first coverage opinion for the Kessler Claim in 2003, until they filed their Memorandum in Support of their Motion for Summary Judgment ("Defendants' MIS") in 2018 (a period of over 15 years), in over 20 different coverage letters and numerous other communications with the Assured, the Defendant Insurers repeatedly reserved (and internally denied) coverage to RFC for both the Kessler and Mitchell Claims (and all related actions) based on their position that fees were "paid to" RFC and as a consequence the Mortgage Fee Exclusion excluded coverage.

242.    At no time in the 15 years since first receiving notice of the Kessler Claim did any of the 20 Coverage Letters issued by the Defendant Insurers for either the Kessler or Mitchell Claims disclaim or reserve coverage based on an assertion that fees were paid to the originating lenders. None of the Defendant Insurers ever claimed that the Kessler or Mitchell Claims were Mortgage Fee Claims based on fees paid to the originating lenders such that coverage was barred under the III.C.10. Mortgage Fee Claim Exclusion. Similarly, none of the Defendant Insurers ever

claimed that coverage was barred under the III.C.9. Return of Fees Exclusion based on fees paid to the originating lenders.

243.    None of the 20 Coverage Letters issued by the Defendant Insurers ever mentioned the clause found at the end of the III.C. Exclusions (referred to by the parties as the "Deemer Clause") nor did any of the 20 Coverage Letters describe the Deemer Clause; and, none of the 20 Coverage letters ever applied the Deemer Clause.

244.    At no time in those 15 years did the Defendant Insurers ever say that the originating lenders were Assureds or Professional Liability Assureds under the terms of the Primary Policy.

245.    At no time is those 15 years did the Defendant Insurers ever refer to the Deemer Clause to assert that the originating lenders were "deemed" an Assured that was paid fees.

246.    Until Lloyd's and the Defendant Insurers filed their Motion for Partial Summary Judgment (Adv. Dkt. 338) and Memorandum in Support ("MIS") in this case on March 16, 2018 (Adv. Dkt. 338-1), Lloyd's and the Defendant Insurers continued to refuse to acknowledge coverage for both the Kessler or Mitchell Claims (and related actions) based on the Mortgage Fee Claim Exclusions by contending that fees were "paid to" RFC in connection with the Kessler and Mitchell Claims.

247.    In Lloyd's and the Defendant Insurers' MIS, however, Lloyd's and the Defendant Insurers admitted for the first time, after over 15 years of asserting that fees were "paid to" RFC, that "the challenged fees were paid to the loan originators or banks that funded the loans, and not to RFC. . ."

248.    The allegations and facts of the Kessler Claim known to Lloyd's and the Defendant Insurers when they filed their MIS were known to Lloyd's and the Defendant Insurers when they issued their first reservation of rights letter for the Kessler Claim on May 2, 2003, and those

allegations and facts did not change during the intervening 15 years before Lloyd's and the Defendant Insurers filed their MIS.

249.    The allegations, facts, and jury verdict in the Mitchell Claim were known to Lloyd's and the Defendant Insurers when they issued their first reservation of rights letter for the Mitchell Claim on October 17, 2008, and those allegations, facts and jury verdict did not change during the intervening 10 years before Lloyd's and the Defendant Insurers filed their MIS.

250.    Lloyd's and the Defendant Insurers' continued assertion for over 15 years that fees were "paid to" RFC, and continued refusal to acknowledge coverage on that basis for both the Kessler and Mitchell Claims (and related actions), was knowingly false, not a position that would have been taken by a reasonable insurer under these facts, and not a good faith basis for reserving or denying coverage.

251.    Lloyd's and the Defendant Insurers' continued false assertion that fees were "paid to" RFC constituted a breach of the covenant of good faith and fair dealing present and implicit in the GM Policies and caused significant financial damage to RFC.

252.    Lloyd's and the Defendant Insurer's refusal to acknowledge coverage based on the knowingly false assertion that fees were "paid to" RFC, caused RFC to shoulder significant and mounting defense costs, report to investors and others potentially massive (unreimbursed and uncovered) liability, and contributed to RFC's precarious financial position and bankruptcy.

**Defendant Insurers' Bad Faith Refusal to Take a Coverage Position and Deny Coverage**

253.    The Defendant Insurers exhibited a clear and consistent pattern of delay throughout the adjustment of the Kessler and Mitchell Claims (and related claims).

254.    The Defendant Insurers themselves have admitted that they were going to deny coverage for the Kessler Claim as early as May, 2003, by stating that "it was already long since

apparent – as of October 2008, if not the May 2003 Kessler Reservation – that Underwriters were not providing coverage for any damages awarded in these claims . . . (Adv. Doc. 315 p.12). The Defendant Insurers also stated that as of 2003, the "Underwriters did not recognize coverage for any judgments or settlements in the Kessler Claims" and that "this coverage position was fundamentally adverse to RFC's position." (Adv. Doc. 299-16 at p.23)

255.    In addition, Lloyd's has openly admitted in its interrogatory answers that it had decided there was no coverage for the Kessler Claim at least as of May 2, 2003.

256.    Yet, despite their clear intention through their words and deeds to deny coverage, the Defendant Insurers refused to clearly communicate that denial to RFC.

257.    In addition, and again despite already having decided to deny coverage, the Defendant Insurers made repeated, duplicative, and completely unnecessary requests for more information from RFC about the Kessler and Mitchell Claims. As confirmed by their early internal decisions to deny coverage, the Defendant Insurers had all of the necessary information to make a coverage decision shortly after they were first given notice of the Kessler and Mitchell Claims.

258.    Through their refusal to issue a clear denial, and through their repeated unnecessary requests for more information, the Defendant Insurers intended to delay taking a definitive coverage position on both the Kessler and Mitchell Claims for as long as possible, and by doing so attempted to preserve potential defenses to coverage they would otherwise rightly have waived or be estopped from asserting.

259.    For example, the Defendant Insurers knew that if they continued the charade of reservations of rights letters instead of a truthful denial of coverage, the Defendant Insurers could attempt to preserve their right to refuse to consent to settlement by RFC.

260.    The Defendant Insurers also refused to participate in the mediation of the Kessler

Claim and related settlement discussions, despite invitations to do so.

261.    The Defendant Insurers' intentional delay in refusing to issue a denial of coverage, and related requests for irrelevant information, was done in bad faith and harmed RFC's ability to defend and resolve the Kessler and Mitchell Claims, in that RFC was forced to proceed without knowing whether any defense costs or ultimate judgment or settlement would be reimbursed by the Defendant Insurers.

262.    The Defendant Insurer's intentional delay, and consequent hindrance of RFC's ability to resolve the Kessler and Mitchell Claims, took advantage of RFC's precarious financial position and was done in an effort to avoid their coverage obligations and avoid paying RFC any money before its bankruptcy in 2012.

263.    The Defendant Insurer's intentional delay caused RFC to shoulder significant and mounting defense costs, report to investors and others potentially massive (unreimbursed and uncovered) liability, and contributed to RFC's precarious financial position and bankruptcy.

**Defendant Insurers' Knowledge of the Excess Policy Terms**

264.    When the Primary Policy was issued, Lloyd's knew and was aware that Excess Policies forming a tower would also be issued as a part of the IRP (Integrated Risk Program), and that those Excess Policies would and did contain provisions, as was also the general custom and practice of excess policies in general, that the Excess Insurers would contend such provisions required Lloyd's and underlying carriers to pay the full limits of their policies before each respective Excess Policy would be triggered.

