1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   IN RE RESIDENTIAL CAPITAL,
    LLC,
4
    ------------------------------x
5                                         23 CV 3385 (JPO)

6
                                          Conference
7                                         (via Telephone)

8                                         New York, N.Y.
                                          May 12, 2023
9                                         3:10 p.m.

10  Before:

11                      HON. J. PAUL OETKEN,

12                                          District Judge

13                          APPEARANCES

14  WALTERS RENWICK RICHARDS SKEENS & VAUGHAN, PC
         Attorneys for Class Plaintiffs
15  BY:  R. FREDERICK WALTERS

16  PERKINS COIE LLP
         Attorneys for Plaintiff ResCap Liquidating Trust
17  BY:  VIVEK CHOPRA
         SELINA J. LINDE
18
    HINSHAW & CULBERTSON LLP
19       Attorneys for Defendant Certain Underwriters at LLoyd's
         of London
20  BY:  J. GREGORY LAHR

21  WILEY REIN LLP
         Attorneys for Defendant Twin City Fire Insurance Company
22  BY:  CARA TSENG DUFFIELD

23  KAUFMAN DOLOWICH & VOLUCK LLP
         Attorneys for Defendant Continental Casualty Company
24  BY:  PATRICK M. KENNELL

25

1                          APPEARANCES (cont'd)

2     STEPTOE & JOHNSON LLP
           Attorneys for Defendant Clarendon National
3          Insurance Company
      BY:  JOHN O'CONNOR, JR.
4
      CAHILL GORDON & REINDEL LLP
5          Attorneys for Defendant Swiss RE International SE
      BY:  THORN ROSENTHAL
6
      HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
7          Attorneys for Defendant Steadfast Insurance Company
      BY:  RONALD P. SCHILLER
8
      KAUFMAN BORGEEST & RYAN LLP
9          Attorneys for Defendant St. Paul Mercury Insurance Company
      BY:  PATRICK STOLTZ
10
      ARNOLD & PORTER LLP
11         Attorneys for Defendant North American Specialty
           Insurance Company
12    BY:  CARMELA T. ROMEO
           KENT A. YALOWITZ
13

14

15

16

17

18

19

20

21

22

23

24

25

 1          THE COURT:  Good afternoon.  This is Judge Oetken.

 2   Mr. Hampton will call the case.

 3          (Case called)

 4          THE DEPUTY CLERK:  Starting with the class attorneys,

 5   can counsel please state your name for the record.

 6          MR. WALTERS:  Fred Walters for the Mitchell class

 7   plaintiffs and for the Kessler class plaintiffs; together, the

 8   class plaintiffs.

 9          MR. CHOPRA:  Good afternoon, your Honor, Vivek Chopra

10   from Perkins Coie for the ResCap Liquidating Trust, also

11   plaintiff.

12          THE COURT:  Good afternoon.

13          MR. LAHR:  Good afternoon, your Honor.  Gregory Lahr

14   for the Lloyd's defendants.

15          THE COURT:  Good afternoon.

16          MS. DUFFIELD:  Cara Duffield for defendant Twin City

17   Fire Insurance Company.

18          THE COURT:  Good afternoon.

19          MR. KENNELL:  Good afternoon, your Honor, this is

20   Patrick Kennell of Kaufman Dolowich & Voluck for defendant

21   Continental Casualty Company.

22          THE COURT:  Good afternoon.

23          MR. O'CONNOR:  Good afternoon, your Honor, John

24   O'Connor, Steptoe & Johnson, for Clarendon National Insurance

25   Company.

 1           THE COURT:  Good afternoon.

 2           MR. ROSENTHAL:  Good afternoon, your Honor, Thorn

 3   Rosenthal, Cahill Gordon, for Swiss Re.

 4           THE COURT:  Good afternoon.

 5           MR. SCHILLER:  Good afternoon, your Honor, Ronald

 6   Schiller for Steadfast Insurance Company.

 7           THE COURT:  Good afternoon.

 8           MR. STOLTZ:  Good afternoon, your Honor, Patrick

 9   Stoltz of Kaufman Borgeest & Ryan on behalf of defendant St.

10   Paul Mercury Insurance Company.

11           THE COURT:  Good afternoon.

12           MR. YALOWITZ:  For North American, it's Kent Yalowitz

13   and Carmela Romeo from Arnold & Porter.

14           THE COURT:  Good afternoon.

15           Anyone else?

16           Thanks, everyone, for joining the call.  I think this

17   will be fairly brief.  Just a reminder to please identify

18   yourself each time you speak.

19           I have reviewed the motion to withdraw the reference

20   in this case with the response and reply.  I know this was

21   before me sometime ago.  I have only the vaguest recollection

22   of it seven or eight years ago when there was a motion to

23   withdraw the reference as a noncore matter.  And I decided to

24   keep it with the bankruptcy court to present ultimately a

25   report and recommendation.

