UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————
ROWENA DRENNEN, *et al.*,
                                    Plaintiffs,

                    -v-

CERTAIN UNDERWRITERS AT
LLOYD'S OF LONDON, *et al.*,
                                    Defendants.
———————————————————————

23-CV-3385 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

This is an adversary proceeding filed against Certain Underwriters at Lloyd's of London,

as well as several other excess insurers, in the Chapter 11 bankruptcy case *In re Residential

Capital, LLC*, No. 12-12020 (Bankr. S.D.N.Y.).[1]  Before the Court is a Report and

Recommendation, comprising two opinions of the United States Bankruptcy Court for the

Southern District of New York, on cross-motions for summary judgment.  *Drennen v. Certain

Underwriters at Lloyd's of London* (*In re Residential Cap.*), 610 B.R. 725 (Bankr. S.D.N.Y.

2019) (Lane, J.); *Drennen v. Certain Underwriters at Lloyd's of London* (*In re Residential Cap.*),

Ch. 11 No. 12-12020, Adv. No. 15-1025, 2022 WL 17836560 (Bankr. S.D.N.Y. Dec. 21, 2022)

(Jones, J.).  As part of the Report and Recommendation, the bankruptcy court recommended that

partial summary judgment be granted in favor of Plaintiffs on the ground that Clause II.C.9 of

the policy (the "Fees Exclusion") does not bar Plaintiffs' claims.  (ECF No. 106-1 ("2019 Op.")

---

[1] The adversary proceeding is captioned as *Drennen v. Certain Underwriters at Lloyd's
of London*, No. 15-1025 (Bankr. S.D.N.Y.).  The current operative complaint is the Third
Amended Adversary Complaint.  (*See* Adv. No. 15-1025, No. 412 ("TAC").)  Unless otherwise
indicated, citations to the Electronic Case Filing (ECF) system are to the docket numbered 23-
CV-3385 in the United States District Court for the Southern District of New York, and page
numbers refer to those automatically generated by ECF in blue text.

at 33.)[2]  For the reasons that follow, the Court declines to adopt the bankruptcy court's Report and Recommendation with respect to the Fees Exclusion and, instead, grants partial summary judgment for Defendants on the applicability of the Fees Exclusion.

## I.    Background

The factual and procedural background of this case is well-documented.  (*See* 2019 Op. at 5-10; ECF No. 106-12 ("2022 Op.") at 8-14.)[3]  The Court adopts the Report and Recommendation's description of the background of the case, with which the Court assumes familiarity, and includes the following only as a "brief summary."  *See In re Madison Bentley Assocs.*, 516 B.R. 724, 726 n.3 (S.D.N.Y. 2014).

Plaintiffs comprise two groups of class action plaintiffs—the *Mitchell* Class and the *Kessler* Class (collectively, "Class Plaintiffs")—along with the ResCap Liquidating Trust (the "Trust").  Class Plaintiffs' claims arise from certain origination and closing fees (the "Fees") paid by members of those class actions in connection with second mortgages obtained from several lenders (the "Originating Banks").  (2019 Op. at 5.)  Class Plaintiffs asserted in the underlying lawsuits that the Fees were unlawful.  Residential Funding Company, LLC ("RFC"), "formerly known as GMAC-Residential Funding Corporation or Residential Capital Corporation," an indirect subsidiary of General Motors Corporation ("GM"), operated as a financial services company that purchased, packaged, and securitized or directly resold mortgages issued by the Originating Banks which had charged the Fees.  (*Id.*)  No one argues that RFC itself received or paid any of the Fees; instead, "the Class Plaintiffs sought to hold RFC

---

[3] When asked by Judge Jones at oral argument whether the parties disputed Judge Lane's characterization of the factual and procedural history of the proceeding, no party indicated an objection.  (*See* 2019 Op. at 8-9 n.4 ("No party objected or identified any reason not to incorporate these portions of Judge Lane's decision."))

derivatively liable for the acts of the Originating Banks pursuant to 15 U.S.C. § 1641(d), and

directly liable for acts that RFC itself performed" after the Fees had been paid.[4]  (*Id.* at 6.)  In the

instant adversary proceeding, Plaintiffs seek to recover from RFC's insurers—Defendants in this

action—pursuant to a professional liability insurance policy (the "Policy").  (ECF No. 110-28.)[5]

### A.    Pre-Bankruptcy Proceedings

The *Mitchell* Plaintiffs sued RFC in the Circuit Court of Jackson County, Missouri,

alleging that RFC was derivatively liable for loans issued by the Originating Banks in violation

of state and federal law.  (ECF No. 92 ("Trust Obj.") at 15-16; 2022 Op. at 10-11.)  Following

trial, RFC was found liable, based on its own conduct in failing to exercise due diligence in

purchasing the loans from the Originating Banks, as well as derivatively liable based on the

Originating Banks' charging of the Fees.  (Trust Obj. at 17.)  RFC was ordered to pay

$4,329,048 in compensatory damages and approximately $92,000,000 in punitive damages.

(2019 Op. at 6.)  After losing at trial in the *Mitchell* class action, RFC paid $8,500,000 to settle

the related Missouri cases and incurred approximately $4,800,000 in defenses costs.  (Trust Obj.

at 18.)  The appellate court affirmed the compensatory damages award but vacated the punitive

---

[4] 15 U.S.C. § 1641(d) provides:  "Any person who purchases or is otherwise assigned a mortgage referred to in section 1602(aa) [defining "high-cost mortgage"] . . . shall be subject to all claims and defenses with respect to that mortgage that the consumer could assert against the creditor of the mortgage, unless the purchaser or assignee demonstrates, by a preponderance of the evidence, that a reasonable person exercising ordinary due diligence, could not determine, based on the documentation required by this subchapter, the itemization of the amount financed, and other disclosure of disbursements that the mortgage was a mortgage referred to in section 1602(aa) of this title."

[5] Unless otherwise noted, references to the "Policy" are to the Combined Directors and Officers Liability and Company Liability (Including Employment Practices Liability), Errors and Omissions Liability, Pension Trust Liability, and Mortgagees Errors and Omissions Insurance Policy, issued to General Motors Corporation by Certain Underwriting Members at Lloyd's of London.  (*See* ECF No. 106-4 ¶ 1.)  Other insurance agreements in this action are "follow-form" policies that do not differ in material respects from the Primary Policy.  (*See* ECF No. 66 ("Twin City Obj. re: Fees Excl.") at 9-11.)

damages award and remanded for retrial.  (2019 Op. at 6.)  RFC settled the compensatory

damages claims and related attorney's fees for $15,648,868.12, and after filing for bankruptcy in

2012, it settled the punitive damages claims for $14,500,000.  (*Id* at 6-7.)

The *Kessler* litigation comprises several related class actions concerning the Fees charged

on second-mortgage loans that were consolidated under the multi-district litigation (MDL)

statute in the United States District Court for the Western District of Pennsylvania.  (Trust Obj.

at 18.)  The *Kessler* cases were pending when RFC filed for bankruptcy.

### B.    Bankruptcy Proceedings

"In May 2012, RFC filed for protection under Chapter 11 of the Bankruptcy Code."

(2019 Op. at 7.)  "In December 2013, the [bankruptcy court] confirmed a Chapter 11

plan . . . which, among other things, approved the [*Mitchell*] Settlement, resulting in an allowed

claim against the estate for $14.5 million" and assigned the Class the rights to pursue the claim

against RFC's insurers, which are defendants in this action.  (2022 Op. at 11.)  The bankruptcy

court also approved a settlement of the *Kessler* cases for $300,000,000, with approximately

$27,000,000 of that amount to be paid by RFC and the remainder amount assigned to the *Kessler*

Class as a claim against RFC's insurers.  (Trust Obj. at 18; Jones Op. at 146.)  That bankruptcy

plan also established the Trust "to liquidate and distribute RFC's remaining assets to unsecured

creditors, and assigned to the Trust any rights RFC had to recover $6.1 million from the Insurers

for defenses costs in the [*Mitchell*] Action, as well as RFC's rights to payment from the Insurers

for the $15.6 million in compensatory damages that RFC paid to the [*Mitchell*] Class before the

bankruptcy filing."  (2022 Op. at 11.)  The Trust was also assigned the right to recover

$4,800,000 in defense costs that RFC incurred in defending and settling the related Missouri

cases.  (Trust Obj. at 18.)

As part of the plan, the *Kessler* settlement "became an allowed claim and was approved by the Bankruptcy Court." (*Id.*) Like in the *Mitchell* class action, the Trust was assigned any right of RFC to recover $7,900,000 in defense costs sustained defending the *Kessler* litigation, as well as the $4,800,000 in defense costs sustained in defending and settling the related Missouri actions. (*Id.* at 18, 27.) The *Kessler* settlement and the *Mitchell* punitive damages settlement were assigned to the *Kessler* Class and *Mitchell* Class, respectively. (*Id.* at 26-27.) The Trust was assigned all other insurance rights, including the above defense costs and "the cost of the *Mitchell* appeal bond; RFC's payment of the *Mitchell* compensatory damages judgment and the *Mitchell* plaintiffs' attorney' fees award; and RFC's payment of the settlements in the Related Missouri Actions." (*Id.* at 27.)