265.    At all times when Lloyd's made its repeated bad faith assertions that the Kessler and Mitchell Claims were Mortgage Fee Claims because fees were "paid to" RFC, Lloyd's was aware that the Excess Insurers would contend that their policies do not attach, and that no claim

could lie against them, until Lloyd's paid out its full policy limits to RFC.

266.    Lloyd's knew that every Excess Policy, with very limited exceptions not relevant to Plaintiffs' claims, followed form to the Primary Policy, and therefore knew that whatever coverage position was taken by Lloyd's would be adopted by the Excess Insurers.

267.    When the Excess Policies were issued, the Excess Insurers knew and were aware that other Excess Policies were issued as a part of the IRP tower, and that those other Excess Policies contained provisions that the Excess Insurers would contend required Lloyd's and the underlying carriers to pay the full limits of their policies before each respective Excess Policy would be triggered.

268.    At all times when the Excess Insurers made their repeated bad faith assertions that the Kessler and Mitchell Claims were Mortgage Fee Claims because fees were "paid to" RFC, the Excess Insurers were each aware that those Excess Insurers that issued policies above their own layer would contend that their policies do not attach, and that no claim could lie against them, until each of the underlying Policies paid out its full policy limits to RFC.

269.    Each of the Excess Insurers knew that every Excess Policy, with very limited exceptions not relevant to Plaintiffs' claims, followed form to the Primary Policy and to one or more of the underlying Excess Policies, and therefore knew that whatever coverage position was taken by Lloyd's and the underlying Excess Insurers would be adopted by the Excess Insurers sitting above the underlying Excess Policies.

E.      **CLAIMS**

1.      **COUNT I:  Declaratory Relief For The *Kessler* Class – Payment for the *Kessler* Settlement**

For the First Count to their Third Amended Adversary Complaint in this action, Plaintiffs state and allege the following:

270.    The preceding paragraphs of the Third Amended Adversary Complaint are realleged and incorporated into this count as though they were fully set forth herein.

271.    The *Kessler* Settlement of the *Kessler* Claim is reasonable and the $300 million allowed claim constitutes covered Loss under the GM Policies.

272.    The Defendant Insurers unreasonably withheld their consent to the *Kessler* Settlement and improperly denied coverage for the payment of the $300 million allowed claim.

273.    RFC has assigned to the *Kessler* Class its post-loss rights to recover the covered Losses in connection with the *Kessler* Settlement.

274.    Accordingly, an actual case or controversy exists among the parties with respect to the Defendant Insurers' obligations to pay the *Kessler* Class for the $300 million payment to be made in settlement of the claims made against RFC in the *Kessler* Claim. The *Kessler* Class is entitled to a judicial declaration that:

a)    the Claims made against RFC in the *Kessler* Claim come within the coverage afforded under the GM Policies;

b)    the Defendant Insurers unreasonably withheld their consent to the *Kessler* Settlement;

c)    the $300 million allowed claim against RFC under the *Kessler* Settlement constitutes Loss covered by the GM Policies;

d)    General Motors and RFC have complied with any and all applicable conditions for coverage of that Loss under the GM Policies; and

e)    the Defendant Insurers are contractually obligated to pay the *Kessler* Class

for that Loss.

## 2. COUNT II: Breach of Contract – The Kessler Class

For the Second Count to their Third Amended Adversary Complaint in this action, Plaintiffs jointly state and allege the following:

275. The preceding paragraphs of this Third Amended Adversary Complaint are realleged and incorporated into this count as though they were fully set forth herein.

276. The GM Policies are binding, valid and enforceable insurance contracts.

277. General Motors and its Subsidiaries, including RFC, have complied with any and all applicable conditions under the GM Policies for coverage of any Loss incurred as a result of Claims made against RFC in the *Kessler* Claim.

278. RFC is a covered Assured under the GM Policies, and has incurred a covered Loss in connection with the *Kessler* Claim and its ultimate resolution through the *Kessler* Settlement that the Defendant Insurers are obligated to pay.

279. RFC has assigned to the *Kessler* Class its post-loss rights to recover the covered Loss in connection with the *Kessler* Settlement.

280. The Defendant Insurers have breached their contractual obligations under the GM Policies to pay the *Kessler* Class as the assignee of RFC for RFC's covered Loss as a result of the final resolution of the *Kessler* Claim through the *Kessler* Settlement.

281. As a direct and proximate result of their breaches of contract, the Defendant Insurers are liable to the *Kessler* Class for the covered Loss incurred as a result of the *Kessler* Settlement in the amount of $300 million.

## 3. COUNT III: Declaratory Relief For The Liquidating Trust – Payment for Defense Costs Relating To The Pennsylvania Actions, *Community Bank* MDL, and the *Kessler* Claim

For the Third Count to their Third Amended Adversary Complaint in this action, Plaintiffs jointly state and allege the following:

282.    The preceding paragraphs of the Third Amended Adversary Complaint are realleged and incorporated into this count as though they were fully set forth herein.

283.    General Motors and its Subsidiaries, including RFC, have complied with any and all applicable conditions under the GM Policies for coverage of any Loss and/or any Costs, Charges and Expenses that were incurred as a result of Claims made against RFC in the *Kessler* Claim.

284.    RFC has expended approximately $7.0 million in reasonable costs, charges and expenses in defending the Pennsylvania Actions, *Community Bank* MDL, and the *Kessler* Claim. This expense constitutes covered Loss under the GM Policies.

285.    The Defendant Insurers have improperly denied coverage for  the approximately $7.0 million in costs, charges and expenses reasonably incurred by RFC in defending the Pennsylvania Actions, *Community Bank* MDL, and the *Kessler* Claim.

286.    RFC has assigned to the Liquidating Trust its post-loss rights to recover the covered Losses in connection with defending the Pennsylvania Actions, *Community Bank* MDL, and the *Kessler* Claim.

287.    Accordingly, an actual case or controversy exists among the parties with respect to the Defendant Insurers' obligations to pay the Liquidating Trust for the $7.0 million in costs, charges and expenses reasonably incurred by RFC in defending the Pennsylvania Actions, *Community Bank* MDL, and the *Kessler* Claim.

288.    The Liquidating Trust is entitled to a judicial declaration that:

          a)      the Claims made against RFC in the Pennsylvania Actions, *Community*

*Bank* MDL, and the *Kessler* Claim come within the coverage afforded under the GM Policies;

b) the $7.0 million in costs, charges and expenses reasonably incurred by RFC in defending the Pennsylvania Actions, *Community Bank* MDL, and the *Kessler* Claim are Loss covered by the GM Policies;

c) General Motors and RFC have complied with any and all applicable conditions for coverage of that Loss under the GM Policies; and

d) the Defendant Insurers are contractually obligated to pay the Liquidating Trust for that Loss.

**4. COUNT IV: Breach of Contract – The Liquidating Trust - Failure to Pay Defense Costs Relating To The Pennsylvania Actions, *Community Bank* MDL, and the *Kessler* Claim**

For the Fourth Count to their Third Amended Adversary Complaint in this action, Plaintiffs jointly state and allege the following:

289. The preceding paragraphs of this Third Amended Adversary Complaint are realleged and incorporated into this count as though they were fully set forth herein.