 1          And I understand there have been proceedings for

 2   several years and that the work of the bankruptcy court is now

 3   done.  And I believe there are dates for the filing of any

 4   objections to what is collectively regarded as an R&R, report

 5   and recommendation, by the bankruptcy court with objections due

 6   May 22 and then oppositions to the objections due July 3,

 7   which, as I understand it, are to be filed with me, and not

 8   with the bankruptcy court, for me to resolve.

 9          Given that the bankruptcy court's work is done, I do

10   believe that it's appropriate and not premature for the

11   reference to be withdrawn and that the objection filing should

12   be here.

13          I really just wanted to get the parties on the line

14   for two reasons.  One, give me any background about what this

15   case is going to look like when it comes back to the district

16   court and, second, any procedural issues I need to know about.

17          I've had a few cases where there were motions to

18   withdraw the reference, and I kept it with the bankruptcy court

19   for a report and recommendation, and I have actually never had

20   them come back.  They got resolved.  So this is the first time

21   it's happening.  And I am not sure if there is any,

22   particularly, procedural things I need to know about or do with

23   the case coming back.  Now it's just like any civil litigation.

24          I guess I would like to start with the first issue,

25   just a little background on the case.  I know at a very high

1    level that it relates to two plaintiff classes who I assume

2    have been certified as classes relating to, I believe, sort of

3    consumer fraud in the context of mortgages.

4         And what remains of the litigation, as I understand

5    it, is coverage issues with all these different insurers and

6    all it is is coverage.  That is about all I know about it.  If

7    there is anything else you can tell me, I'll start with

8    Mr. Walters, then Mr. Chopra, and then any of the defense

9    counsel who want to weigh in.

10        Anything else you need to tell me about what the case

11   is about and what's left.  Am I right that the R&R does not

12   resolve all the coverage issues on summary judgment but

13   actually proposes that there are issues for trial, which

14   usually doesn't happen in a case involving coverage?  If we are

15   doing a trial, I will do a trial.  I want to know if it's a

16   jury trial or bench trial.

17        Mr. Walters.

18        MR. WALTERS:  Thank you, your Honor.

19        Just to give you a wee bit of background, these two

20   classes that we are talking about, one was originally filed,

21   the Mitchell class was originally filed in a Missouri court and

22   was a Missouri-certified class action.  It was tried and a $92

23   million verdict was rendered against the debtor, RFC, who ended

24   up -- RFC was one of 52 entities who filed bankruptcy in the

25   main RFC bankruptcy.  That case was tried.  It was reversed, in

1    part, as to punitive damages.  In early 2012, before RFC filed

2    bankruptcy, the remaining part of that claim was settled for 14

3    and a half million dollars in January and February of 2012.

4           RFC filed bankruptcy in May of 2012 and that

5    settlement that had occurred before that had not yet been

6    finalized in the Missouri state court.  So the Mitchell class

7    became a creditor and filed a claim in the bankruptcy.  And

8    during the course of the bankruptcy, from May of 2012 until the

9    final plan was adopted in December -- or on December 11 of

10   2013, the Mitchell case was finally settled.  It was remanded

11   back to the state court for completion of the 14 and a half

12   million dollar settlement.  The settlement was approved by

13   Judge Glenn at the bankruptcy court.  So that's a 14 and a half

14   million dollar settlement that was assigned the Mitchell class'

15   rights against RFC.  The policyholders were assigned to that

16   class and that's the reason they are a party plaintiff in this

17   case.

18          And the case was filed, as you will see from our

19   motion to withdraw, the reference with all three plaintiffs,

20   and I'll talk about the Kessler class in a minute, there were

21   about 256 loans in that Mitchell case.  So that 14 and a half

22   million dollar settlement and the interest that's accused on it

23   are the subject of the coverage action for the Mitchell class.

24          With respect --

25          THE COURT:  Hold on.  Let me stop you there.  Has the

1  settlement been paid out?

2          MR. WALTERS:  Has the settlement been paid out?  No,

3  it has not.  The underlying -- Mr. Chopra will probably speak

4  to the rest of that case, your Honor.  But the 14 and a half

5  million dollar settlement was never paid out either by RFC or

6  by the insurance carriers who provided coverage for RFC.

7          But the underlying case, which was on appeal, there

8  was about four and a half million dollars of actual damages.

9  And by the time the Mitchell case was finally appealed, RFC

10  actually ended up paying to the Mitchell class for compensatory

11  damages in excess of $15 million, is my recollection.  And I

12  believe that $15 million that was actually paid out by RFC at

13  that point in time is the subject of the coverage claim of the

14  trust, which is the successor to RFC.  The liquidating trust is

15  a successor to RFC.