On February 4, 2015, Plaintiffs filed an adversary complaint in the bankruptcy court seeking declaratory judgments and money damages for liabilities owed to the *Kessler* and *Mitchell* Classes; defense costs in defending the *Kessler* and *Mitchell* actions and related actions; punitive damages; and costs and attorney's fees in the present litigation. (ECF No. 106-14 ("Adv. Compl.") at 68-70.) The current operative complaint is the Third Amended Complaint, which, in addition to the relief sought in the original complaint, also seeks from Lloyd's and the Excess Insurers consequential damages stemming from lost prejudgment interest, attorney's fees, and other recoverable consequential damages suffered by RFC and the Plaintiffs. (ECF No. 110-27 ("TAC") at 102-05.)

### C.    First Motion to Withdraw Bankruptcy Reference

Soon after Plaintiffs filed the original adversary complaint, on April 8, 2015, Defendants moved to withdraw the bankruptcy reference. (Ch. 11 No. 12-12020, No. 8063; Case No. 15-CV-2712, ECF No. 1.) Plaintiffs opposed that motion, arguing that the proceedings at issue were "core" and that judicial efficiency compelled permitting the bankruptcy court to pass first on the

insurance coverage issues.  (Case No. 15-CV-2712, ECF No. 50.)  This Court held that, though

the present proceedings against the Insurers are "non-core," "[w]ithdrawing the reference at

[that] stage of the proceeding would cause undue delay to the parties and would waste judicial

resources."  *In re Residential Cap., LLC*, No. 15-CV-2712, 2015 WL 9302834, at *4-5

(S.D.N.Y. Dec. 21, 2015).  The parties returned to the bankruptcy court, which "for eight

years . . . supervised the entirety of all pretrial activities, including fact and expert discovery and

dispositive motions." (Trust Obj. at 11.)  Those proceedings concluded in the parties' filing

several "motions for summary judgment," including "briefs and statements of undisputed fact,

detailed responses and replies to both, and hundreds of exhibits and deposition excerpts."  (*Id.*)

The bankruptcy court "also heard nearly two days of argument on those motions," based on

which Judges Lane and Jones issued preliminary rulings on the motions for summary judgment

that constitute the Report and Recommendation now before this Court.  (*Id.*)

      **D.**    **Second Motion to Withdraw Bankruptcy Reference**

Following the bankruptcy court's issuance of the Report and Recommendation, Plaintiffs

moved to withdraw the bankruptcy reference on April 21, 2023.  (ECF No. 1.)  Defendants did

not oppose the motion outright—agreeing that "this case must return to the District Court

because the Bankruptcy Court is without constitutional authority to conduct a trial in this case (if

one is required) or to enter a final judgment on any claim"—but asked that it be held in abeyance

pending the resolution of objections in the bankruptcy court.  (ECF No. 6 at 1-2.)  This Court

granted the motion to withdraw on May 12, 2023, agreeing that the bankruptcy court had

"finished its work and completed the Report and Recommendation," and set a schedule for filing

objections—including refiling those already filed in the bankruptcy court.  (ECF No. 29.)

Dozens of objections and responses were filed from May to July 2023.

## II.    Legal Standards

### A.    Review of the Bankruptcy Court's Report and Recommendation

"Where a bankruptcy court acts in a noncore proceeding, a final order may be issued only in one of two ways: by the district court after *de novo* review of the bankruptcy court's proposed factual findings and legal conclusions; or by the bankruptcy court with the consent of the parties." *Central Vt. Pub. Serv. Corp. v. Herbert*, 341 F.3d 186, 191 (2d Cir. 2003) (citations omitted).  Here, the parties did not consent to final disposition by the bankruptcy court.  (*See* ECF Nos. 4 at 2; 6 at 1.)  Therefore, this Court must "make a de novo review upon the record or, after additional evidence, of any portion of the bankruptcy judge's findings of fact or conclusions of law to which specific written objection has been made in accordance with this rule."  Fed. R. Bankr. P. 9033(d); *see also In re Madison Bentley Assocs.*, 516 B.R. at 726 (S.D.N.Y. 2014). "The district judge may accept, reject, or modify the proposed findings of fact or conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge with instructions." Fed. R. Bankr. P. 9033(d).

### B.    Summary Judgment

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is appropriate only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In making this determination, a court must "resolve all ambiguities and draw all permissible inferences in favor of the party against whom summary judgment is sought."  *Friend v. Gasparino*, 61 F.4th 77, 84 (2d Cir. 2023) (quotation marks omitted).

### C.      Insurance Contract Interpretation

Everyone acknowledges that either Michigan or New York law governs the present cross motions.  (2019 Op. at 12-13; 2022 Op. at 16-17.)  However, "the parties agree that there is no conflict between Michigan and New York law regarding the basic principles of contract interpretation at play in this motion."  (Twin City Obj. re: Fees Excl. at 16.)  "Under New York law, 'an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract.'"  *Morgan Stanley Grp. Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000) (quoting *Vill. of Sylvan Beach v. Travelers Indemnification Co.*, 55 F.3d 114, 115 (2d Cir. 1995)).  "If the provisions are clear and unambiguous, courts are to enforce them as written."  *Vill. of Sylvan Beach*, 55 F.3d at 115.  It is when "the policy language is ambiguous, particularly the language of an exclusion provision," that "the ambiguity must be interpreted in favor of the insured."  *Id.* (citing *Marino v. N.Y. Tel. Co.*, 944 F.2d 109, 112 (2d Cir. 1991).  "An insurance policy should be read in light of common speech and the reasonable expectations of a businessperson."  *Parks Real Est. Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (quoting *Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co.*, 788 N.Y.S.2d 142, 144 (2d Dep't 2004)) (cleaned up).

In cases like these, "[t]he insurer generally bears the burden of proving that the claim falls within the scope of an exclusion."  *Vill. of Sylvan Beach*, 55 F.3d at 115.  "To negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case."  *Id.* at 115-16 (quoting *Sea Ins. Co., Ltd. v. Westchester Fire Ins. Co.*, 51 F.3d 22, 26 (2d Cir 1995) (quotation marks omitted)).  This principle is also known as "*contra proferentem*," and applies to resolve ambiguities in insurance contract interpretation against the

insurer. [6]  *See Morgan Stanley*, 225 F.3d at 275-76.  But Defendants argue that *contra*

*proferentem* is wholly inapplicable in this case due to "GM's size and sophistication, and the

_____

[6] Because no party argues that *contra proferentem* should govern here, the Court is not bound to construe any ambiguities in favor of coverage.  However, for the avoidance of doubt, a discussion of the case law in this Circuit will help to explain the Court's conclusion that where an insurance contract is unambiguous—as it finds the Fees Exclusion to be—the *contra proferentem* canon is wholly inapplicable.  In other words, "*contra proferentem* does not come into play unless this court first determines that the contract is, in fact, ambiguous."  *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 616 (2d Cir. 2001) (citing *Wallace v. 600 Partners Co.*, 86 N.Y.2d 543 (N.Y. 1995)).

The Second Circuit has called the "clear and unmistakable language" test a "heavy burden."  *Sea Ins. Co.*, 51 F.3d at 26 (quotation marks omitted).  Still, the court should "find a word or phrase ambiguous, and hence subject to rules of construction against the drafter, only when it is capable of more than a single meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  *Id.*  (quoting *U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*, 949 F.2d 569, 572 (2d Cir. 1991) (cleaned up)).  More simply, courts "should not strain to create an ambiguity where, in common sense, there is none." Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes.* 19 (19th ed. 2019) (quoting *Farm Bureau Mut. Ins. Co. v. Laudick*, 18 Kan. App. 2d 782, 784 (1993)).  Thus, for example, even if a particular phrase appears ambiguous—and accordingly susceptible to construction against the insurer—if its context reveals only one reasonable meaning, a court is to accord the text that meaning.  *Farm Bureau Mut. Ins. Co.*, 18 Kan. App. 2d at 27 ("When we consider [the] exclusion in 'the context of the entire integrated agreement' and with reference to the policy's 'risk, subject matter and purpose,' the apparent ambiguity of the phrase disappears, and it becomes evident that only one reasonable interpretation is possible.'").  Moreover, an exclusion that "a little clumsily" incorporates another clause's definition is not fatally ambiguous, since "crystalline clarity" is not required before an exclusion is interpreted to bar coverage.  *Id.* at 27-28.  Instead, a term is ambiguous only "if reasonable minds could differ as to its meaning."  *Haber v. St. Paul Guardian Ins. Co.*, 137 F.3d 691, 695 (2d Cir. 1998) (citing *Werbungs Und Commerz Union Astault v. Collectors' Guild, Ltd.*, 930 F.2d 1021, 1026 (2d Cir. 1991)).