290. The GM Policies are binding, valid and enforceable insurance contracts.

291. General Motors and its Subsidiaries, including RFC, have complied with any and all applicable conditions under the GM Policies for coverage of any Loss incurred as a result of Claims made against RFC in the *Pennsylvania Actions, Community Bank MDL,* and the *Kessler* Claim.

292. Under the GM Policies, the Defendant Insurers are obligated to pay for any covered Loss in connection with the defense of the Pennsylvania Actions, *Community Bank* MDL, and the *Kessler* Claim.

71

293.     RFC has assigned to the Liquidating Trust its post-loss rights to recover the covered Loss related to the costs, charges and expenses reasonably incurred by RFC in connection with defending the Pennsylvania Actions, *Community Bank* MDL, and the *Kessler* Claim.

294.     The Defendant Insurers have breached their contractual obligations under the GM Policies to pay the Liquidating Trust as the assignee of RFC for RFC's covered Loss as a result of the reasonably incurred costs, charges and expenses in defending the Pennsylvania Actions, *Community Bank* MDL, and the *Kessler* Claim.

295.     As a direct and proximate result of their breaches of contract, the Defendant Insurers are liable to the Liquidating Trust for the covered Loss incurred as a result of defending the Pennsylvania Actions, *Community Bank* MDL, and the *Kessler* Claim in the amount of approximately $7.0 million.

## VIII.   THE *MITCHELL* CLASS AND RESCAP LIQUIDATING TRUST'S CLAIMS RELATED TO THE *MITCHELL* ACTION AND SETTLEMENT

### A.     COVERAGE UNDER THE TERMS OF THE PRIMARY INSURANCE POLICY

296.     RFC is an Assured and a Professional Liability Assured under all of the GM Policies.

297.     The payment made by RFC in partial satisfaction of the judgment against it in the *Mitchell* Action, the allowed claim owed to the *Mitchell* Class in the *Mitchell* Settlement entered into by RFC, along with the legal fees and expenses incurred by RFC in defending the *Mitchell* Action, constitute covered Loss that RFC was and is legally obligated to pay by reason of the *Mitchell* Action.

298.     The Claim filed against RFC in the *Mitchell* Action resulted directly from one or more Wrongful Acts committed by RFC.  RFC committed an actual or alleged breach of duty,

neglect, error, misstatement, misleading statement, or omission, in one or more of, but not limited to, the following respects, by:

    a)    failing to adequately scrutinize for violations of law the loans it purchased from its correspondent lender customer and client, MCR and subsequently securitized;

    b)    accepting assignments of loans from its correspondent lender customer and client, MCR without performing adequate due diligence;

    c)    providing a flow of capital to its correspondent lender customer and client, MCR, that was violating the law;

    d)    failing to monitor and uncover the illegal lending practices by its correspondent lender customer and client, MCR.

299.    The Wrongful Acts committed by RFC were in the ordinary course of its activities as a financial services company (as disclosed to the Defendant Insurers) in rendering or failing to render Professional Services which included, without limitation, the acquisition of residential mortgage loans on the secondary market from its correspondent lender customer and client, MCR, and securitizing residential mortgage loans for its downstream customers and clients.

300.    The Claims in the *Mitchell* Action were first made against RFC during the Policy Period.

301.    The payments that RFC made in partial satisfaction of the judgment in the *Mitchell* Action, the *Mitchell* Settlement entered into by RFC and the costs, charges and expenses incurred by RFC in defending the *Mitchell* Action are all a covered Loss under the GM Policies.  None of this Loss is excepted or excluded from the Policies' definition of covered Loss and Costs, Charges and Expenses.  None of the Policies' exclusions or conditions operate to exclude from coverage

any element of this Loss or any of the Claims in the *Mitchell* Action.

302.     General Motors and its Subsidiaries including RFC have complied with any and all applicable conditions under the GM Policies for coverage of any Loss incurred as a result of Claims made against RFC in the *Mitchell* Action, including but not limited to:

a)     providing sufficient and timely notice to the Defendant Insurers of the *Mitchell* Action;

b)     providing the Defendant Insurers with any information, assistance and co-operation as the Defendant Insurers reasonably requested with regard to the *Mitchell* Action; and

c)     advising the Defendant Insurers of any efforts to resolve the *Mitchell* Action in advance of settlement.

B.     **CLAIMS**

1.     **COUNT VI:  Declaratory Relief For The *Mitchell* Class – Payment for the *Mitchell* Settlement**

For the Sixth Count to their Third Amended Adversary Complaint in this action, Plaintiffs state and allege the following:

303.     The preceding paragraphs of the Third Amended Adversary Complaint are realleged and incorporated into this count as though they were fully set forth herein.

304.     The *Mitchell* Settlement of the *Mitchell* Action is reasonable and the $14.5 million allowed claim constitutes covered Loss under the GM Policies.

305.     The Defendant Insurers have unreasonably denied coverage for the payment of the $14.5 million allowed claim.

306.     RFC has assigned to the *Mitchell* Class its post-loss rights to recover the covered Loss in connection with the *Mitchell* Settlement.

74

307.    Accordingly, an actual case or controversy exists among the parties with respect to the Defendant Insurers' obligations to pay the *Mitchell* Class for the $14.5 million payment to be made in settlement of the remaining claims made against RFC in the *Mitchell* Action.

308.    The *Mitchell* Class is entitled to a judicial declaration that:

a)    the Claims made against RFC in the *Mitchell* Action come within the coverage afforded under the GM Policies;

b)    the $14.5 million allowed claim against RFC under the *Mitchell* Settlement constitutes Loss covered by the GM Policies;

c)    General Motors and RFC have complied with any applicable conditions for coverage of that Loss under the GM Policies; and

d)    the Defendant Insurers are contractually obligated to pay the *Mitchell* Class for that Loss.

## 2.    COUNT VII:  Breach of Contract – The *Mitchell* Class

For the Seventh Count to their Third Amended Adversary Complaint in this action, Plaintiffs jointly state and allege the following:

309.    The preceding paragraphs of this Third Amended Adversary Complaint are realleged and incorporated into this count as though they were fully set forth herein.

310.    The GM Policies are binding, valid and enforceable insurance contracts.

311.    General Motors and its Subsidiaries including RFC, have complied with any applicable conditions for coverage of any Loss incurred in the *Mitchell* Action.

312.    RFC is a covered Assured under the GM Policies, and has incurred a covered Loss in connection with the *Mitchell* Action and its ultimate resolution through the *Mitchell* Settlement.

313.    Under the GM Policies, the Defendant Insurers are obligated to pay for any covered

Loss incurred in connection with the *Mitchell* Action.

314.    Defendant Insurers, in breach of their contractual obligations under the GM Policies, unreasonably denied coverage for the *Mitchell* Settlement.

315.    RFC has assigned to the *Mitchell* Class its post-loss rights to recover the covered Losses in connection with the *Mitchell* Settlement.

316.    The Defendant Insurers have breached their contractual obligations under the GM Policies to pay the *Mitchell* Class as the assignee of RFC for RFC's covered Losses as a result of the final resolution of the *Mitchell* Action through the *Mitchell* Settlement.