16          Does that answer your question, your Honor?

17          THE COURT:  I am confused.  It sounded like you said

18  it was not paid out and then that it was paid out.

19          MR. WALTERS:  There were two aspects of it.  There was

20  one aspect of it, the compensatory damages and attorneys' fees

21  and interest accrued.  All of those damages were paid out by

22  RFC.  The case was appealed and there was also a $92 million

23  punitive damages verdict.  The punitive damage verdict was

24  reversed on appeal because of an instructional error.  And

25  before it could be retried, that 14 and a half million dollar

1  punitive damage claim was settled for -- was settled for 14 and

2  a half million dollars.  Actually, the claim was much, much

3  larger than 14 and a half million dollars.  It's only the

4  punitive damage portion of the damages that have not been paid

5  out, if that makes sense.

6           THE COURT:  It was a simple question.  Were the

7  plaintiffs in the underlying Mitchell class paid their money in

8  compensatory damages?

9           MR. WALTERS:  No.  For compensatory damages?

10          THE COURT:  Yes.

11          MR. WALTERS:  Yes, they have for compensatory damages,

12 but not for the punitive damage settlement.

13          THE COURT:  14 and a half million is an all-in

14 settlement.

15          MR. WALTERS:  14 and a half million resolved the

16 remainder of the case other than the actual damages that they

17 had been paid.  That's correct, yes.

18          THE COURT:  Go on.

19          MR. WALTERS:  With respect to the Kessler case, your

20 Honor, the Kessler case was a multidistrict litigation that was

21 first filed in 2001.  There were several cases filed that were

22 consolidated into an MDL in the Western District of

23 Pennsylvania.

24          That case started with RESPA claims, Real Estate

25 Settlement Practices Act claims, for illegal loans,

1  originations, practices, predatory lending practices by the

2  originating lenders who were two big banks at the time,

3  Community Bank of Northern Virginia and Guaranty National Bank

4  of Tallahassee, Florida.  That case was pending in the Western

5  District of Pennsylvania from 2001 and it went up to the Third

6  Circuit on appeals at various times during the time it was

7  pending there twice, once for an alleged settlement in 2003.

8  That settlement was revoked.  The case went back to the Western

9  District of Pennsylvania.

10       Then the class attorneys in that case had -- we were

11  objectors to that settlement and were appellants in that first

12  appeal -- came back after that appeal and -- again not us, but

13  the class plaintiff again tried to settle it.  And it was just

14  RESPA claims in that case at that point in time.

15       And the assertion was that there were other valuable

16  claims, HOEPA, which is the Home Equity Protection Act, and

17  TILA claims that the original class counsel did not assert and

18  that we said should have been asserted because they were very

19  valuable.

20       Anyway, the case went up to the Third Circuit after a

21  second attempt at class settlement and, again, there was only a

22  RESPA claim.  Again -- not the Second Circuit.  The Third

23  Circuit reversed a second time.  It came back and at that point

24  in time discovery actually began in earnest.  Even though the

25  case had been pending for seven, eight, ten years, there hadn't

1   been a lot of discovery undertaken.

2          So discovery started in 2010 after that second

3   reversal by the Second Circuit.  And then early in 2011, the

4   original class plaintiff and the objectors, which we were

5   objectors at that point in time, combined forces.  We amended

6   the MDL complaint and alleged the missing causes of action that

7   hadn't been previously asserted, that is, the HOEPA TILA claims

8   and we said those HOEPA TILA claims were in excess of a billion

9   dollars.  The RESPA claims and the HOEPA TILA claims, once

10  together, the plaintiffs asserted were worth very close to $2

11  billion in damages.

12         Discovery began in earnest in that case, as I say, in

13  late 2010.  There were motions to dismiss filed in the MDL in

14  the fall of 2011.  And the original district court judge, Judge

15  Lancaster, unexpectedly passed away, and he was replaced by

16  Judge Schwab of the Western District of Pennsylvania.

17         There were motions to dismiss filed in the fall of

18  2011, and those were pending in fully briefed.  We roll around

19  on that particular case until May of 2012.  RFC was, again, one

20  of the defendants in that case, your Honor.  And once RFC filed

21  bankruptcy in 2012, in RFC, the case against RFC in that case

22  was stayed, and the class plaintiffs all filed claims in the

23  bankruptcy court.

24         The claims by the borrowers in that case were asserted

25  under RESPA and the Home Ownership Protection Act and TILA and,

1    lastly, there were some RICO claims also asserted in that case.

2           When the claim was filed in the bankruptcy court, I

3    think it was in November of 2012, the claim asserted by the

4    Kessler class was $1.87 billion.  While the case was pending in

5    the bankruptcy court, and this bankruptcy judge at that time,

6    the ResCap bankruptcy I believe was the largest bankruptcy

7    filed in 2012 in the Southern District of New York.