More recent decisions by the Second Circuit emphasize that the rule of *contra proferentem* does not kick in until after other methods of contract interpretation—including analysis of the plain meaning and consideration of extrinsic evidence—are exhausted.  *See, e.g.*, *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012) ("If the extrinsic evidence fails to establish the parties' intent, courts may apply other rules of contract interpretation, including New York's rule of *contra proferentem*, according to which ambiguity should be resolved in favor of the insured."); *Inc. Vill. of Old Westbury v. Am. Alt. Ins. Corp.*, 710 Fed App'x 504, 505 (2d Cir. 2018) (summary order) (same); *Catlin Specialty Ins. Co. v. QA3 Fin. Corp.*, 629 Fed. App'x 127, 129-30 (2d Cir. 2015) (summary order) (assuming the same *arguendo*).  While older cases "describe the rule's earlier and more rigid application," now, *contra proferentem* "is used only as a matter of last resort after all aids to construction have been

drafting history." [7]  (ECF No. 78 ("Swiss RE Obj. re: Fees Excl.") at 17.)  Plaintiffs agree, or at

least explicitly decline to controvert Defendants' assertion that the canon does not apply here.

The Trust "has not [argued] and does not argue that *contra proferentem* applies in this case,"

though it does dispute the Defendants' characterization of GM's role in drafting the relevant

language.  (ECF No. 176 (Trust Resp. re: Fees Excl.) at 56 n.44.)  Class Plaintiffs similarly do

not "invoke or rely upon *contra proferentem*."  (Class Resp. re: Fees Excl. at 42.)  Thus, if the

plain meaning of the Policy is clear, this Court's inquiry is at its end.

## III.    Discussion

The coverage at issue arises out of Insuring Clause I.D.(a) of the Policies for errors and

omissions liability.  (*See* ECF No. 110-28 ("Primary Policy") at 14.)  The Insuring Clause states:

---

employed but have failed to resolve the ambiguities in the written instrument."  *U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*, 949 F.2d at 573.

The parties in this case have for years, and most recently in the bankruptcy court, urged significantly different interpretations of the Insuring Clause, the Fees Exclusion, and the Deemer Clause.  But "ambiguity does not exist 'simply because the parties urge different interpretations.'"  *Hugo Boss Fashions*, 252 F.3d at 616 (quoting *Seiden Assocs. Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992).  "Rather, the question of whether an insurance policy is ambiguous is a matter of law to be determined by the court."  *Id.* (cleaned up).  In sum, to prevail or to proceed past summary judgment, insureds must at least put forward a reasonable interpretation of relevant contract language that results in coverage for the claims at issue.  *Contra proferentem* is a canon that selects among reasonable interpretations, not unreasonable ones.

[7] It is true that some courts hold that "the principle [of *contra proferentem*] is not applicable in [cases] where sophisticated parties bargained over the terms of an insurance contract."  *Caitlin Specialty Ins. Co. v. QA3 Fin. Corp.*, 36 F. Supp. 3d 226, 342 (S.D.N.Y. 2024).  But other cases, and the ones cited in *Caitlin*, emphasize more than just the insured's sophistication when refusing to apply the *contra proferentem* principle, such as the plaintiff's preparation of the contract language and equal bargaining power between the parties.  *See, e.g.*, *Cummins, Inc. v. Atl. Mut. Ins. Co.*, 867 N.Y.S.2d 81, 83 (1st Dep't 2008).  In any event, all of the parties agree that *contra proferentem* does not apply, and so the Court is not constrained to construe ambiguity—though it ultimately finds none—in the contract language against the Insurer Defendants.

> Underwriters shall pay on behalf of the Assureds:
>
> (a) Loss which the Assureds shall become legally obligated to pay by reason of any Claim first made against such Assured during the Policy Period resulting directly from a Wrongful Act committed by a Professional Liability Assured or by any person or entity for whose conduct a Professional Liability Assured is legally responsible in rendering or failing to render Professional Services . . . .

*(Id.*)  It is undisputed that RFC was both an "Assured" and a "Professional Liability Assured" under the Policies.

The Policies contain a number of exclusions, including the Fees exclusion, which excludes from coverage any claim

> for premiums, return premiums, *fees*, commissions, costs, expenses or other charges paid or payable by or to the Assured . . . .

(*Id.* at 27 (emphasis added).)

Begin where the parties agree.  *First*, "fees" includes the Fees charged by the Originating Banks giving rise to RFC's liability in the prepetition litigation in this case.  (Trust Obj. at 16.) *Second*, RFC—but not the Originating Banks—is an "Assured."  (*See id.* at 21.)  And *third*, RFC did not pay or receive any of the Fees in question.  (2019 Op. at 19 n.12.)  Thus, the text of the Fees Exclusion on its own does not reach the type of liability for which Plaintiffs seek coverage from the Insurer Defendants.  Instead, the Insurer Defendants argue that the scope of the Fees Exclusion is expanded by the "Deemer Clause,"[8] which provides:

---

[8] Class Plaintiffs argue that there is significance in calling this clause a "deemer" clause, as opposed to a "legally responsible" clause, since the former implies that the clause operates to add a category of "Assured."  (*See* ECF No. 167 ("Class Pls. Resp. re: Fees Excl.") at 17 n.11.) The Court does not agree that the word "deem" implies that the clause operates only according to Plaintiffs' proposed interpretation, and refers to the clause as the "Deemer Clause" for the sake of consistency with the bankruptcy court orders.

> As used in the Exclusions set forth in Clause III.C, the term
> Assured includes any person or entity for whose conduct an
> Assured is legally responsible in rendering or failing to render
> Professional Services.

(Primary Policy at 30.)

Plaintiffs respond with three arguments.[9]  First, they argue that the Fees Exclusion's

requirement that fees be "paid or payable by or to *the* Assured" means the fees must have been

paid by or to the particular Assured claiming coverage.  (*See* ECF No. 176 ("Trust Resp. re: Fees

Excl.") at 26-33.).  On this question, the bankruptcy court agreed, recommending summary

judgment for Plaintiffs that the Fees Exclusion does not bar the recovery sought here.  (2019 Op.

at 16-27.)  Second, Plaintiffs argue that even if the Fees Exclusion might apply, it does not cover

---

[9] Class Plaintiffs, but not the Trust, argue additionally that the Fees Exclusion should not
bar coverage because the Insurers waived the defense to coverage, as the bankruptcy court found
the Insurers to have waived another exclusion, III.C(38), which also relies on the Deemer Clause.
(*See* Class Pls. Resp. re: Fees Excl. at 68-70.)  But the Class Plaintiffs did not make this
argument in their summary judgment briefing before the bankruptcy court.  (*See* Adv. No. 15-
1025, No. 337-2 at 33-35.)  In fact, Class Plaintiffs appeared to represent the opposite:  first, at
oral argument, that "we don't assert a waiver-or-estoppel argument" with respect to the Deemer
Clause, because "we don't think those are good arguments."  (Adv. No. 15-1025, ECF No. 358
("Oral Arg. Tr.") at 57:4-57:6, 57:13-57:14); and second, in their briefs, that "Defendant
Insurers[] [have] reli[ed] on the fee exclusions to deny coverage for the both [*sic*] the Kessler and
Mitchell Claims for the past 15 years"  (Adv. No. 15-1025, ECF No. 337 at 35).  Class Plaintiffs
also come close to saying the same before this Court earlier in their brief:  "Plaintiffs and
Insurers agreed that given the Insurers' extensive reliance on the Fees Exclusions to deny
coverage for RFC's claims for the prior decade plus, it made sense to file cross motions for
summary judgment and have the Bankruptcy Court resolve the issue."  (Class Pls. Resp. re: Fees
Excl. at 17.)  Class Plaintiffs have thus waived this argument, and, in the alternative, appear to
have conceded that the Insurers have repeatedly cited the Fees Exclusion to deny coverage.
Moreover, Class Plaintiffs cite the bankruptcy court's finding that Exclusion III.C(38) was
waived does not implicate the Deemer Clause, as the court held that, unlike the Fees Exclusion,
the entire substance of Exclusion III.C(38) was waived, not merely the question of the Deemer
Clause's applicability.  (*See* 2022 Op. at 36-38.)  So, Class Plaintiffs' argument is without merit
in any event.  But most importantly, because Class Plaintiffs affirmatively disclaimed the
argument below and no Defendant had the opportunity to brief it in this Court, it would be
particularly inequitable to consider the argument—tucked away in the final three pages of Class
Plaintiffs' brief—in resolving the motion for partial summary judgment.

the Fees at issue here because the RFC is not "legally responsible" for the conduct of the Originating Banks that charged the Fees. (Trust Resp. re: Fees Excl. at 39-52.) And third, Plaintiffs argue that the Deemer Clause requires the Originating Banks to have been rendering or failing to render Professional Services, which they were not. (*Id.* at 34-39.) The Court addresses each of these arguments in turn.

### A.    "The Assured"

The plain meaning of the Fees Exclusion and the Deemer Clause excludes coverage for fees paid to or received by an entity for whose conduct an Assured is legally responsible in rendering or failing to render Professional Services. In other words, the Deemer Clause modifies the Fees Exclusion. That is the result of the plain meaning: The Fees Exclusion references fees paid to or by "the Assured." The Deemer Clause singles out the exclusions, rather than Policy writ large, for an expanded definition of "Assured." Thus, the entities for whose conduct RFC is legally responsible in rendering or failing to render Professional Services are *included* in the definition of "Assured." So included, the article modifying "Assured" in the Fees Exclusion does not change the scope of what "Assured" includes, even if it changes which Assured is relevant for determining whether the exclusion applies.