317.    As a direct and proximate result of their breaches of Contract, the Defendant Insurers are liable to the *Mitchell* Class for the covered Loss incurred as a result of the *Mitchell* Settlement in the amount of $14.5 million.

       **3.**     **COUNT VIII:   Declaratory Relief For The Liquidating Trust – Payment for *Mitchell* Judgment and Defense Costs Relating To The *Mitchell* Action**

For the Eighth Count to their Third Amended Adversary Complaint in this action, Plaintiffs jointly state and allege the following:

318.    The preceding paragraphs of the Third Amended Adversary Complaint are realleged and incorporated into this count as though they were fully set forth herein.

319.     General Motors and its Subsidiaries including RFC have complied with any and all applicable conditions under the GM Policies for coverage of any Loss incurred as a result of Claims made against RFC in the *Mitchell* Action.

320.    RFC on September 7, 2011, October 5, 2011 and March 2, 2012 paid the *Mitchell* Class a total of $15,648,868.12 in partial satisfaction of the award and partial judgment (including the award of attorneys' fees) affirmed by the Missouri Court of Appeals.

321.     RFC has expended approximately $6.1 million in reasonable costs, charges and expenses in defending the *Mitchell* Action, which have not been reimbursed, despite the fact that RFC's prior request for reimbursement of defense costs, charges and expenses incurred by RFC in defense of the *Mitchell* Action was approved on or about May 1, 2009 and subsequently paid to RFC.

322.     The costs, charges and expenses incurred by RFC in defending the *Mitchell* Action are reasonable and constitutes a covered Loss under the GM Policies.

323.     The payment by RFC of $15,648,868.12 in partial satisfaction of the judgment in the *Mitchell* Action constitutes covered Loss under the GM Policies.

324.     The Defendant Insurers have improperly denied coverage for the payment of $15,648,868.12 in partial satisfaction of the judgment in the *Mitchell* Action and $6.1 million in costs, charges and expenses reasonably incurred by RFC in defending the *Mitchell* Action.

325.     RFC has assigned to the Liquidating Trust its post-loss rights to recover the covered Loss incurred in connection with the *Mitchell* Action.

326.     Accordingly, an actual case or controversy exists among the parties with respect to the Defendant Insurers' obligations to pay the Liquidating Trust for the $15,648,868.12 paid by RFC in partial satisfaction of the judgment in the *Mitchell* Action and $6.1 million in costs, charges and expenses reasonably incurred by RFC in defending the *Mitchell* Action.

327.     The Liquidating Trust is entitled to a judicial declaration that:

    a)     the Claims made against RFC in the *Mitchell* Action come within the coverage afforded under the GM Policies;

    b)     the $15,648,868.12 paid by RFC to satisfy a portion of the judgment in *Mitchell* constitutes Loss covered by the GM Policies;

c)       the approximately $6.1 million in costs, charges and expenses reasonably incurred by RFC in defending the *Mitchell* Action constitutes Loss covered by the GM Policies;

d)       General Motors and RFC have complied with any and all applicable conditions for coverage under the GM Policies;

e)       and the Defendant Insurers are contractually obligated to pay the Liquidating Trust for that Loss.

**4.      COUNT IX:  Breach of Contract – The Liquidating Trust - Failure to Pay the *Mitchell* Judgment and Defense Costs Relating To The *Mitchell* Action**

For the Ninth Count to their Third Amended Adversary Complaint in this action, Plaintiffs jointly state and allege the following:

328.    The preceding paragraphs of this Third Amended Adversary Complaint are realleged and incorporated into this count as though they were fully set forth herein.

329.    The GM Policies are binding, valid and enforceable insurance contracts.

330.    General Motors and its Subsidiaries including RFC have complied with any and all applicable conditions under the GM Policies for coverage of any Loss and Costs, Charges and Expenses incurred as a result of Claims made against RFC in the *Mitchell* Action.

331.    The Defendant Insurers, in breach of their contractual obligations under the GM Policies, denied coverage for the remaining, unreimbursed costs, charges and expenses reasonably incurred by RFC in defending the *Mitchell* Action and the payment by RFC of a portion of the judgment against RFC in the *Mitchell* Action.

332.    RFC is a covered Assured under the GM Policies, and has incurred a covered Loss in connection with the *Mitchell* Action.

333.     Under the GM Policies, the Defendant Insurers are obligated to pay for any covered Loss incurred in connection with the *Mitchell* Action.

334.     RFC has assigned to the Liquidating Trust its post-loss rights to recover the covered Loss reasonably incurred by RFC in connection with defending the *Mitchell* Action.  The Liquidating Trust also was assigned RFC's rights under the GM Policies to collect for any damages, judgments, or settlements prior to the *Mitchell* Settlement previously paid by RFC with respect to the *Mitchell* Action.

335.     The Defendant Insurers have breached their contractual obligations under the GM Policies to pay the Liquidating Trust as the assignee of RFC for RFC's covered Loss as a result of the $15,648,868.12 paid by RFC to satisfy a portion of the judgment against RFC in the *Mitchell* Action and the costs, charges and expenses incurred by RFC in defending the *Mitchell* Action.

336.     As a direct and proximate result of their breaches of contract, the Defendant Insurers are liable to the Liquidating Trust for RFC's payment of $15,648,868.12 in partial satisfaction of the judgment in the *Mitchell* Action and the approximately $6.1 million in unreimbursed defense costs RFC incurred in the *Mitchell* Action.

## IX.    THE RESCAP LIQUIDATING TRUST'S CLAIMS ARISING FROM DEFENSE AND SETTLEMENT OF THE RELATED MISSOURI ACTIONS

### A.    COVERAGE UNDER THE TERMS OF THE PRIMARY INSURANCE POLICY

337.     RFC is an Assured and Professional Liability Assured under all of the GM Policies.

338.     The settlements paid by RFC in connection with the Related Missouri Actions, along with the legal fees and expenses incurred by RFC in defending the Related Missouri Actions constitute a covered Loss that RFC was and is legally obligated to pay by reason of the Related Missouri Actions.

339.    The allegations made against RFC in the Mitchell Action and Related Missouri Actions are Interrelated Wrongful Acts, and as a result the Claims in the Mitchell Action and Related Missouri Actions are considered a single "Claim" under the terms of the Primary Policy, to which all of the Excess GM Policies follow form.  As such, only one $5 million retention applies to all of the Loss sustained by RFC in the defense and settlement of the Mitchell and Related Missouri Actions.

340.    The Claim filed against RFC in the Related Missouri Actions resulted directly from one or more Wrongful Acts committed by RFC.  RFC committed an actual or alleged breach of duty, neglect, error, misstatement, misleading statement, or omission, in one or more of, but not limited to, the following respects, by allegedly:

   a)    failing to adequately scrutinize for violations of law the loans it purchased on the secondary market from its customers and clients and subsequently securitized;

   b)    accepting assignments of loans from its customers and clients without performing adequate due diligence; and

   c)    failing to monitor and uncover the illegal settlement practices that pervaded the loans it purchased from its customers and clients.