8           Because of the massive amount of claims in that case,

9    Judge Peck was appointed by Judge Glenn to act as a global

10   mediator of that case in the fall or December, I believe,

11   actually, of 2012.  Judge Peck then engaged in mediation with

12   all of the parties, and over time a global settlement was

13   reached not only with the Kessler class settlement, but with

14   all of the trusts.  There were literally thousands of

15   securitization trusts, your Honor, that had claims in the

16   bankruptcy case against RFC for bad loans.

17          As a result of that global settlement, there was a

18   settlement reached under the auspices of Judge Peck in the

19   mediation.  In the summer, I think, June 24 or 26, the date

20   slips me, of 2013, the Kessler class was settled, class claim

21   was settled for $300 million.

22          And that class, your Honor, was made up -- as I

23   indicated before, the Mitchell class was only 245 loans,

24   probably about three or 400 actual borrowers.  The Kessler

25   class from these two originating banks, CBNV and GMBT, was a

1   massive class.  There were 44,535 loans in the Kessler class

2   and there were in excess of 70,000 actually class members that

3   were borrowers on those 44,535 loans.

4        Once it was settled -- and also consistent and sort of

5   parallel to the settlement of this claim, there were all kind

6   of negotiations with constituent parties, including the

7   unsecured creditor's committee, about arriving at a final

8   Chapter 11 plan, and it was a liquidating plan, your Honor,

9   that it was supposed to be.

10       Anyway, let me just take you through the Kessler

11  settlement.  The case was settled in June of 2013.  Given this

12  was a class settlement where the class had to be -- and the

13  settlement had to be approved by the Court, as you know, so

14  there was a preliminary approval motion filed in early August

15  of 2013.  Judge Glenn approved that -- preliminarily approved

16  it with his order with a preliminary approval order in August

17  of 2013, late August, and set a final class settlement hearing

18  for November of 2013.

19       At that November hearing, there was one borrower

20  objector and then there was also an objection by PNC Bank.  The

21  objection by PNC Bank --

22       THE COURT:  This is taking way too long, Mr. Walters.

23       MR. WALTERS:  I'm sorry, your Honor.

24       That case was finally resolved and settled and it was

25  again resolved on December 11 of 2013 in the approval --

 1              THE COURT:  Hold on, Mr. Walters.  You can stop.

 2              Mr. Chopra, can you do this more efficiently, please.

 3              MR. CHOPRA:  Sure, your Honor.  Thank you.

 4              This is an insurance-coverage action that stems from

 5      errors-and-omissions policies that were sold by a tower of

 6      insurers, those are the defendants, to GM, and a subsidiary of

 7      GM, RFC, is the insured.  And RFC declared bankruptcy in 2012

 8      and the bankruptcy plan was confirmed in the summer of 2013,

 9      and out of that came three plaintiffs who all had insurance

10      claims.

11              There's Mr. Walters' clients, which is the Kessler

12      class.  They had a big settlement that he just talked about.

13      There is a Mitchell class that had a 14 and a half million

14      dollar punitive settlement that he talked about.  And then

15      there is the trust, the liquidating trust, which resolves

16      claims filed on behalf of the creditors.

17              We got all the other insurance rights and that is like

18      defense costs.  There was some other settlement.  There was a

19      judgment in the Mitchell case.  The RFC had paid --

20              THE COURT:  When you say we, tell me what you mean by

21      we.

22              MR. CHOPRA:  I'm so sorry.  RFC had paid those prior

23      to its bankruptcy.  The coverage had been denied by the

24      insurers.  So those were chosen actions.  Those were claims

25      that existed that were assigned to the liquidating trusts to

1    prosecute as part of the confirmed plan.

2              THE COURT:  You represent that trust.

3              MR. CHOPRA:  Correct.  And the trust has about $68

4    million in claims related to amounts that RFC paid prior to its

5    bankruptcy in the defense and settlement of a number of these

6    consumer fraud cases.

7              The trust, the Kessler class, and the Mitchell class

8    filed suit in February 2015.  It was referred to the bankruptcy

9    court.  There was a motion to withdraw the reference.  You're

10   aware of that.

11             In the bankruptcy court there were several summary

12   judgment issues that were addressed.  Those are all combined in

13   the report and recommendation.  I will say that Judge Lane and

14   Judge Jones do a nice job of summarizing the history of the

15   case in that report.

16             We went through fact discovery, went through expert

17   discovery.  And at the end of expert discovery, the parties

18   filed motions in the spring of 2022, and we had a hearing on

19   May 12, 2022 on these 11 different summary judgment motions,

20   that Judge Jones issued his opinion in December of 2022, and

21   you have seen the summation order.  He combined the prior

22   summary judgment decision by Judge Lane and all of his summary

23   judgment decisions into a report and recommendation.  The

24   objections are due May 22.  The responses are due July 3.