For a simpler example, consider a homeowner's insurance contract that provided coverage for harm caused by a homeowner or their immediate family, but which excluded coverage for intentional harm caused by "*the* homeowner." Now imagine that, at the end of the exclusions portion of the contract, there was a "deemer clause" that said: "As used in the exclusions, the term 'homeowner' shall include *a* homeowner's immediate family." The most logical reading of those two provisions together would be that the policy excludes coverage for intentional harm caused by either the claimant homeowner *or* the claimant homeowner's immediate family, notwithstanding the use of the definite article in the exclusion text or the

indefinite article in the deemer clause text.  That would also square the exclusion with the coverage clause: there would be coverage for harm by the homeowner or their family, and an exclusion for intentional harm, again, by the homeowner or their family.  But Plaintiffs' approach would yield a different, counterintuitive result:  The agreement would cover harm caused by the homeowner or their immediate family, but—because in the exclusion "homeowner" is modified by "the"—the deemer clause would not expand the intentional-harm exclusion as broadly as the coverage provision.  Such an approach is at odds with not only the text, but also the structure, of the agreement.

The Trust points the Court to two insurance law treatises for the proposition that "[a]n exclusion's applicability to 'the insured' is limited to exclude coverage solely for the insured that engaged in the excluded conduct."  (Trust Resp. re: Fees Excl. at 27 (citing Allan D. Windt, *Insurance Claims & Disputes: Representation of Insurance Companies & Insureds* § 11:8 (6th ed. 2018); Randy J. Maniloff & Jeffrey W. Stempel*, General Liability Insurance: Key Issues in Every State* §§ 10.00-10.01 (3d ed. 2015).)  The Windt treatise, in the context of so-called "any insured exclusions," explains that some insurance contracts are written so that if any insured entity takes a particular action covered by the exclusion, the exclusion works to prevent coverage for every insured.  *See* Windt, *supra*, at § 11:8.  Naturally, then, when "exclusions are written to apply to actions taken by 'the' insured . . . , the exclusion would be inapplicable as to any insured that did not engage in the proscribed actions."  *Id.*  But like much of Plaintiffs' cited authority, that does not explain how to interpret a provision that applies to "the Assured" and then defines "Assured" to include related entities.  Instead, the Windt treatise stands for a rather uncontroversial proposition:  Insurance contracts use "the" and "an" to differentiate the effects of exclusions where multiple insured entities might take action to trigger an exclusion.  Maniloff &

Stempel similarly concerns coinsurance agreements, explaining the effect of an exclusion covering conduct by "an" or "any" insured on other insureds.  *See* Maniloff & Stempel, *supra*, at § 10:01.  But this is not a case about the effects of different insureds' conduct on one another.  It is a case about the effects of the conduct for which one insured is legally responsible on the insured's coverage.

Plaintiffs' cases track the same course.  For example, in *Vanguard Insurance Co. v. McKinney*, the Court of Appeals of Michigan rested on the difference between "an insured" and "the insured," but in the context of a homeowner's policy without anything resembling the Deemer Clause in this case.  *See* 459 N.W.2d 316, 320 (Mich. App. 1990).  The same goes for *Allstate Ins. Co. v. Mugavero*, in which the Court of Appeals of New York observed that "exclusionary clauses barring coverage of intentional harm by '*the* insured', rather than by '*an* insured', have been held to exclude coverage only for harm caused by the particular insured committing the act."  79 N.Y.2d 153, 164 (N.Y. 1992) (citation omitted).  That does not say anything about the situation where an exclusion refers to "the Assured," but then "Assured" is defined to include certain other entities.  In fact, these cases (and the rest cited by Plaintiffs and included in the Report and Recommendation) are compatible with the Insurer Defendants' preferred interpretation:  If RFC is "legally responsible" for "conduct" that involves receiving or paying an excluded fee, then it is "the Assured" that triggers the Fees Exclusion by virtue of the Deemer Clause.  (*See* ECF No. 66 ("Twin City Obj. re. Fees Excl.") at 19.)

The bankruptcy court stressed that "[e]very clause or word in an insurance contract is deemed to have some meaning," and so "the Court must consider the significance of the word 'the' in the Return of Fees Exclusion."  (2019 Op. at 19 (quoting *Wirth v. Liberty Mut. Ins. Co.*, 997 N.Y.S.2d 552, 554 (4th Dep't 2014).)  But the Deemer Clause's expansion of the definition

of "Assured" in the Fees Exclusion does not render the word "the" meaningless. Instead, that

word "means that the Return of Fees Exclusion applies only to 'the' Assured that engaged in the

excluded conduct" (2019 Op. at 19) *or* a person or entity for whose conduct an Assured is legally

responsible.[10] (*Cf. id.*) Moreover, that the second half of the Deemer Clause references "an"

Assured makes sense, since the Deemer Clause applies to several exclusions that may reference

one Assured, multiple Assureds, or all of the Assureds. In the context of the Fees Exclusion, the

Deemer Clause's application is straightforward: to exclude coverage for loss directly resulting

from fees paid to or by an Assured or an entity for whose conduct that Assured is legally

responsible in rendering or failing to render Professional Services.

The Trust argues that the purpose of the Deemer Clause is to add a fifth category of

Assured, *i.e.*, any entity for whose conduct an Assured is legally responsible in rendering or

failing to render professional services. (Trust Resp. re: Fees Excl. at 31; *see also* 2019 Op. at 19

n.11.) For starters, it is difficult to understand why the Policy would define a new category of

insured entity for the sole purpose of excluding coverage, since the purpose of the exclusions is

to remove coverage where it already existed. It would be surplusage to define a new category of

---

[10] It is almost certainly insignificant that, in the Deemer Clause, the second instance of "Assured" is modified by "an" rather than "the." To illustrate by example, consider the following sentence: "The term 'Party' includes a Party's counsel." To be sure, the article "a" is an indefinite article. But the only reasonable reading of the sentence is that "Party" includes that Party's counsel—*i.e.*, plaintiff as "party" would include plaintiff's counsel, and defendant as "party" would include defendant's counsel. In any event, that the second instance of "Assured" in the Deemer Clause is modified by "an," rather than "the," at most means that the Fees Exclusion bars recovering for liability based on fees paid to or by any person or entity for whose conduct *the* Assured—here, meaning RFC—is legally responsible in rendering or failing to render Professional Services. In that case, the claims at issue would still be excluded. Partial summary judgment is thus appropriate regardless of the interpretation of the latter half of the Deemer Clause because no reasonable reading of the text renders the Fees Exclusion inapplicable. *See Chock Full O'Nuts Corp. v. Tetley, Inc.*, 152 F.3d 202, 204 (2d Cir. 1998) ("Notwithstanding the existence of contractual ambiguities, summary judgment may be granted if under any of the reasonable interpretations the moving party would prevail.").

coverage for only the exclusions, since anything not previously covered by the Policy would be by definition unaffected by the exclusions.  In "the construction and interpretation of insurance contracts . . . words should be given the meanings ordinarily ascribed to them and absurd results should be avoided."  *World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 184 (quoting *Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986)). Business usage is relevant, as the Court is to examine the contract as would "a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  *Id.* (quoting *Morgan Stanley Grp. Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 275 (2000)).

But even that context aside, the Deemer Clause does not purport to add a "category" of Assured.  Instead, it refers to the "use[]" of "*the term Assured*" in the exclusions, changing its *linguistic* meaning rather than adding a *substantive* category of coverage.  The only faithful way to interpret that language is, upon encountering "Assured" in an exclusion, to include in the definition of "Assured" "any person or entity for whose conduct an Assured is legally responsible in rendering or failing to render Professional Services."

Reading the Fees Exclusion and Deemer Clause in the context of the Insuring Clause underscores the unreasonableness of Plaintiffs' interpretation.  The Insuring Clause extends coverage to loss which Assureds are legally obligated to pay by reason of any claim first made against such assured resulting directly from a wrongful act committed by a professional liability assured or any person or entity for whose conduct a professional liability assured is legally responsible in rendering or failing to render professional services.  The exclusions carve certain forms of loss out of that, including "fees" paid to or by the Assured.  And the Deemer Clause

17

defines "Assured," as used in the exclusions, as including "any person or entity for whose conduct an Assured is legally responsible in rendering or failing to render Professional Services." Read together, the operation of the three provisions is straightforward:  The insurance contract covers several types of losses—when incurred as a result of either the Assured's conduct or the conduct of a person or entity for which the Assured is legally responsible—and it excludes some types of losses, like fees—when paid to or by either an Assured or a person or entity whose conduct the Assured is legally responsible.