341.    The Wrongful Acts committed by RFC were in the ordinary course of its activities as a financial services company (as disclosed to the Defendant Insurers) in rendering or failing to render Professional Services which included, without limitation, the acquisition of residential mortgage loans on the secondary market from its correspondent lender customers and clients, and securitizing residential mortgage loans for its downstream customers and clients.

342.    The Claims in the Related Missouri Actions were first made against RFC during

the Policy Period.

343.    The settlement payments that RFC made in the Related Missouri Actions and the costs, charges and expenses incurred by RFC in defending the Related Missouri Actions are all a covered Loss under the GM Policies.  None of this Loss is excepted or excluded from the Policies' definition of covered Loss and Costs, Charges and Expenses.  None of the Policies' exclusions or conditions operate to exclude from coverage any element of this Loss or any of the Claims in the Related Missouri Actions.

344.    General Motors and its Subsidiaries including RFC have complied with any and all applicable conditions under the GM Policies for coverage of any Loss and Costs, Charges and Expenses incurred as a result of Claims made against RFC in the Related Missouri Actions.

B.    **CLAIMS**

1.    **COUNT X:  Declaratory Relief For The Liquidating Trust – Payment for the Settlements in the Related Missouri Actions and Defense Costs Relating To The Related Missouri Actions**

For the Tenth Count to their Third Amended Adversary Complaint in this action, Plaintiffs jointly state and allege the following:

345.    The preceding paragraphs of the Third Amended Adversary Complaint are realleged and incorporated into this count as though they were fully set forth herein.

346.    RFC paid a total of $8.5 million in separate settlements in the Related Missouri Actions.

347.    RFC has expended approximately $4.7 million in reasonable costs, charges and expenses in defending the Related Missouri Actions, which have not been reimbursed.

348.    The costs, charges and expenses incurred by RFC in defending the Related Missouri Actions are reasonable, and along with the settlement payments incurred by RFC,  constitute

covered Loss under the GM Policies.

349.    The Defendant Insurers have improperly denied coverage for the settlement payments and defense costs incurred by RFC in connections with the Related Missouri Actions.

350.    RFC has assigned to the Liquidating Trust its post-loss rights to recover the covered Loss incurred in connection with the settlement and defense of the Related Missouri Actions.

351.    Accordingly, an actual case or controversy exists among the parties with respect to the Defendant Insurers' obligations to pay the Liquidating Trust for covered Loss incurred in relation to the Related Missouri Actions.

352.    The Liquidating Trust is entitled to a judicial declaration that:

    a)    the Claims made against RFC in the Related Missouri Actions come within the coverage afforded under the GM Policies;

    b)    the $8.5 million paid by RFC in settlements in the Related Missouri Actions constitutes Loss covered by the GM Policies;

    c)    the approximately $4.7 million in costs, charges and expenses reasonably incurred by RFC in defending the Related Missouri Actions constitutes Loss and Costs, Charges and Expenses covered by the GM Policies;

    d)    General Motors and RFC have complied with any and all applicable conditions for coverage of that Loss and Costs, Charges and Expenses under the GM Policies;

    e)    and the Defendant Insurers are contractually obligated to pay the Liquidating Trust for that Loss and Costs, Charges and Expenses.

**2.    COUNT XI:  Breach of Contract – The Liquidating Trust - Failure to Pay for the Settlements in the Related Missouri Actions and Defense Costs Relating To The Related Missouri Actions**

For the Eleventh Count to their Third Amended Adversary Complaint in this action, Plaintiffs jointly state and allege the following:

353.    The preceding paragraphs of this Third Amended Adversary Complaint are realleged and incorporated into this count as though they were fully set forth herein.

354.    The GM Policies are binding, valid and enforceable insurance contracts.

355.    General Motors and its Subsidiaries including RFC have complied with any and all applicable conditions under the GM Policies for coverage of any Loss and Costs, Charges and Expenses incurred as a result of Claims made against RFC in the Related Missouri Actions.

356.    The Defendant Insurers, in breach of their contractual obligations under the GM Policies, denied coverage for the defense costs and settlement payments reasonably incurred by RFC in the Related Missouri Actions.

357.    RFC is a covered Assured under the GM Policies, and has incurred covered Loss in connection with the Related Missouri Actions.

358.    RFC has assigned to the Liquidating Trust its post-loss rights to recover the covered Loss and Costs, Charges and Expenses incurred by RFC in connection with settling and defending the Related Missouri Actions.

359.    The Defendant Insurers have breached their contractual obligations under the GM Policies to pay the Liquidating Trust as the assignee of RFC for RFC's covered Loss and Costs, Charges and Expenses as a result of the settlements paid by RFC in the Related Missouri Actions and the costs, charges and expenses incurred by RFC in defending the Related Missouri Actions.

360.    As a direct and proximate result of their breaches of contract, the Defendant Insurers are liable to the Liquidating Trust for the $8.5 million in covered Loss incurred by RFC in the settlement of the Related Missouri Actions and the approximately $4.7 million incurred by

RFC in defending the Related Missouri Actions.

**X.      THE *PLAINTIFFS'* CLAIMS AGAINST LLOYD'S FOR BREACHING THE COVENANT OF GOOD FAITH AND FAIR DEALING.**

> A.      **COUNT XII: Lloyd's Breach of the Covenant of Good Faith and Fair Dealing for the Kessler Claim.**

For the Twelfth Count to their Third Amended Adversary Complaint in this action, Plaintiffs jointly state and allege the following:

361.    The preceding paragraphs of this Third Amended Adversary Complaint are realleged and incorporated into this count as though they were fully set forth herein.

362.    The Primary Policy contains an implicit covenant of good faith and fair dealing binding on all parties to the contract, including but not limited to Lloyd's and the remaining Defendant Insurers.

363.    Lloyd's position and/or conduct in the handling and adjustment of the Kessler Claim was unlawful, arbitrary, unreasonable, was a position and/or conduct that no reasonable insurer under those given facts would have asserted, and breached the implied covenant of good faith and fair dealing, by and in one or more of the following respects:

> a)      failing to acknowledge coverage and pay its policy limits immediately upon the entry and approval of the Kessler Settlement;

> b)      refusing to acknowledge that fees were never "paid to" RFC in connection with the Kessler Class Loans, despite knowing and having possession of all necessary facts showing that fees were never "paid to" RFC;

> c)      repeatedly asserting that the Mortgage Fee Claim Exclusion was the primary reason RFC could not obtain coverage for the Kessler Claim, despite knowing that the underlying basis for asserting that exclusion was false;

d)     continuing to assert that fees were "paid to" RFC in connection with the Kessler Claim, despite knowing that assertion was false, and thereby harming RFC's right to receive the benefits of the Primary Policy, including but not limited to RFC's right to a timely exhaustion of the Primary Policy;

e)     delaying 15 years to manufacture a meritless coverage defense based on fees paid to originating lenders through the Deemer Clause immediately upon withdrawing its previous false assertion that fees were "paid to" RFC despite never mentioning the Deemer Clause a single time in any correspondence with RFC;

f)     delaying without just cause or excuse notifying RFC that it had decided to deny coverage for the Kessler Claim as early as 2002 and delaying without just cause or excuse providing RFC with any coverage analysis before May 2003;

g)     unreasonably continuing to request additional, unnecessary, and duplicative information from RFC in order to further delay advising RFC of its intention to deny coverage;

h)     delaying advising RFC of its denial of coverage so that Lloyd's could attempt to preserve other policy defenses;

i)     refusing to pay and delaying payment to RFC in order to take advantage of RFC's impending bankruptcy;

j)     refusing to participate in the mediation of the Kessler Claim and related settlement discussions, despite invitations to do so;

k)     refusing to timely pay RFC's mounting and significant defense costs; and

l)      all the other conduct described and set forth in Paragraphs 196 through 219

and 241 through 269.