25             Let me do one more thing.  Most coverage cases have,

1  obviously, issues that are resolved on summary judgment, and

2  Judge Jones has resolved a number of exclusions, whether the

3  claims are covered under the insuring clause, but he found that

4  there are issues of disputed fact regarding foreseeability of

5  consequential damages regarding the alleged bad faith -- I am

6  trying to be neutral here -- to the alleged bad faith,

7  obviously, of the insurer defendants and also of whether the

8  Kessler settlement was reasonable.  Those the judge all found

9  were issues of fact that should be the subject of a trial.  The

10 parties will be filing, I assume, the defendants and the

11 plaintiffs, objections and responses to those rulings, but

12 that's basically how they shake out.

13         THE COURT:  Is it a bench trial or a jury trial?

14         MR. CHOPRA:  No.  It's a jury trial.  A jury trial has

15 been demanded and that was one of the reasons, in addition to

16 the parties objecting to the case being tried in a bankruptcy

17 court, that it must be tried in the district court.

18         THE COURT:  It's not just a declaratory judgment

19 action.

20         MR. CHOPRA:  It is not just a declaratory judgment

21 action.  There is breach-of-contract claims and the plaintiffs

22 have consequential damages demands as part of those

23 breach-of-contract claims.  The third amended adversary

24 complaint is the operative complaint and that complaint

25 includes a request for attorneys' fees and consequential

1   damages.  Both of those requests have factual issues.

2          THE COURT:  In the bankruptcy court have you had

3   settlement discussions in the last couple of years?

4          MR. CHOPRA:  Not in the bankruptcy court, but the

5   parties engaged in a mediation in the fall of 2019.  This was

6   while summary judgment was pending on one set of exclusions and

7   no discovery had occurred.  The mediation failed.  There have

8   been no substantive settlement discussions since then, and we

9   spent basically '20 and '21 and into '22 completing an enormous

10  amount of fact discovery, about 60 depositions, ten experts,

11  and all of the briefing that I just summarized that Judge Jones

12  ruled on in December of 2022.

13         THE COURT:  Explain to me, a nonbankruptcy expert, the

14  different positions of Mr. Walters and his clients and you and

15  your client, the liquidating trust, vis-a-vis positions in the

16  litigation.  Are you essentially aligned?  Are there

17  differences?

18         MR. CHOPRA:  We are essentially aligned as plaintiffs.

19  I think the way you should think about this is, there are about

20  six components to the insurance-coverage claims.  The trust

21  owns four of them, defense costs for all these different

22  actions and certain settlements and a judgment that RFC paid.

23  The Kessler class owns, because it was assigned as part of the

24  plan, a claim for a $300 million settlement that was reached

25  during the bankruptcy.  So it hasn't been paid, right.  It's an

 1   assigned claim and now the --

 2          THE COURT:  You stated it has not been paid or it has

 3   been paid?

 4          MR. CHOPRA:  It has not been paid because it was an

 5   allowed claim in the bankruptcy.  So the settlements reached in

 6   the bankruptcy, the plaintiffs in RFC in the bankruptcy said,

 7   hey, it's worth $3 million, and the Kessler class has been

 8   assigned the right to pursue RFC's insurers for that amount.

 9          THE COURT:  What about the Mitchell class, is that

10   still part of it?

11          MR. CHOPRA:  Yeah.  The Mitchell class is a little bit

12   more complicated.  I'll do it very simply.  There was a

13   compensatory damages judgment and attorneys' fee award that was

14   affirmed on appeal, and RFC paid that before it went bankrupt.

15   But there was a punitive-damages settlement that was never paid

16   because it was consummated on the eve of the bankruptcy.

17          THE COURT:  That's the 14 and a half million.

18          MR. CHOPRA:  That's the 14 and a half million.  That's

19   one of Mr. Walters' clients.  You are going to hear Mitchell

20   spoken about.

21          My client, the trust, has its claim for paid amounts,

22   the judgment that RFC paid in 2011, the defense costs it

23   incurred for years.  It paid an attorneys' fee award in 2012.

24          There is a Mitchell settlement class that's an allowed

25   claim in the bankruptcy, and they were given -- assigned their

1   rights to pursue that 14 and a half million against this tower

2   of insurers, where Lloyd's is the primary.  Then there is

3   several of what they call first-level excess.  Then there is

4   Swiss Re, the second-level excess.  And then there are several

5   insurers at the top.

6          The Lloyd's policy has all the terms and conditions

7   that are largely relevant, and then the rest of these policies

8   follow form.  I don't want to speak for them.  But that's

9   generally how the litigation is.