After reviewing the plain text of the Fees Exclusion and Deemer Clause, the bankruptcy court considered the effects of Defendants' proffered interpretation in the context of other exclusions in Section III.C.  The court focused in particular on Exclusion III.C.8(a), which excludes coverage for loss arising out of any wrongful act committed or Professional Services rendered after "revocation or surrender (voluntary or involuntary) of *the* Assured's charter or license to do business."  (2019 Op. at 26 (quoting Primary Policy at 27).)  The court determined that if Defendants were correct about the impact of the Deemer Clause on exclusions referencing "the Assured," then Exclusion III.C.8(a) would be "impossibly broad," because it would exclude coverage for any number of claims following the revocation of a license by any Assured.  (2019 Op. at 27.)  But that interpretation places too much weight on the interaction of the Deemer Clause and a single, other exclusion.

First, even the "impossibly broad" interpretation is consistent with the plain meaning of the terms as written, unlike the interpretation Plaintiffs have offered of the relevant clauses here. It may be that the plain meaning of Exclusion III.C.8(a), as modified by the Deemer Clause, is overbroad, but that does not mean that the interaction of the Deemer Clause and every other exclusion must be modified as a result.  That is especially the case where, as here, the Deemer

Clause does not render the Fees Exclusion "impossibly broad," but is logically consistent with the Insuring Clause: to exclude coverage for liability based on the receipt or payment of fees, regardless of whether that liability is primary or derivative.  Exclusion III.C.8(a) does not work the same way; it does not seek to eliminate a *type* of liability, but only liability occurring during a particular *time period.*  Because, by definition, only a single entity can commence the time period, *i.e.,* by losing its charter or license, the context of the exclusion may imply that only one entity may trigger the exclusion.  By contrast, the Fees Exclusion does not exclude coverage once any Assured pays or receives a fee but excludes specific liabilities when they arise from the payment or receipt of specific fees.  Thus, because multiple types of entities may incur that particular type of liability, the context does not similarly imply that the Fees Exclusion may be triggered by only one particular entity.  In other words, interpreting Exclusion III.C.8(a) is not really about "the" or "an," but about the Deemer Clause.  For example, if the exclusion said, "*an* Assured's charter or license to do business," the same problem would arise:  If an entity for whose conduct an Assured is legally responsible in rendering or failing to render Professional Services loses its license or charter, would that forever exclude coverage for the responsible Assured as a result of the Deemer Clause?  Simply, whether "Assured" in Exclusion III.C.8(a) is modified by "the" or "an," its context may suggest that the Deemer Clause does not reach it.

Moreover, Defendants do not argue that the phrase "the Assured" means *any* Assured.  Instead, they argue that "the Assured," as used in the exclusions, includes entities for whose conduct an Assured is legally responsible in rendering or failing to render Professional Services.  In that way, Exclusion III.C.8(a) works the same as the Fees Exclusion:  "[T]he Assured," in the context of the exclusion, covers the Assured claiming a loss as well as entities for whose conduct it is legally responsible in rendering or failing to render Professional Services.  It may be a harsh

outcome that one of those entities' losing a charter or license to do business forecloses coverage for the Assured for subsequent loss, but that does not mean that the Deemer Clause cannot apply any time the phrase "the Assured" appears in an exclusion.  It may not even be "impossibly broad," since the parties could well have contemplated that if an entity for whose conduct an Assured is legally responsible in rendering or failing to render Professional Services loses its license or charter, the Assured can no longer avail itself of its professional liability insurance. But even assuming overbreadth, the special context of Exclusion III.C.8(a) is what would lead a court to refrain from applying the Deemer Clause or to limit the effect of the exclusion notwithstanding the plain meaning of the text.

The bankruptcy court also pointed to Exclusion III.C.3, which excludes coverage for liability assumed by "the Assured" by agreement unless the liability arises in one of three scenarios:  The liability would have attached to "the Assured" in the absence of such an agreement; arises from "the Assured's" failure to perform; or is expected or intended by "any Assured" and results from any breach of contract.  (2019 Op. at 27 (quoting Primary Policy at 23).)  The bankruptcy court interpreted Exclusion III.C.3 to "differentiate" between parties using "the" and "any" to refer to "Assured."  (*Id.*)  But again, Defendants' interpretation does not require that there be no difference in meaning between "the" and "any," only that the term "Assured"—however it is modified—bring with it the entities defined by the Deemer Clause. And the context of Exclusion III.C.3 supports that interpretation, since, like the Fees Exclusion, Exclusion III.C.3 attempts to limit a *type* of liability—that which is assumed by contract.  The plain meaning is that if an Assured—or an entity for whose conduct it is legally responsible per the Deemer Clause—assumes liability by contract, that liability is not covered.  And limiting the first two exceptions to that exclusion—for inevitable liability in the absence of such an

20

assumption and liability from failure to perform—to "the Assured" makes sense, since an Assured's or its Deemer Clause entities' contractually assumed liabilities should not have an effect on the coverage of other Assureds. But the last exception to the exclusion, for "[l]oss which is expected or intended by any Assured and which results from any breach of contract," creates a broad limitation of the exclusion: All intentional or knowing "Losses"—not just liabilities—caused by a breach of contract are not excluded. The first two exceptions deal with particular liabilities with respect to particular contracts, while the third exception deals with the broader category of Loss from any contract that may affect any Assured.

Likewise, the difference in uses of "the" and "any," aside from differentiating the effects of certain contract-based liabilities *among* Assureds, is also more easily explained by the parallelism in the exclusion's exceptions: The first two exceptions refer to "such contract" and "the Assured," while the final exception refers to "any contract" and "any Assured." Put another way, the first two exceptions are concerned with particular contracts and liabilities, while the third exception is concerned with any type of contract. No matter how one slices it, though, the other exclusions do not suggest that the Fees Exclusion is unmodified by the Deemer Clause, as the Policy's plain meaning requires.

The Court concludes that the Deemer Clause unambiguously applies to the Fees Exclusion notwithstanding that exclusion's use of the definite article "the" before "Assured."

### B.    "Legally Responsible"

Plaintiffs' first argument in the alternative is that the Deemer Clause applies only to persons or entities "for whose conduct an Assured is legally responsible," and that "legally responsible" requires supervision or control rising to the level of agency. (Trust Resp. re: Fees Excl. at 39.) Plaintiffs ask for a particularly stringent definition of the term "legally responsible"—not that an agency relationship may give rise to legal responsibility, but that an

agency relationship is required to give rise to legal responsibility.  Under Plaintiffs' formulation,

one is "legally responsible" for another only when one has the authority to control the other's

conduct, and whenever they lack that authority, there is definitionally no legal responsibility for

their conduct.  The Court concludes that this first alternative argument was waived and, on the

merits, is an incorrect interpretation of the phrase "legally responsible" as used in the Deemer

Clause.

### 1.    Waiver

As a preliminary matter, Defendants are correct that Plaintiffs waived the argument that

RFC was not "legally responsible" for the conduct of the originating banks.  (*See* Swiss RE

Resp. re: Fees Excl. at 29, 31.)  In fact, at oral argument before Judge Lane, counsel for Class

Plaintiffs explicitly conceded RFC's legal responsibility, saying first, "[T]he legal responsibility,

we don't contest, under 1641(d), this legal responsibility that RFC was legally responsible for

what the originating banks did.  We don't contest that."  (Bankr. S.D.N.Y. Adv. No. 15-01025,

ECF No. 358 ("Oral Arg. Tr.") at 75:20-75:23.)  Counsel for Class Plaintiffs continued:  "Under

1641(d), RFC is legally responsible for the conduct of the originating banks.  Not enough."  (*Id.*

at 76:8-76:10.)  And finally:  "[T]he plaintiffs say that they'd agree that RFC's legally

responsible for those originating banks, but as we said, that's not enough. . . . You had to be

doing it 'rendering or failing to render Professional Services.'"  (*Id.* at 86:2-86:6.)  After counsel

for the Class Plaintiffs concluded, counsel for the Trust purported to agree, saying, "I don't have

anything else to add to Mr. Walters' comments and discussion."  (*Id.* at 112:15-112:16.)

The Trust cites *See v. Government Employees Insurance Co.* for the proposition that a

party may raise an issue for the first time in responding to an objection to a Report and

Recommendation.  (*See* Trust Resp. re: Fees Excl. at 40 n.27.)  But the court in that case also

observed that "[d]istrict courts conducting *de novo* review 'ordinarily refuse to consider

arguments, case law and/or evidentiary material which could have been, but was not, presented

to the magistrate judge in the first instance.'"  No. 21-CV-547, 2023 WL 2731697, at *5 (quoting

*Santiago v. City of New York*, No. 15-CV-517, 2016 WL 5395837, at *1 (E.D.N.Y. Sept. 27,

2016), *aff'd*, 697 F. App'x 36 (2d Cir. 2017) (summary order)).  Moreover, Plaintiffs are not

trying merely to present a new argument to the Court here.  They are seeking to reverse a

position they articulated explicitly and repeatedly at oral argument on the pending motions.

In any event, for the reasons that follow, Plaintiffs are incorrect about the meaning of

"legally responsible" as used in the Deemer Clause.