364.    At the time the Primary Policy was issued, Lloyd's knew and was otherwise aware

that any refusal by Lloyd's to pay the full limits of the Primary Policy for a claim that exceeded

the limits of the Primary Policy would impede the Assured (RFC) from seeking coverage from any

of the Excess Policies because the Excess Insurers would contend that their policies cannot attach

until Lloyd's pays the full limits of the Primary Policy.

365.    As a direct and proximate effect of Lloyd's breach of the covenant of good faith

and fair dealing, the Excess Insurers have contended that coverage under their respective Excess

Policies is barred because the limits of the underlying insurance were not exhausted by the actual

payment of claims or losses.

366.    As a direct and proximate effect of Lloyd's breach of the covenant of good faith

and fair dealing, RFC has been damaged, in that the Excess Insurers contend that RFC's claims

for coverage have not been triggered, and therefore contend that RFC's entitlement to prejudgment

interest on the amounts owed RFC under the Excess Policies would not begin to accrue, until the

limits of their respective underlying policies have been exhausted.

367.    As a direct and proximate result of Lloyd's breaches of the covenant of good faith

and fair dealing, the Kessler Class has suffered consequential damages in the amount of the

prejudgment interest the Kessler Class would be entitled to collect under applicable law from the

Excess Insurers in the absence of Lloyd's bad faith conduct.

368.    As a direct and proximate result of Lloyd's breaches of the covenant of good faith

and fair dealing, Kessler Class has suffered consequential damages in the amount of the attorney's

fees incurred by the Kessler Class in litigating the underlying coverage dispute and wrongful denial

of coverage by Lloyd's.

369.    The Excess Policies contain an implicit covenant of good faith and fair dealing binding on all parties to the contract, including but not limited to the Excess Insurers and the remaining Defendant Insurers.

370.    The Excess Insurers' position and/or conduct in the handling and adjustment of the Kessler Claim was unlawful, arbitrary, unreasonable, was a position and/or conduct that no reasonable insurer under those given facts would have asserted, and breached the implied covenant of good faith and fair dealing, by and in one or more of the following respects:

  a)    failing to acknowledge coverage and pay its policy limits immediately upon the entry and approval of the Kessler Settlement;

  b)    refusing to acknowledge that fees were never "paid to" RFC in connection with the Kessler Class Loans, despite knowing and having possession of all necessary facts showing that fees were never "paid to" RFC;

  c)    repeatedly asserting that the Mortgage Fee Claim Exclusion was the primary reason RFC could not obtain coverage for the Kessler Claim, despite knowing that the underlying basis for asserting that exclusion was false;

  d)    continuing to assert that fees were "paid to" RFC in connection with the Kessler Claim, despite knowing that assertion was false, and thereby harming RFC's right to receive the benefits of the Excess Policies, including but not limited to RFC's right to a timely exhaustion of the Excess Policies;

  e)    delaying 15 years to manufacture a meritless coverage defense based on fees paid to originating lenders through the Deemer Clause immediately

upon withdrawing its previous false assertion that fees were "paid to" RFC despite never mentioning the Deemer Clause a single time in any correspondence with RFC;

f)      delaying without just cause or excuse notifying RFC that it had decided to deny coverage for the Kessler Claim as early as 2002 and delaying without just cause or excuse providing RFC with any coverage analysis before May 2003;

g)      unreasonably continuing to request additional, unnecessary, and duplicative information from RFC in order to further delay advising RFC of its intention to deny coverage;

h)      delaying advising RFC of its denial of coverage so that the Excess Insurers could attempt to preserve other policy defenses;

i)      refusing to pay and delaying payment to RFC in order to take advantage of RFC's impending bankruptcy;

j)      refusing to participate in the mediation of the Kessler Claim and related settlement discussions, despite invitations to do so; and

k)      all the other conduct described and set forth in Paragraphs 196 through 219 and 241 through 269.

371.    At the time the Excess Policies were issued, the Excess Insurers knew and were otherwise aware that any refusal by the Excess Insurers to pay the full limits of their respective Excess Policies for a claim that exceeded the limits of their respective layers would impede the Assured (RFC) from seeking coverage from any of the upper tier Excess Policies because those Excess Insurers would contend that their policies cannot attach until all lower tiers pay the full

limits of their respective Policies.

372.    As a direct and proximate effect of the Excess Insurers' breach of the covenant of good faith and fair dealing, the Excess Insurers have contended that coverage under their respective Excess Policies is barred because the limits of the underlying insurance were not exhausted by the actual payment of claims or losses.

373.    As a direct and proximate effect of the Excess Insurers' breach of the covenant of good faith and fair dealing, RFC has been damaged, in that the Excess Insurers contend that RFC's claims for coverage have not been triggered, and therefore contend that RFC's entitlement to prejudgment interest on the amounts owed RFC under the Excess Policies would not begin to accrue, until the limits of their respective underlying policies have been exhausted.

374.    As a direct and proximate result of the Excess Insurers' breaches of the covenant of good faith and fair dealing, the Kessler Class has suffered consequential damages in the amount of the prejudgment interest the Kessler Class would be entitled to collect under applicable law from the Excess Insurers in the absence of the Excess Insurers' bad faith conduct.

375.    As a direct and proximate result of the Excess Insurers' breaches of the covenant of good faith and fair dealing, the Kessler Class has suffered consequential damages in the amount of the attorney's fees incurred by the Kessler Class in litigating the underlying coverage dispute and wrongful denial of coverage by the Excess Insurers.

376.    As a direct and proximate effect of Lloyd's and the Defendant Insurers' breach of the covenant of good faith and fair dealing in regard to the Kessler Claim, RFC was damaged, in that RFC continued to: (a) shoulder significant and mounting defense costs, (b) report to investors and others potentially massive (unreimbursed and uncovered) liability, and (c) suffer from a precarious financial position which later contributed to RFC's bankruptcy.  RFC, and later the

Liquidating Trust, suffered consequential damages as a result, including but not limited to pre-bankruptcy losses, pre-judgment interest, and attorney's fees and costs in the bankruptcy action and in litigating the present coverage action.

      B.    **COUNT XIII: Lloyd's Breach of the Covenant of Good Faith and Fair Dealing for the Mitchell Claim and the Related Missouri Actions.**

For the Thirteenth Count to their Third Amended Adversary Complaint in this action, Plaintiffs jointly state and allege the following:

377.    The preceding paragraphs of this Third Amended Adversary Complaint are realleged and incorporated into this count as though they were fully set forth herein.

378.    The Primary Policy contains an implicit covenant of good faith and fair dealing binding on all parties to the contract, including but not limited to Lloyd's and the remaining Defendant Insurers.