10          So the three plaintiffs are aligned in coverage, but

11   we each have different claims with different quantum.

12          THE COURT:  Got it.

13          The jury trial will deal with the issues of insurers'

14   alleged bad faith, consequential damages.  What else?

15          MR. CHOPRA:  This is a subject of motions that you are

16   going to see in the objections, so I don't want to speak too

17   far to it.  The Kessler settlement -- the insurers challenge

18   the reasonableness of the Kessler settlement.  That's the $300

19   million settlement.  That's one of Mr. Walters' clients.  And

20   there was briefing before Judge Jones as to whether they can

21   challenge the reasonableness or whether it's per se reasonable

22   under the law.  Judge Jones ruled on that and that's part of

23   the report and recommendation, so you are going to be engaging

24   on these issues when you engage with the objections.

25          Just to summarize, at the end of Judge Jones' handling

1   of it, he had said that a jury should decide the reasonableness

2   of the settlement, that it's a factual issue.  That's not my

3   claim, but that's certainly a subject for the jury, according

4   to Judge Jones.

5           MS. ROMEO:  This is Carmela Romeo from Arnold &

6   Porter.

7           Since we are talking about this, I think, looking at

8   the decision as it stands, and just like Mr. Chopra said, this

9   is going to be the subject of objections on both sides, right,

10  for the different 11 rulings.

11          But as it stands, the jury trial would touch on -- it

12  would be, one, reasonableness of the settlement; two, breach of

13  good faith and duty of cooperation by the insured; and, third,

14  intentional misconduct.

15          MR. CHOPRA:  That's fair.  Those are the defendant

16  insurers' defenses to the Kessler settlement, your Honor.

17          THE COURT:  How long do you contemplate a jury trial

18  will be if I scheduled it?

19          MR. CHOPRA:  It's a great question.  The parties have

20  not met and conferred on it.  The plaintiffs spoke about this

21  yesterday in preparation for the hearing.

22          I think three weeks is probably where this goes.  Both

23  sides have experts.  The insurer plaintiffs will have some fact

24  witnesses.  There will likely be claims representative

25  testimony on the side of the defendants.  So it seems to me,

 1   having done these trials in other forms, I think three weeks is

 2   probably where we are at.

 3              THE COURT:  I could decide not to accept the R&R, to

 4   the extent that summary judgment was denied on certain issues,

 5   and determine that summary judgment is appropriate on

 6   everything one way or another.

 7              MR. CHOPRA:  There were two motions, your Honor, below

 8   that were -- there would be complete defenses to coverage, had

 9   Judge Jones ruled in favor of the defendants.  Judge Jones

10   ruled in favor of the insureds on those issues.  One was an

11   exclusion called CE38.  The other was whether the claim

12   satisfies the insuring agreement.

13              To answer your question, if you were to reverse Judge

14   Jones on either of those two rulings, you would obviate the

15   need for a trial.  Of course, I'd be hugely disappointed.

16              THE COURT:  Got it.

17              MR. SCHILLER:  Your Honor, this Ronald Schiller for

18   Steadfast.

19              The only thing I wanted to add is that there are some

20   insurers at the very top of the tower, and we are one of them,

21   Steadfast, the fourth excess layer.  We will also have other

22   arguments and defenses.

23              We do follow the language of an earlier underlying

24   policy, but the conduct as to whether there is waiver,

25   estoppel, breach of the policy's cooperation clause is

1  different as to those of us that don't even attach until $300

2  million.

3          I have a hard time answering what's a fair question,

4  which is how long this will go, because I think, to some

5  extent, it's going to really depend on what your Honor decides

6  should be tried.

7          MS. ROMEO:  Going back to your question, Judge,

8  depending on what objections are brought, our position is that

9  you have *de novo* review of that, right, so you can make your

10  findings based on what should go to trial and what shouldn't.

11          One thing I wanted to note is, you had asked at the

12  outset about procedural issues to keep in mind and things of

13  that nature.  One thing I wanted to put out there is, you know,

14  this case is certainly going to be a lot of motion in lims from

15  everybody, as the number of parties involved, and there will be

16  a number of motion in lims on both sides, I'm sure, going to

17  the three issues that would be tried as of right now.

18          One other thing is, there could also be a potential

19  request to try to sever the trial between the primary and the

20  excess issues.

21          Again, we have not met and conferred about these

22  things.  It's all very preliminary.  I just wanted to throw

23  that out in the sense of procedural things where that might be

24  in the pipeline or things to consider.

25          THE COURT:  On the procedural question, I frankly

1  didn't understand the opposition to the motion to withdraw the

2  reference.  Given that Judge Jones was done with the case, I

3  don't know why it's premature to move to withdraw the

4  reference.  I know that objections are going to be filed, but

5  those are filed with me, right?