### 2.    Definition of "Legally Responsible"

The parties agree that the first step in interpreting "legally responsible," as used in the

Deemer Clause but undefined in the Agreement, is to turn to the dictionary.[11]  (*See* Trust Resp.

re: Fees Excl. at 40; Swiss RE Obj. re: Fees Excl. at 32; Class Resp. re: Fees Excl. at 47.)  The

twelfth edition of *Black's Law Dictionary* defines "responsible" as "[m]orally *or legally*

answerable for the discharge of a duty, trust, debt, service, or other obligation."  *Responsible*,

*Black's Law Dictionary* (12th ed. 2024) (emphasis added).  The seventh edition—operative at

the time the Policy was written[12]—defines "responsibility" merely as "liability."  *Responsibility*,

*Black's Law Dictionary* (7th ed. 1999).  Under the related entry for "responsible," the seventh

edition goes on to quote H.L.A. Hart:

> [As for] the ambiguities of the word 'responsibility,' . . . it is, I
> think, still important to distinguish two of the very different things
> this difficult word may mean.  To say that someone is *legally*
> *responsible* for something often means *only* that under legal rules he
> is liable to be made either to suffer or to pay compensation in certain

---

[11]  The Court has reviewed definitions of the term "legally responsible" in every
dictionary cited by the parties, as well as other prominent legal dictionaries.

[12]  The Primary Policy indicates various execution dates in 2001 and 2002.  (*See* Primary
Policy.)

> eventualities.  The expression 'he'll pay for it' covers both these
> things.  In this *the primary sense of the word*, though a man is
> normally only responsible for his own actions or the harm he has
> done, he may also be responsible for the actions of other persons if
> legal rules so provide.

*Id.* (quoting H.L.A. Hart, *Changing Conceptions of Responsibility, in Punishment and Responsibility* 186, 196-97 (1968)) (alterations in original and emphasis added).  The dictionary quotes Hart, continuing:  "[T]he word simply means liable to be made to account or pay and we might call this sense of the word 'legal accountability.'"  *Id.*

The third edition of *Ballantine's Law Dictionary* contains a similar entry, defining "responsible" as "[u]nder obligation," "[u]nder liability," "[l]egally responsible," "[a]nswerable, legally or morally, for the discharge of a duty, trust, debt, service, or other obligation; accountable, as to a judge, master, creditor, ruler, or rightful superior; subject to obligations; bound."  *Responsible*, *Ballantine's Law Dictionary* (3d ed. 1969).  Notably, that definition excludes entirely any requirement of control, direction, or supervision.  So does the *Bouvier Law Dictionary: Compact Edition*, which explains that "responsibility ([or] responsible)" is "[m]ost often . . . a synonym for legal liability, because one is liable for acts or omissions for which one is responsible."  *[R]esponsibility ([R]esponsible)*, *Bouvier Law Dictionary: Compact Edition* (2011).

*Webster's Third New International Dictionary of the English Language Unabridged* defines responsible to have several different meanings, such as "likely to be called upon to answer"; "answerable as the primary cause, motive, or agent"; but also "liable or subject to legal review or in case of fault to penalties"; and "able to respond or answer for one's conduct and obligations."  *Responsible, Webster's Third New International Dictionary of the English Language Unabridged* (3d ed. 1993).

Though the dictionary entries are their own forceful evidence that "legally responsible" at least *permits* the theory of derivative liability advanced by Defendants here, case law provides further support. For example, in reviewing many of the same dictionary entries in the context of an insurance contract's use of the term "legally responsible," the Seventh Circuit explained that "[w]hen used in the legal sense, 'responsible' means roughly 'subject to some kind of liability.'" *Am. Fam. Mut. Ins. Co. v. Williams*, 832 F.3d 645, 648 (7th Cir. 2016). Similarly, in *Wyoming County, N.Y. v. Ins. Co. of N. Am.*, the Second Circuit determined that the state of Wyoming was "legally responsible" for conduct committed by a state employee because the state was "subject to liability because of [the employee's] acts or omissions" under state law. 518 F.2d 23, 25 n.2 (2d Cir. 1975) (quotation marks omitted). And in the criminal context, it is routine to say that "a defendant may be legally responsible for acts of coconspirators prior to the defendant's entry into the conspiracy," *see, e.g.*, *United States v. Blackmon*, 839 F.2d 900, 908-09 (2d Cir. 1988) (citing *United States v. Guillette*, 547 F.2d 743, 751 (2d Cir. 1976)), even though there is no way for the defendant in such cases to have controlled or supervised the prior acts.

Plaintiffs' proffered definitions do not compel a different result. The Trust points first to *Black's Law Dictionary*'s definition of "responsible" as "[h]aving a duty to be in charge of something or to look after someone or something." (Trust Resp. re: Fees Excl. at 41.) But that is the third definition of the term, ignoring the first, which again, defines the term to include being "legally answerable for the discharge of a duty, trust, debt, service, or other obligation." *Responsible, Black's Law Dictionary* (12th ed. 2024). Moreover, the edition of that dictionary that was operative at the time the Agreement became effective included the passage from Hart's discussion of the unique meaning of "*legally* responsible"—the precise phrase at issue. *See Responsible, Black's Law Dictionary* (7th ed. 2004). The Trust turns next to *Oxford English*

*Dictionary*, which Plaintiffs assert defines "Responsible" as "Being in charge of something; appointed to look after something." (Trust Resp. re: Fees Excl. at 41.) But, like *Black's Law*, *Oxford English Dictionary* contains many other definitions as well, such as "Answerable or liable to be called to account to another person for something." *[R]esponsible, Oxford English Dictionary*, https://www.oed.com/dictionary/responsible_adj?tab=meaning_and_use#25683765 (last accessed Oct. 11, 2024).[13]

Plaintiffs' cases fare no better. In *EnTitle Insurance Co. v. Darwin Select Insurance Co.*, the Sixth Circuit was asked to determine whether the plaintiff was "legally responsible for Direct Title as an *entity*." 553 Fed App'x 543, 546 (6th Cir. 2014) (unpublished opinion). The Court held that the plaintiff was not "legally responsible" for Direct Title because Direct Title was the plaintiff's agent for only particular professional services—not those giving rise to liability in the case. *Id.* at 546-47. But the distinction the Sixth Circuit relied upon was not that between agency and derivative liability; instead, it was that between direct liability and contractual liability via an agreement to indemnify: "[A] closing protection letter doesn't make EnTitle responsible for Direct Title's escrow activities, but it is an agreement to indemnify for loss in certain circumstances. . . . All of the foregoing supports the district court's conclusion that the wrongful acts of Direct Title at issue in this litigation were not committed by EnTitle or by an entity for whom [EnTitle] is legally responsible." *Id.* (quotation marks omitted). In other words, "legal responsibility" under that contract did not include "contractual liability for which

---

[13] That definition, out of context, does not control this situation for another reason: Even if "legally responsible" is to require agency, principals are not typically "*appointed* to look after" their agents. Thus, to read "legally responsible" as standing-in exclusively for Plaintiffs' chosen *Oxford English Dictionary* entry would result in a contract meaning advanced by neither party. That further supports the Court's conclusion that there is nothing in the Agreement, dictionary definitions, or case law that suggests that "legally responsible" refers exclusively to any one form of legal relationship.

EnTitle [was] responsible," in large part because if it had, "EnTitle should have readily reimbursed all of its customers who were victims of Direct Title's misappropriation, not just those who had [indemnification agreements]." *Id.* at 547. In fact, the court even observed that in a world where the indemnification agreements "were required by law . . . [or the defendant insurance company] had a say in the content of the [agreements], . . . then the context might dictate a contrary result. But none of those circumstances [was] present on the . . . record." *Id.*

Plaintiffs' next case, *Great American Insurance Co. v. General Accident Fire & Life Assurance Corp.*, held that a company had no "legal responsibility for the acts of the employees" of another. 321 F.2d 948, 952 (5th Cir. 1963). In that case, a policyholder (Power Company) was trying to recover on a contract with a vendor (Trees), under which Trees would transplant a tree, as well as insure and indemnify Power Company. *Id.* at 949. Trees' employee, a truck driver, was injured when a palm frond struck Power Company's overhead electrical lines. *Id.* He sued Power Company for failing to furnish a safe working environment, and Power Company assigned its right to seek insurance to Great American Insurance Company. *Id.* at 949-50. The insurance agreement in question required Power Company to have been "in[] the category of 'any person or organization legally responsible for the use', loading, unloading of the vehicle." *Id.* at 950. The court held that Power Company was not in such a category, because even though the driver was on its premises, generating potential legal liability, that liability did not flow in any way from the use of the truck. *Id.* at 952. In other words, "[p]hysical operational use of the vehicle, at least to some degree, by a party or by one for whose acts it has a legal responsibility is required to give the stranger the status of an . . . assured." *Id.* And importantly, in so holding, the Fifth Circuit actually contrasted a strict agency/employee relationship, writing: "Power Company . . . was not using the truck. Nor were any of its employees. . . . [No]r [was] anyone

for whom it had a legal responsibility . . . engaged in directing or supervising or controlling the use of the truck. . . . [I]t was not legally responsible on the usual doctrines of respondeat superior for their acts.  Nor was it responsible legally for the use of the truck."  *Id.*  It seems even that sheer liability would have been enough—consistent with Defendants' reading of the Agreement here—to constitute "legal responsibility," since in *Great American Insurance*, "the legal liability to employees of Trees or members of the public arises out of Power Company's duties in the transmission of electricity."  *Id.*  In sum, the Fifth Circuit was defining the scope and source of Power Company's liability, not the term "legally responsible," and it did so without any consideration of the requirements of agency.