379.    Lloyd's position and/or conduct in the handling and adjustment of the Mitchell Claim was unlawful, arbitrary, unreasonable, was a position and/or conduct that no reasonable insurer under those given facts would have asserted, and breached the implied covenant of good faith and fair dealing, by and in one or more of the following respects:

    a)    failing to acknowledge coverage and pay its policy limits immediately upon the entry and approval of the Mitchell Settlement;

    b)    refusing to acknowledge that fees were never "paid to" RFC in connection with the Mitchell Class Loans, despite knowing and having possession of all necessary facts showing that fees were never "paid to" RFC;

    c)    repeatedly asserting that the Mortgage Fee Claim Exclusion was the primary reason RFC could not obtain coverage for the Mitchell Claim, despite knowing that the underlying basis for asserting that exclusion was

false;

d)      continuing to assert that fees were "paid to" RFC in connection with the Mitchell Claim, despite knowing that assertion was false, and thereby harming RFC's right to receive the benefits of the Primary Policy, including but not limited to RFC's right to a timely exhaustion of the Primary Policy;

e)      delaying 15 years to manufacture a meritless coverage defense based on fees paid to originating lenders through the Deemer Clause immediately upon withdrawing its previous false assertion that fees were "paid to" RFC despite never mentioning the Deemer Clause a single time in any correspondence with RFC;

f)      failing to provide a coverage opinion for the Mitchell Claim for over 5 years from first receiving notice of the Claim and 9 months after the jury verdict was entered against RFC, conduct which the Defendant Insurers themselves agreed was egregious;

g)      unreasonably continuing to request additional, unnecessary, and duplicative information from RFC in order to further delay advising RFC of its intention to deny coverage;

h)      delaying advising RFC of its denial of coverage so that Lloyd's could attempt to preserve other policy defenses;

i)      refusing to pay reimburse RFC for the payment of the Mitchell judgment, settlement of the Related Missouri Actions, and all of its defense costs;

j)      refusing to pay and delaying payment to RFC in order to take advantage of RFC's impending bankruptcy; and

k)      all the other conduct described and set forth in Paragraphs 220 through 269.

380.    At the time the Primary Policy was issued, Lloyd's knew and was otherwise aware that any refusal by Lloyd's to pay the full limits of the Primary Policy for a claim that exceeded the limits of the Primary Policy would impede the Assured (RFC) from seeking coverage from any of the Excess Policies because the Excess Insurers would contend that their policies cannot attach until Lloyd's pays the full limits of the Primary Policy.

381.    As a direct and proximate effect of Lloyd's breach of the covenant of good faith and fair dealing, the Excess Insurers have contended that coverage under their respective Excess Policies is barred because the limits of the underlying insurance were not exhausted by the actual payment of claims or losses.

382.    As a direct and proximate effect of Lloyd's breach of the covenant of good faith and fair dealing, RFC has been damaged, in that the Excess Insurers contend that RFC's claims for coverage have not been triggered, and therefore contend that RFC's entitlement to prejudgment interest on the amounts owed RFC under the Excess Policies would not begin to accrue, until the limits of their respective underlying policies have been exhausted.

383.    As a direct and proximate result of Lloyd's breaches of the covenant of good faith and fair dealing, the Mitchell Class has suffered consequential damages in the amount of the prejudgment interest the Mitchell Class would be entitled to collect under applicable law from the Excess Insurers in the absence of Lloyd's bad faith conduct.

384.    As a direct and proximate result of Lloyd's breaches of the covenant of good faith and fair dealing, the Mitchell Class has suffered consequential damages in the amount of the attorney's fees incurred by the Mitchell Class in litigating the underlying coverage dispute and wrongful denial of coverage by Lloyd's.

385.    The Excess Policies contain an implicit covenant of good faith and fair dealing binding on all parties to the contract, including but not limited to the Excess Insurers and the remaining Defendant Insurers.

386.    The Excess Insurers' position and/or conduct in the handling and adjustment of the Mitchell Claim was unlawful, arbitrary, unreasonable, was a position that no reasonable insurer under those given facts would have asserted, and breached the implied covenant of good faith and fair dealing, by and in one or more of the following respects:

a)    failing to acknowledge coverage and pay its policy limits immediately upon the entry and approval of the Mitchell Settlement;

b)    refusing to acknowledge that fees were never "paid to" RFC in connection with the Mitchell Class Loans, despite knowing and having possession of all necessary facts showing that fees were never "paid to" RFC;

c)    repeatedly asserting that the Mortgage Fee Claim Exclusion was the primary reason RFC could not obtain coverage for the Mitchell Claim, despite knowing that the underlying basis for asserting that exclusion was false;

d)    continuing to assert that fees were "paid to" RFC in connection with the Mitchell Claim, despite knowing that assertion was false, and thereby harming RFC's right to receive the benefits of the Excess Policies, including but not limited to RFC's right to a timely exhaustion of the Excess Policies;

e)    delaying 15 years to manufacture a meritless coverage defense based on fees paid to originating lenders through the Deemer Clause immediately upon withdrawing its previous false assertion that fees were "paid to" RFC

93

despite never mentioning the Deemer Clause a single time in any correspondence with RFC;

    f)    failing to provide a coverage opinion for the Mitchell Claim for over 5 years from first receiving notice of the Claim and 9 months after the jury verdict was entered against RFC, conduct which the Defendant Insurers themselves agreed was egregious;

    g)    unreasonably continuing to request additional, unnecessary, and duplicative information from RFC in order to further delay advising RFC of its intention to deny coverage;

    h)    delaying advising RFC of its denial of coverage so that the Excess Insurers could attempt to preserve other policy defenses;

    i)    refusing to pay and delaying payment to RFC in order to take advantage of RFC's impending bankruptcy; and

    j)    all the other conduct described and set forth in Paragraphs 220 through 269.

387.    At the time the Excess Policies were issued, the Excess Insurers knew and were otherwise aware that any refusal by the Excess Insurers to pay the full limits of their respective Excess Policies for a claim that exceeded the limits of their respective layers would impede the Assured (RFC) from seeking coverage from any of the upper tier Excess Policies because those Excess Insurers would contend that their policies cannot attach until all lower tiers pay the full limits of their respective Policies.

388.    As a direct and proximate effect of the Excess Insurers' breach of the covenant of good faith and fair dealing, the Excess Insurers have contended that coverage under their respective Excess Policies is barred because the limits of the underlying insurance were not exhausted by the

actual payment of claims or losses.

389.    As a direct and proximate effect of the Excess Insurers' breach of the covenant of good faith and fair dealing, RFC has been damaged, in that the Excess Insurers contend that RFC's claims for coverage have not been triggered, and therefore contend that RFC's entitlement to prejudgment interest on the amounts owed RFC under the Excess Policies would not begin to accrue, until the limits of their respective underlying policies have been exhausted.

390.    As a direct and proximate result of the Excess Insurers' breaches of the covenant of good faith and fair dealing, the Mitchell Class has suffered consequential damages in the amount of the prejudgment interest the Mitchell Class would be entitled to collect under applicable law from the Excess Insurers in the absence of the Excess Insurers' bad faith conduct.

391.    As a direct and proximate result of the Excess Insurers' breaches of the covenant of good faith and fair dealing, the Mitchell Class has suffered consequential damages in the amount of the attorney's fees incurred by the Mitchell Class in litigating the underlying coverage dispute and wrongful denial of coverage by the Excess Insurers.