6          MS. ROMEO:  Yes, your Honor.  I think, from our

7  perspective, the most important thing is that the objections

8  are to be reviewed *de novo*, and that's our position.  It's

9  something that both sides have been going back on, back and

10  forth on.  And I think, practically, if you withdraw the

11  reference, which you indicated you are going to do, then we

12  would just file our objection here, both sides.  Then file the

13  responses.  And then your Honor will decide those and that will

14  be how the case moves forward.

15          THE COURT:  Ms. Romeo, if you know, is it like a

16  magistrate judge R&R in that as to which there is objections,

17  it's *de novo* review and those with respect to which there are

18  no objections, it's basically abuse of discretion are clearly

19  erroneous?

20          MS. ROMEO:  It's akin to that, correct.

21          MR. CHOPRA:  That's largely right, meaning there is

22  now a report and recommendation with these rulings and there

23  are going to be objections and responses.

24          There are some rulings within that report and

25  recommendation that the trust is going to take the position

1    it's not *de novo* review, and I think that will be addressed in

2    objections and response briefs, and then you will make that

3    decision.  That's the only tweak I want to say.

4            It's not a perfect analogy to the magistrate because

5    the bankruptcy court has a broader jurisdiction over

6    interlocutory orders and anything that is not final.  We will

7    address it in our papers.  I don't want to reopen something --

8            MS. ROMEO:  Going along with that, we take different

9    positions on that, and your Honor will see that in the

10   objections.  But I do think that is also part of this motion

11   and the objection which we mention in our response.

12           MR. CHOPRA:  Your Honor, I think, procedurally, you'll

13   decide these objections and responses.  And assuming that they

14   go the way the motions went in the bankruptcy court, there will

15   be many coverage issues decided, but there will be several

16   issues that will require a finder of fact to be tried.

17           What the trust would request is that we schedule a

18   hearing at some point soon where we could have a scheduling

19   conference where we talk about getting a trial date scheduled,

20   understanding that you'll be getting objections and you'll be

21   getting responses and you will take some time to rule on them.

22           Given the age of the case, our hope is that we can get

23   a trial date as soon as is available so that once those

24   objections are ruled upon, we could go straight into the

25   pretrial process.

1              MR. WALTERS:  Judge, we are in agreement with

2    Mr. Chopra about the scheduling conference to get a trial date,

3    given the length of this trial, potentially.  I think as much

4    lead time as we can get ahead of time with the trial setting,

5    it would benefit all the parties.

6              THE COURT:  OK.  Let me just ask briefly about that.

7              Mr. Chopra threw out the idea of a three-week jury

8    trial.  We can probably act pretty quickly to get something on

9    the calendar.

10             However, I guess I wonder how much variability is

11   there in the likelihood of a longer or a shorter trial based on

12   how I come out on the various objections?  In other words, is

13   there a world -- I know there is one that Mr. Chopra mentioned.

14   But sort of based on other possible outcomes, is there a world

15   where it's a one-week trial, two-week trial, four-week trial,

16   such that I should wait before scheduling the trial until I

17   rule on the objections?

18             MR. CHOPRA:  That's a very fair question.  There is a

19   motion about the reasonableness of the Kessler settlement

20   that's a heavily fought factual issue.  If you rule that

21   reasonableness is not a defense the insurers can raise, then

22   the trial would shorten considerably.  On the other hand, just

23   to be evenhanded, if you rule on some of these exclusions,

24   there is not much of a trial left because only defense costs

25   would be available for the trust.

1          I guess what I would respectfully request is that

2    knowing the volume of paper you are about to receive through

3    the objections and responses process with someone who has lived

4    through this case for seven years, having a conference with you

5    some time in the next month or so to set a trial date that,

6    admittedly, it may shorten, depending on how you rule, I

7    respectfully still request to get on your calendar for 2024,

8    honestly, so that we have an end date for this case.

9          MR. WALTERS:  Your Honor, Mr. Chopra is right.  With

10   respect, there are two -- the reasonableness motion.  There is

11   one that's a procedural motion that has been heavily briefed

12   that the insurers can't raise the reasonableness procedurally

13   of the Kessler settlement.  Then there is a second one about

14   its reasonableness as a matter of law.

15         Judge Jones said both of those were fact issues for

16   the reasons and there will be objections to each of those.

17         One of those, Mr. Chopra is right, that reasonableness

18   has to be tried.  Or if you should change Judge Jones' ruling

19   in that regard, that could shorten it somewhat.