Finally, Plaintiffs offer *Eastern Aviation & Marine Underwriters, Inc. v. McNeil*, a case that did at least "turn[] on the meaning of the phrase 'legally responsible.'"  865 F.2d 263 (table), 1988 WL 131664, at *1 (9th Cir. 1988) (unpublished opinion).  There, a prior owner of an aircraft who had negligently maintained it sought coverage for tort liability under an insurance contract that defined an "additional insured" to include "[a]ny person or organization that uses or is *legally responsible* for [the] aircraft."  *Id.*  The court held that the prior owner was not "legally responsible" because, in the context of the insurance agreement, legal responsibility should not be retroactive to protect a prior owner.  *Id.*  But importantly, the court said nothing about the sort of relationship between entities that would be required to give rise to legal responsibility.  Nor would it, since the prior owner had an even closer connection than an agency relationship—the prior owner directly committed the tort.  *See id.*  So, to say one who directly committed a tort is nevertheless not "legally responsible," as defined in an insurance agreement, because they committed the tort well before the agreement was signed, is to say nothing about what types of liabilities constitute legal responsibility.  Instead, all the court held was that the new owner "did

not intend to purchase coverage for . . . any other prior owner," and so the prior owner did not

constitute an additional insured.  *Id.*

Dictionary definitions and cases aside, the Trust also emphasizes that the Agreement here

required the Assured to be legally responsible *for* conduct, and that the word "for" creates a

requirement of supervision or control.  (Trust Resp. re: Fees Excl. at 41-42.)  But it is unclear

what preposition other than "for" would better provide the context for the legal dictionaries'

primary definitions of "responsible."  And the Trust is incorrect to say that the Deemer Clause

"uses 'responsible' to refer . . . to supervising others' conduct—when a person is 'responsible

*for*' someone else" (*id.* at 42), because such a reading does not match the Policy language.  The

Deemer Clause refers to legally responsibility for "conduct," not for an entity.  Where one is

responsible for an entity, it might make sense to presume that they have some control or

supervision over that entity.  But where one is merely responsible for conduct—and particularly

"legally responsible" for conduct—it is reasonable to say they are answerable for liability

generated by that conduct.

Plaintiffs argue finally that the Policy uses in different places "legally liable" and "legally

responsible," and thus that the terms must be given independent meanings.  (*Id.* at 34.)

Defendants counter that, had the drafters intended to make "legally responsible" require an

agency relationship, they could have done so, as the agreement "uses the words 'employees' and

'agents' in certain places . . . which shows the drafters were aware these words existed and

purposefully chose not to use them in Insuring Clause I.D. or the Legally Responsible Clause."

(Swiss RE Corrected Obj. re: Fees Excl. at 31-32.)  Moreover, Defendants argue that the final

Agreement was the product of the compilation of forms which may have used those terms

interchangeably and which no party saw the need to correct, which should not create the presumption of distinct meanings.  (*Id.* at 31 n.18.)

Even if "legally liable" and "legally responsible" are to have different meanings, it is not clear why "legally responsible" should take on the definition offered by Plaintiffs.  Indeed, as already described, nothing in the dictionaries or case law supports the restrictive interpretation that Plaintiffs urge here.  Moreover, other explanations for the difference in terms exist.  Consider one: that "responsibility" includes the potential for liability, not its certainty.[14]  But that distinction does not imply some difference in the degree of control, for "[a] promise to be 'responsible' for the contract of another is a guaranty rather than a suretyship."  *See id.* (quoting *Bickel v. Auner*, 9 Phila. (Pa.) 499).  Another possible difference could be akin to that in *EnTitle*, *i.e.*, that between a contractual obligation to indemnify a third party (not "legally responsible") and derivative liability for the conduct itself.

Moreover, the mere usage of similar terms in a contract does not require that the terms be given independent meanings if doing so requires an unreasonable interpretation of the agreement.  *See Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128 (2d Cir. 2001) (interpreting "arising out of" and "relating to" to have independent meanings).  Where that is the case, the Court is to afford a term—regardless of independent meanings—its "clear and unambiguous" meaning, even "to exclude . . . coverage," because in such a situation "the rules of interpretation . . . requiring ambiguities to be construed in favor of the insured are not

---

[14] *See Responsible: Definition & Legal Meaning*, The Law Dictionary, https://thelawdictionary.org/responsible/#:~:text=RESPONSIBLE%20Definition%20%26%20Legal%20Meaning&text=To%20say%20that%20a%20person,which%20he%20may%20be%20under. (last accessed Oct. 11, 2024) ("[T]o say that a person is 'responsible' means that he is able to pay a sum for which he is or may become liable, or to discharge an obligation which he may be under.").

implicated." *Id.* at 129.  And particularly important here, the hypothetical situation raised by

"legally liable" need not defeat the clear meaning of "legally responsible," since "a finding of

ambiguity [is not] appropriate, even assuming that a broad term might be ambiguous with respect

to its application to a hypothetical set of facts, where . . . the plain meaning of the phrase

unambiguously includes the actual situation for which overage is sought." *Id.*  Finally, with

respect to "legally liable," "the absence of a definition for a term does not render the term

ambiguous," since "[t]here is no rule of contract construction which requires that every term in

an insurance contract must be defined."  Ostrager & Newman, *supra*, at 20 (quotation marks

omitted).

That the term "responsible," "like many words[,] carries several definitions" (Trust Resp.

re: Fees Excl. at 41), does not create an ambiguity that should be resolved in favor of broader

coverage or permit the Plaintiffs to proceed past summary judgment.  That is because

Defendants' interpretation of "legally responsible" does not require that there be only one

meaning of the term.  Instead, Defendants submit that merely one way an entity may be "legally

responsible" for the conduct of another is through derivative liability of the sort that RFC

obtained as a result of purchasing the mortgages at issue here.  To be sure, an agency relationship

is one way that a person or entity may be legally responsible for the conduct of another.  *See,*

*e.g.*, *Johnson v. M. Melnick & Co., Inc.*, 104 F.3d 355, at *1 (2d Cir. 1996) (table) ("[I]t is well-

settled that an attorney is his client's 'agent and representative' and that a litigant is 'legally

responsible for his attorney's conduct.'" (quoting *Davidson v. Keenan*, 740 F.2d 129, 133 (2d

Cir. 1984))).  But as long as "responsible"—or, precisely, "legally responsible"—unambiguously

includes derivative liability, then there is no genuine dispute of material fact that RFC was

"legally responsible" for the Originating Banks' conduct.  And because no dictionary definition

31

or other cited authority suggests that "legally responsible" requires control, supervision, or agency, there is no ambiguity to construe against the insurer-drafter.

### C.    "In Rendering or Failing to Render Professional Services"

Plaintiffs' second argument in the alternative is that the Deemer Clause requires *the entity for whose conduct the Assured is legally responsible* to have been engaging in "rendering or failing to render Professional Services."  Because the Originating Banks were not "rendering or failing to render Professional Services" under the Policy, Plaintiffs contend, the Deemer Clause does not trigger the Fees Exclusion.  Defendants disagree, arguing that Plaintiffs' interpretation of the clause is ungrammatical and defies the purpose of the agreement.  (Swiss RE Obj. re: Fees Excl. at 37-38.)

Once again, the text of the Deemer Clause provides:  "As used in the Exclusions . . . the term Assured includes any person or entity for whose conduct an Assured is legally responsible in rendering or failing to render Professional Services . . . ."  (Primary Policy at 30.)  Plaintiffs argue that the phrase "in rendering or failing to render Professional Services" modifies not "legally responsible," but rather the earlier phrase beginning with "any person or entity."  But Plaintiffs' reading is simply not the natural reading of the language.  The ordinary meaning of the Deemer Clause is that it is the "Assured" that is "legally responsible"—that is, RFC—that must be "rendering or failing to render Professional Services."