392.    As a direct and proximate effect of Lloyd's and the Defendant Insurers' breach of the covenant of good faith and fair dealing in regard to the Mitchell and Related Missouri Action claims, RFC was damaged, in that RFC continued to: (a) shoulder significant and mounting defense costs, (b) report to investors and others potentially massive (unreimbursed and uncovered) liability, and (c) suffer from a precarious financial position which later contributed to RFC's bankruptcy.  RFC, and later the Liquidating Trust, suffered consequential damages as a result, including but not limited to pre-bankruptcy losses, pre-judgment interest, and attorney's fees and costs in the bankruptcy action and in litigating the present coverage action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, the *Kessler* Class, the *Mitchell* Class and the Liquidating Trust, respectfully request that the Court enter judgment on the Third Amended Adversary Complaint and in their favor on their claims as follows:

    I.      On Plaintiffs' First Count;

          a)     A judgment declaring that the Defendant Insurers are and shall be obligated, under the GM Policies, to pay the *Kessler* Class for the $300 million Loss incurred as a result of the *Kessler* Settlement;

    II.     On Plaintiffs' Second Count;

          a)     A judgment against the Defendant Insurers and in favor of the *Kessler* Class for actual money damages in the amount of $300 million, together with pre-judgment and post-judgment interest and costs.

    III.    On Plaintiffs' Third Count;

          a)     A judgment declaring that the Defendant Insurers are and shall be obligated, under the GM Policies, to pay the Liquidating Trust for the approximately $7.0 million in Loss and Costs, Charges and Expenses incurred as a result of defending the Pennsylvania Actions, the *Community Bank* MDL and the *Kessler* Claim;

    IV.    On Plaintiffs' Fourth Count;

          a)     A judgment against the Defendant Insurers and in favor of the Liquidating Trust for actual money damages in the amount of defense costs incurred, together with pre-judgment and post-judgment interest and costs, as a result of defending the Pennsylvania Actions, the *Community Bank* MDL and the *Kessler* Claim;

    VI.     On Plaintiffs' Sixth Count;

a)      A judgment declaring that the Defendant Insurers are and shall be obligated, under the GM Policies, to pay the *Mitchell* Class for the $14.5 million Loss incurred as a result of the *Mitchell* Settlement;

VII.      On Plaintiffs' Seventh Count;

a)      A judgment against the Defendant Insurers and in favor of the *Mitchell* Class for actual money damages in the amount of $14.5 million, together with pre-judgment and post-judgment interest and costs.

VIII.      On Plaintiffs' Eighth Count;

a)      A judgment declaring that the Defendant Insurers are and shall be obligated, under the GM Policies, to pay the Liquidating Trust for the $15,648,868.12 paid by RFC in partial satisfaction of the judgment in the *Mitchell* Action and the approximately $6.1 in Loss and Costs, Charges and Expenses incurred as a result of defending the *Mitchell* Action;

IX.      On Plaintiffs' Ninth Count;

a)      A judgment against the Defendant Insurers and in favor of the Liquidating Trust for actual money damages in the amount of the $15,648,868.12 for the sums paid by RFC in partial satisfaction of the judgment in the *Mitchell* Action and the Loss and Costs, Charges and Expenses incurred as a result of defending the *Mitchell* Action, together with pre-judgment and post-judgment interest and costs;

X.      On Plaintiffs' Tenth Count;

a)      A judgment declaring that the Defendant Insurers are and shall be obligated, under the GM Policies, to pay the Liquidating Trust for the $8.5 million paid by RFC in settlements in the Related Missouri Actions and the approximately $4.7 million in Loss and Costs, Charges and Expenses incurred as a result of defending the Related Missouri Actions;

XI.    On Plaintiffs' Eleventh Count;

a)    A judgment against the Defendant Insurers and in favor of the Liquidating Trust for actual money damages for the $8.5 million paid by RFC in settlements in the Related Missouri Actions and the approximately $4.7 million in Loss and Costs, Charges and Expenses incurred as a result of defending the Related Missouri Actions, together with pre-judgment and post-judgment interest and costs;

XII.    On Plaintiffs' Twelfth Count;

A judgment against Lloyd's and the Excess Insurers and in favor of the Plaintiffs for

a)    consequential damages in an amount sufficient to fully compensate the Kessler Class and the Liquidating Trust under applicable law for any lost prejudgment interest from any or all of the Insurers;

b)    the attorney's fees and costs incurred by the Plaintiffs; and

c)    all other recoverable consequential damages suffered by RFC and the Plaintiffs.

XIII.    On Plaintiffs' Thirteenth Count;

A judgment against Lloyd's and the Excess Insurers and in favor of the Plaintiffs for

a)    consequential damages in an amount sufficient to fully compensate the Mitchell Class and the Liquidating Trust under applicable law for any lost prejudgment interest from any or all of the Insurers;

b)    the attorney's fees and costs incurred by the Plaintiffs; and

c)    all other recoverable consequential damages suffered by RFC and the Plaintiffs.

XIV.    On all Counts;

      a)    For costs of suit and attorney's fees incurred herein and interest at the legally accepted rate; and

      b)    For such other relief as the Court may deem just and proper.

Dated:  October 17, 2019

By: *R. Frederick Walters*
**WALTERS RENWICK RICHARDS SKEENS & VAUGHAN, P.C.**
R. Frederick Walters, Esq.
Karen W. Renwick, Esq.
David M. Skeens, Esq.
Michael B. Sichter, Esq.
1100 Main, Suite 2500
Kansas City, Missouri 64105
(816) 421-6620 (Telephone)
(816) 421-4747 (Facsimile)
fwalters@wrrsvlaw.com
krenwick@wrrsvlaw.com
dskeens@wrrsvlaw.com
msichter@wrrsvlaw.com
*Co-Lead Counsel for the Kessler Class*
*Counsel for the Mitchell Class*

By: *R. Bruce Carlson*
**CARLSON LYNCH SWEET & KILPELA, LLP**
R. Bruce Carlson, Esq.
Gary F. Lynch, Esq.
1133 Penn Avenue, 5th Floor
Pittsburgh, Pennsylvania 15222
(412) 322-9243 (Telephone)
(412) 231-0246 (Facsimile)
Pittsburgh, Pennsylvania 15212
bcarlson@carlsonlynch.com
glynch@carlsonlynch.com
*Co-Lead Counsel for the Kessler Class*

By: *Selena J. Linde*
**PERKINS COIE, LLP**
Selena J. Linde, Esq.
Vivek Chopra, Esq.
Alexis Danneman, Esq.
700 13th St. NW, Suite 600
Washington, DC 20005
Telephone (202) 654-6200
Facsimile (202) 654-9952
SLinde@perkinscoie.com
VChopra@perkinscoie.com
ADanneman@perkinscoie.com
*Counsel for the ResCap Liquidating Trust*

By: *Daniel J. Flanigan*
**POLSINELLI**
Daniel J. Flanigan, Esq.
Jason A. Nagi, Esq.
900 Third Avenue, 21st Floor
New York, New York 10022
(212) 684-0199 (Telephone)
(212) 684-0197 (Facsimile)
dflanigan@polsinelli.com
jnagi@polsinelli.com
*Counsel for Kessler and Mitchell Classes*