20         THE COURT:  Ms. Romeo.

21         MS. ROMEO:  Your Honor, if I may.

22         I do agree with one thing Mr. Chopra said.  I think we

23   should perhaps set a conference to discuss the setting of a

24   date, which I don't think we should do today because I don't

25   think we are in a position to do that, to see who files what on

1   May 22 and to have an idea of what's before you.

2           Like Mr. Chopra said, there could be a lot of

3   variability here in terms of how this trial is going to shake

4   out, how long it's going to be, what's in, what's out.

5           And then the other thing I was going to say is, once

6   your Honor has had an opportunity to review the objections and

7   the responses and then render rulings on that, another thing we

8   think procedurally that we should have the deadlines for

9   preparing all of the related pretrial materials, the JPTO, the

10  motion in lim, which, again, we think will be plenty, and the

11  jury instructions to flow from that date once the decisions are

12  made on the objections.

13          We don't think we are in a position to set a trial

14  date today, particularly because we have not yet conferred

15  amongst ourselves, between the plaintiffs and defendants, to

16  see what we might be able to tell you to reasonably set such a

17  date.  I don't think we should do that today.

18          MR. CHOPRA:  We are stretching out a bit, so I

19  appreciate your patience, your Honor.

20          I wonder if we could request a conference after July

21  3.  At that point, all of the objections and responses will be

22  in.  You'll have a better sense of the volume of work you have

23  ahead of you, and, at the same time, it would give us an

24  opportunity soon, some time in July, hopefully, to be in front

25  of you to talk about scheduling issues.

1            I'm not suggesting we get a trial date today.  I am

2    just saying, there is some urgency on the plaintiff's part,

3    given the age of the case, that we get a trial date just so

4    that we don't miss out on the opportunity.

5            THE COURT:  That's fine.

6            MR. WALTERS:  We agree with Mr. Chopra with respect to

7    that scheduling conference being after the July filing.  You

8    will have a good sense at that point in time.

9            Obviously, according to your pretrial procedures, once

10   you rule on all those objections and all the dispositive

11   motions have been ruled, we drop right into your pretrial

12   procedures on your chambers' direction.  We think that's a good

13   idea.  The other set of plaintiffs do also.  If your schedule

14   permits us to talk again after July 3, soon thereafter, we

15   think that would be helpful.

16           THE COURT:  That's fine.  Do you want to come in and

17   do it in person?  Would that be helpful or is that too

18   complicated, given the number of people?

19           MR. WALTERS:  We would prefer Zoom.  We would probably

20   prefer Zoom, if that's something you would entertain.

21           MS. ROMEO:  We are OK with in person or remote.  We

22   are also fine with setting a conference to talk, once

23   everything is in.

24           MR. CHOPRA:  Your Honor, we can obviously do both, in

25   person or remote.  I would think the scheduling conference is

1    fine to do remote.

2          MR. SCHILLER:  Remote is fine for us as well, your

3    Honor.

4          THE COURT:  How does July 11 look for you all for a

5    scheduling conference?  That's a Tuesday.

6          MS. ROMEO:  Your Honor, that would be fine for me

7    currently.  I just would need to check with my colleague, Kent

8    Yalowitz, who unfortunately had to drop off the call at 3:30.

9    If I could just put that caveat in there.  From our

10   perspective, that would be OK.

11         MR. WALTERS:  I think July 11 would be fine, your

12   Honor, for us.

13         MR. CHOPRA:  Your Honor, that date works for the

14   trust.

15         MR. LAHR:  Gregory Lahr for the Lloyd's defendants.

16   That date would work for us.

17         MS. DUFFIELD:  Fine for Twin City as well.

18         THE COURT:  Anybody it does not work for?

19         Why don't we put it down for July 11, a conference --

20   can we make it 3 p.m. New York time?

21         MR. CHOPRA:  Thank you, your Honor.

22         MS. ROMEO:  Yes, your Honor.

23         MR. WALTERS:  Yes, your Honor.

24         THE COURT:  We will set it for 3:00 p.m. July 11.  I

25   will send out information.  It will either be by Microsoft

1  Teams or by phone.  I'll let you know in advance of the

2  conference.

3        Thank you, all.  That was helpful background.  I look

4  forward to your objections.  We will talk on July 11 at 3:00

5  p.m.  If that ends up not work for anyone, you can all just

6  propose another date in that week or the following week.  I

7  have a fair amount of openings those weeks.

8        Anything else anybody else wanted to raise today?

9        MR. ROSENTHAL:  Yes, your Honor.  Thorn Rosenthal from

10 Cahill.

11        Certain of the defendants filed objections already in

12 the bankruptcy court with respect to one of the motions.  Would

13 your Honor like us to refile them in the district court?

14        THE COURT:  Yes, if you would.  That would be great.

15        MR. ROSENTHAL:  Thank you.

16        THE COURT:  Anyone else?

17        Thanks, everyone.  This matter is adjourned.  Have a

18 good day.

19        (Adjourned)

20

21

22

23

24

25