Specifically, Plaintiffs argue that the phrase "in rendering or failing to render Professional Services" modifies the entire preceding noun phrase, "any person or entity for whose conduct an Assured is legally responsible."  (Trust Resp. re: Fees Excl. at 35; ECF No. 167 ("Cl. Pls. Resp. re Fees Excl.") at 58.)  But the basic structure of the sentence precludes the "in rendering" phrase from modifying "person," and stripping out the other modifiers shows why.  Taking everything out but the operative words in Plaintiffs' formulation yields nonsense:

"The term Assured . . . includes any person or entity . . . in rendering or failing to render Professional Services."  It is not even a matter of whether the phrase starting with "any person" "hangs together," as Plaintiffs argue.  Plaintiffs' construction is just not "the natural signification of the words."  *Cf. Lake Cty. v. Rollins*, 130 U.S. 662, 670 (1889).  Plaintiffs' interpretation would make sense without the word "in," converting the phrase into a participle phrase that would more naturally modify a preceding noun; in that case, the basic structure of the sentence would read: "The term Assured . . . includes any person or entity . . . rendering or failing to render Professional Services."  It is natural for persons or entities to be "rendering."  But they are not "in rendering."  And the Court must give meaning to the preposition "in" that precedes the gerunds "rendering or failing to render."[15]

Plaintiffs' reading also violates the "rule of the last antecedent," under which "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows."  *Lockhart v. United States*, 577 U.S. 347, 352 (2016) (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)) (omission in original).  Put another way, "qualifying words or phrases modify the words or phrases immediately preceding them and not words or phrases more remote, unless the extension is necessary from the context or the spirit of the entire writing."  *Id.* (quoting *Black's Law Dictionary* (10th ed. 2014)) (cleaned up).  The rule is foundational in the proper grammatical interpretation of legal text—the Supreme Court has used it since the

---

[15] Consider this example:  "The corporate board requires the CEO to participate in meetings with other officers whom the CEO supervises in running the company."  According to the Plaintiffs' approach to syntax, the final phrase, "in running the company," should modify "officers," since "officers whom the CEO supervises" supposedly "hangs together."  But "officers . . . in running the company" is nonsense.  On the contrary, "supervises" can be modified by "in running the company," meaning that the only syntactically plausible interpretation of the sentence is that if, as part of running the company, the CEO supervises an officer, the CEO must meet with that officer.

Founding, and it "reflects the basic intuition that when a modifier appears at the end of a list, it is easier to apply that modifier only to the item directly before it." *Id.* Of course, there are exceptions to the rule where a reader will "intuitively" carry the modifier past the last antecedent, such as in the case of "the laws, the treaties, and the constitution of the United States." *Id.* at 352. But that is because those terms "are often cited together" and "readers are used to" that configuration. *Id.* Most importantly, the rule cannot convert a grammatically or syntactically incorrect construction into a correct one.

Plaintiffs argue that this case belongs in that exceptional category because the modifier "directly follows a concise and integrated clause—here, 'any person or entity for whose conduct an Assured is legally responsible.'" (Trust Resp. re: Fees Excl. at 36 (cleaned up).) But as already explained, it would be ungrammatical for "in rendering or failing to render" to modify "person or entity." Conversely, it is proper for "in rendering or failing to render" to modify "is legally responsible," since one may generate legal responsibility in the course of rendering or failing to render something.[16] It is thus not just that the rule of the last antecedent comports with

---

[16] Plaintiffs' contention that "any person or entity for whose conduct an Assured is legally responsible" is a "concise and integrated clause," aside from defying the plain meaning, is grammatically incorrect. Strictly speaking, all clauses, including relative clauses, are incomplete without a subject and a verb. *See In re China Fishery Grp. Ltd.*, No. 16-11914, 2023 WL 2435701, at *11 (S.D.N.Y. Bankr. Mar. 8, 2023). And "in rendering or failing to render" could not be the subject of any clause, because it does not include a noun that performs a verb. So, to form a complete clause that "hangs together," "in rendering or failing to render" must modify a verb or verb phrase that has its own subject.

Now take the Deemer Clause in full: "[T]he term Assured *includes* any person or entity for whose conduct an Assured *is legally responsible* in rendering or failing to render Professional Services." The verbs—the two options for what "in rendering or failing to render" might modify—are italicized. "Includes" is obviously off the table, since the subject of that verb is "the term," and no one argues that a term would be involved in the rendering or failing to render of Professional Services. That leaves "is legally responsible," and the grammar works: The subject of the clause is "Assured," the verb (phrase) is "is legally responsible," and the modifier of that verb is "in rendering or failing to render Professional Services." That makes a complete clause. On the contrary, Plaintiffs' construction treats "person or entity for whose conduct an

a plain reading of the Deemer Clause; there is simply no other grammatically correct way to apply it.

Moreover, the phrase "any person or entity for whose conduct an Assured is legally responsible" is hardly the "concise and integrated clause" that Plaintiffs pretend it to be. If the Deemer Clause has a "concise and integrated clause" that is naturally modified by "in rendering or failing to render Professional Services," it is the five words that immediately precede the latter phrase: "an Assured is legally responsible . . . ." [17]

---

Assured is legally responsible" as one long clause. But "person or entity" is preceded by "includes," meaning "person or entity" is an *object*, not a subject. Its supposedly "concise and integrated clause" thus lacks an essential ingredient of even the most basic clause. And most unreasonable of all, it requires that "person or entity" be modified by "in rendering."

This is also why Plaintiffs' interpretation would work better without the word "in": Without "in," "rendering or failing to render" is a verb phrase, and "person or entity for whose conduct an Assured is legally responsible rendering or failing to render Professional Services," while awkward, would have all the ingredients of a complete clause. It would look even less awkward with a couple of extra commas: "person or entity, for whose conduct an Assured is legally responsible, rendering or failing to render Professional Services." But both versions illustrate the point that "in rendering or failing to render Professional Services" cannot modify "person whose conduct . . ." because, as used there, "person" is an object and cannot form a complete phrase with the verb phrase "in rendering or failing to render Professional Services," since the entire thing would lack a subject.

[17] Another way Plaintiffs might achieve their desired result—though they do not argue for it—is to read the "in rendering" phrase as modifying "conduct." Thus, one could rewrite the sentence to say, "As used in the Exclusions . . . the term Assured includes any person or entity for whose *conduct in rendering or failing to render Professional Services* an Assured is legally responsible." This reading is unreasonable because it requires rearranging the order of words and phrases in the sentence to achieve a result that the parties plainly did not write. The "plain meaning" of the words, which the Court is required to apply, includes their plain order. To do otherwise would also violate the rule of the last antecedent because there is nothing to suggest that the "rendering" phrase at the end of the sentence should modify anything other than what immediately precedes it. And that is to say nothing of the awkwardness of writing "conduct in rendering," where the subject of the gerund—"person or entity"—must be implied (*i.e.*, conduct in [such person's or entity's] rendering). Those issues, coupled with Plaintiffs' failure to advance the argument at all, make the question of whether the rendering phrase modifies "conduct" purely academic. But it is also an unnatural reading of the text, and to illustrate, consider one final example, even closer to the language at issue: "The term Law Clerk includes any lawyer or student for whose conduct a judge is responsible in managing cases." The only

The text aside for a moment, it would be surprising if the Agreement—which requires the rendering or failure to render of Professional Services to establish coverage in the first place—*permitted* coverage upon a finding of a lack of rendering or failing to render Professional Services by virtue of an exclusion. It would make the exclusion turn not upon what RFC was doing when it obtained liability—the way every other part of the contract works—but instead upon the activities of the source of the derivative liability. Most fundamentally, in the Deemer Clause, "the rule of the last antecedent is not overcome by other indicia of meaning," and as already described, the "context fortifies the meaning that principle commands." *Lockhart*, 577 U.S. at 352. But again, it is not just unreasonable and divorced from the context to read "in rendering or failing to render Professional Services" as modifying "person or entity"; it is ungrammatical. There is only one reasonable interpretation of the role of "in rendering or failing to render Professional Services" as used in the Deemer Clause: to require, in order for the Deemer Clause to be triggered, that the Assured have been rendering or failing to render Professional Services when it became legally responsible for the relevant conduct.

### D. Effect of the Deemer Clause on the Fees Exclusion

Given that the only reasonable interpretation of the Deemer Clause and the Fees Exclusion is that they exclude coverage claims for fees paid to persons or entities for whose conduct RFC was legally responsible in rendering or failing to render Professional Services, it remains only to apply that language to the request for coverage here. Plaintiffs do not dispute that, but for their arguments about the definite article, the meaning of "legally responsible" and the noun that "in rendering or failing to render Professional Services" modifies, the Deemer

---

fair reading of that sentence, aside perhaps from shuffling the words into a completely novel order, is that "in managing cases" modifies "a judge is responsible."

Clause expands the Fees Exclusion to bar coverage in this case.  (*See* Twin City Obj. re: Fees Excl. at 6.)  That has to be true, since Plaintiffs have already argued that RFC was at least derivatively liable for the fees charged by the Originating Banks, and that derivative liability arose in the course of rendering or failing to render Professional Services.  (Trust Obj. at 23.) Even though the Trust argues that liability, at least for the *Mitchell* action, arose from RFC's own conduct (Trust Resp. re: Fees Excl. at 45-52), that does not change that the fees that are the basis for that liability were paid to an entity for which RFC was legally responsible.  All that the Fees Exclusion concerns is the recipient or payer of the fees, not who bears ultimate liability for them. Thus, Defendants are entitled to partial summary judgment with respect to the Fees Exclusion, over which there is no genuine dispute of material fact.

## IV.    Conclusion

For the foregoing reasons, Defendants' objections to the bankruptcy court's Report and Recommendation are sustained in part, and Defendants' motion for partial summary judgment is GRANTED with respect to the Fees Exclusion.

Plaintiffs' motion for leave to file a motion for partial summary judgment is DENIED as moot.  The Clerk of Court is directed to close the motion at ECF No. 211.

The parties are directed to confer and file a joint status letter by October 21, 2024, regarding the effect of this decision on the remaining objections to the Report and Recommendation and the issues to be tried.

SO ORDERED.

Dated: October 11, 2024
        New York, New York

_____
                J. PAUL OETKEN
                United States District Judge